ACCEPTED
06-15-00076-CV
SIXTH COURT OF APPEALS
TEXARKANA, TEXAS
11/9/2015 4:47:09 PM
DEBBIE AUTREY
CLERK

No. 06-15-00076-CV

**In the Court of Appeals for the**
**Sixth Judicial District**
**Texarkana, Texas**

FILED IN
6th COURT OF APPEALS
TEXARKANA, TEXAS
11/10/2015 8:06:00 AM
DEBBIE AUTREY
Clerk

Texas Health and Human Services Commission, AND
Office of Inspector General,
*Appellants*,

v.

Antoine Dental Center,
*Appellee*.

On Appeal from the 200th Judicial District Court of Travis County, Texas
Cause No. D-1-GN-14-002229
*Hon. Amy Clark Meachum, Presiding*

### BRIEF OF APPELLANTS

| | |
|---|---|
| Respectfully submitted, | RAYMOND CHARLES WINTER<br>State Bar No. 21791950<br>Chief, Civil Medicaid Fraud Division |
| Office of the Attorney General | |
| CHARLES E. ROY<br>First Assistant Attorney General | REYNOLDS B. BRISSENDEN<br>State Bar No. 24056969 |
| JAMES E. DAVIS<br>Deputy Attorney General for Civil Litigation | NOAH REINSTEIN<br>State Bar No. 24089769 |
| | Assistant Attorneys General<br>Office of the Texas Attorney General<br>P.O. Box 12548, Capitol Station MC 056-1<br>Austin, Texas 78711-2548<br>Telephone: (512) 936-1709<br>Facsimile: (512) 370-9477<br>Raymond.Winter@texasattorneygeneral.gov |
| | *Attorneys for Texas Health and Human Services Commission and Office of Inspector General* |

**Submitted: November 9, 2015**          **ORAL ARGUMENT REQUESTED**

## IDENTITY OF PARTIES AND COUNSEL

Pursuant to Tex. R. App. P. 38.1(a), appellant presents the following list of all parties and names and addresses of counsel:

**Appellant/Defendant at District Court**: Texas Health and Human Services Commission and Office of Inspector General

**Counsel:**

Raymond C. Winter
Reynolds B. Brissenden
Noah Reinstein
Office of the Texas Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
Telephone: (512) 936-1709
Facsimile:  (512) 370-9477

**Appellee/Plaintiff at District Court:** Antoine Dental Center

**Counsel:** Jason Ray
Riggs & Ray, PC
506 W. 14th Street, Suite A
Austin, Texas 78701
Telephone: (512) 457-9812
Facsimile:  (512) 457-9066

# TABLE OF CONTENTS

**IDENTITY OF PARTIES AND COUNSEL** ....................................................... ii

**TABLE OF CONTENTS** ................................................................................. iii

**INDEX OF AUTHORITIES** .......................................................................... vi

**STATEMENT OF THE CASE** ........................................................................ 2

**STATEMENT REGARDING ORAL ARGUMENT** ....................................... 3

**ISSUES PRESENTED** .................................................................................... 3

**STATEMENT OF FACTS** ............................................................................... 4

    **I.**    **The Texas Medicaid program provides health care for the indigent, including limited orthodontia services.** ................................................ 4

    **A.**    **Medicaid provides a limited benefit for orthodontics.** ......................... 4

    **B.**    **Providers must obtain prior authorization by accurately and honestly representing that their patient has a severe handicapping malocclusion before they may request reimbursement for orthodontic services.** ................................................................................. 6

        **1.**    **Providers are required to rely on their education and training in making diagnoses, requesting prior authorization, and making claims for Medicaid reimbursement.** .................... 7

        **2.**    **"Ectopic eruption" is an exceedingly rare condition, and in the TMPPM the term is afforded the meaning generally understood in the practice of dentistry.** .................................... 8

    **II.**   **HHSC-OIG is responsible for protecting Medicaid from waste, fraud and abuse. OIG is required by law to impose a payment hold based on a credible allegation that a provider has committed Medicaid fraud.** ..................................................................................... 10

    **III.**  **Antoine billed Texas Medicaid for more than $8 million in orthodontia services over a three-year period, and OIG placed Antoine on payment hold.** ............................................................. 14

    **IV.**  **Antoine requested a hearing on the payment hold, and, after the**

**hearing and the ALJs' recommendation that HHSC order OIG to lift the hold, the EC reversed the PFD and ordered the hold to remain in place.**......................................................................19

**STANDARD OF REVIEW** ................................................................21

**SUMMARY OF THE ARGUMENT**..................................................24

**ARGUMENT** ....................................................................................25

    **I.**   **The EC acted within his discretion to correct misapplications of Medicaid law and policy by the SOAH ALJs.** ...................................25

        **A.**   **The proper interpretation of Texas Medicaid policy is a question of law to be determined by the EC. The EC properly interpreted Medicaid policy in harmony with the governing statutes and regulations, and Antoine has shown no basis for the Court to deviate from the EC's correct interpretation.**......................................................................27

        **B.**   **The EC's corrections of the ALJs' errors in interpreting Medicaid policy are entitled to respect from the Court.** ........29

    **II.**  **The EC did not exceed his authority in entering the AFO and Antoine cannot establish otherwise.**.....................................................32

        **A.**   **The ALJs misunderstood and misapplied Texas Medicaid law and policy and the EC corrected the misunderstanding with a proper construction of law and policy.**.........................33

            **1.**   **The rules of statutory construction govern questions of agency policy and administrative rules.**.............................37

            **2.**   **The ALJs ignored statutes, rules, and evidence and made fundamental errors in interpreting and applying Texas Medicaid policy. The misapplications were properly corrected by the EC.** ...........................................................38

        **B.**   **Substantial evidence exists to show that Antoine committed fraud or made willful misrepresentations necessary to maintain the payment hold. The EC properly corrected the ALJs' errors, and Antoine cannot establish that the EC exceeded his authority.** ...........................................................43

            **1.**   **Providers have a duty to know and follow law and policy.**

.............................................................................................44

    **2.**    **Dr. Kanaan's scoring pattern shows, at a minimum, he acted with conscious disregard or reckless indifference to the truth or falsity of his representations of patient conditions.** ...............................................45

    **3.**    **The ALJs compounded their errors by relying on "experts" who misunderstood and misapplied Texas Medicaid policy.** .................................................47

**III.**  **Every modification made in the EC's AFO is supported by substantial evidence and Antoine cannot establish otherwise.** .........49

    **A.**    **Finding of Fact No. 45**.................................................49

    **B.**    **Finding of Fact No. 46.**...............................................51

    **C.**    **Finding of Fact No. 47.**...............................................52

    **D.**    **Finding of Fact No. 48.**...............................................54

    **E.**    **Finding of Fact No. 49.**...............................................56

    **F.**    **Finding of Fact No. 50.**...............................................57

    **G.**    **Conclusion of Law No. 13.**.........................................58

**CERTIFICATE OF COMPLIANCE**................................................61

**CERTIFICATE OF SERVICE**.........................................................61

**INDEX OF APPENDIX**...................................................................62

# INDEX OF AUTHORITIES

**Cases**

*Akin v. Tex. State Bd. of Dental Exam'rs*, No. 03-14-00390-CV, 2015 WL1611803, (Tex. App.—Austin Apr. 9, 2015, no pet.hist.)..........................**24, 25, 26, 28, 43, 59**

*Atascosa Cnty. v. Atascosa Cnty. Appraisal Dist.,* 990 S.W. 2d 255 (Tex.1999)...**29**

*Bd. of Law Exam'rs v. Stevens*, 868 S.W.2d 773 (Tex. 1994), *cert. denied, Stevens v. Bd. of Law Exam'rs*, 512 U.S. 1206, 114 S.Ct. 2676 (1994)…………...............**22**

*Bd. of Trs. of the Emps. Ret. Sys. v. Benge*, 942 S.W.2d 742 (Tex. App.—Austin 1997, writ denied)..................................................................................**22**

*Boswell v. Brazos Electric Power*, 910 S.W.2d 593 (Tex. App.—Fort Worth 1995, writ denied)..................................................................................**37, 42**

*Bridgestone/Firestone, Inc. v. Glyn-Jones*, 878 S.W.2d 132 (Tex.1994)…….**38, 40**

*City of El Paso v. Pub. Util. Comm'n*, 883 S.W.2d 179 (Tex. 1994)..........**22, 23, 32**

*City of Waco v. Tex. Comm'n Envtl. Quality*, 346 S.W.3d 781(Tex. App. —Austin 2011, *rev'd* on other grounds 413 S.W.3d 409 (Tex. 2013))…..........................**32**

*Cont'l Cas. Ins. Co. v. Functional Restoration Assocs.*,19 S.W.3d 393 (Tex. 2000)..................................................................................**37**

*Employees Ret. Sys. of Texas v. Garcia*, 454 S.W.3d 121 (Tex. App.—Austin 2014), pet. denied (Sept. 4, 2015)…………….…..……......…………………**21, 32**

*Exxon Corp. v. R.R. Comm'n*, 993 S.W.2d 704 (Tex. App.—Austin 1999, no pet.)..................................................................................**27**

*Fitzgerald v. Advanced Spine Fixation Sys., Inc.*,996 S.W.2d 864 (Tex. 1999).....**37**

*Flores v. Emps. Ret. Sys. of Tex.*, 74 S.W.3d 532 (Tex. App.—Austin 2002, pet. denied)..................................................................................**49**

*Froemming v. Tex. State Bd. of Dental Exam'rs*, 380 S.W.3d 787 (Tex. App.—Austin 2012, no pet.)..................................................................................**24, 26, 28**

*Gomez v. Tex. Educ. Agency*, 354 S.W.3d 905 (Tex. App.—Austin 2011, pet. denied)..................................................................................................................**29**

*Graff Chevrolet Co. v. Tex. Motor Vehicle Bd.,* 60 S.W.3d 154 (Tex. App.—Austin 2001, pet. denied)...............................................................................**22-23, 24**

*Granek v. Texas State Bd. of Med. Exam'rs*, 172 S.W.3d 761 (Tex. App.—Austin 2005, no pet.)..................................................................................................**59**

*Gulf States Utils. Co. v. Pub. Util. Comm'n*,841 S.W.2d 459 (Tex. App.—Austin 1992, writ denied).......................................................................................**22**

*Harlingen Family Dentistry v. Tex. Health & Human Servs. Comm'n*, 452 S.W.3d 479 (Tex. App.—Austin 2014, pet. filed)............................................................**18**

*Heckler v. Community Health Servs.,* 467 U.S. 51(1984)...................................**43-44**

*Heritage on the San Gabriel v. Tex. Comm'n on Envt'l Quality*, 393S.W.3d 417(Tex. App.—Austin 2012, pet. denied).....................................................**32, 49**

*In re: E.I. DuPont de Nemours & Co.*, 136 S.W.3d 218 (Tex. 2004).....................**13**

*Levy v. Tex. State Bd. of Medical Exam'rs*, 966 S.W.2d 813 (Tex. App.–Austin 1998, no pet.)..................................................................................................**49**

*Lewis v. Southmore Savings Ass'n,* 480 S.W.2d 180 (Tex. 1972).........................**23**

*Liberty Mut. Ins. Co. v. Garrison Contractors, Inc.*, 966 S.W.2d 482 (Tex. 1998)……...…..................................................................................... **37**

*Locklear v. Tex. Dep't of Ins.*, 30 S.W.3d 595 (Tex. App.—Austin 2000, no pet.)…………………………………………………………………………..**23**

*N. Mem'l Med. Ctr. v. Gomez*, 59 F. 3d 735 (8th Cir. 1995)................................**45**

*Personal Care Products, Inc. v. Hawkins*, 635 F. 3d 155 (5th Cir. 2001).............**44**

*Pierce v. Tex. Racing Comm'n*, 212 S.W.3d 745 (Tex. App.—Austin 2006, pet. denied)………………………….......... …………………………..…………**49, 59**

*R.R. Comm'n of Tex. v. Tex. Citizens for a Safe Future & Clean Water*, 336 S.W. 3d 619 (Tex. 2011)……...….......................................................**28, 29, 32, 37, 38**

*Rehak Creative Servs. v. Witt*, 404 S.W.3d 716 (Tex. App.—Houston [l4th Dist.] 2013, pet. denied)......................................................................................**55**

*Sanchez v. Tex. State Bd. of Med. Exam'rs*, 229 S.W.3d 498 (Tex. App.—Austin 2007, no pet.).................................................................................**24, 27, 50**

*Smith v. Montemayor*, 03-02-00466-CV, 2003 WL 21401591 (Tex. App.—Austin June 19, 2003, no pet.)...............................................................**26, 27, 28, 50**

*State v. Pub. Util. Comm'n*, 883 S.W.2d 190(Tex. 1994)...........................**21, 22, 32**

*State v. Terrell*, 588 S.W.2d 784 (Tex.1979).....................................................**37-38**

*State v. Mid-South Pavers, Inc.,* 246 S.W.3d 711(Tex. App.–Austin 2007, pet. denied)..............................................................................................................**49**

*Sw. Pharm. Solutions, Inc., v. Tex. Health & Human Servs. Comm'n*, 408 S.W.3d 549 (Tex. App.—Austin 2013, pet. denied)........................**28, 29, 30-31, 32, 42, 48**

*Tex. Ass'n of Psychological Assocs. v. Tex. State Bd. of Exam'rs of Psychologists*, 439 S.W.3d 597602 (Tex. App.—Austin 2014, no pet.).......................................**23**

*Tex. Emp't Comm'n v. Hays*, 360 S.W.2d 525 (Tex. 1962)...............................**21-22**

*Tex. Health Facilities Comm'n. v. Charter Med.-Dallas, Inc.*, 665 S.W.2d 446 (Tex.1984).........................................................................................................**21**

*Tex. State Bd. of Med. Exam'rs v. Birenbaum*, 891 S.W.2d 333 (Tex. App.—Austin 1995, writ denied)..................................................................................................**22**

*Tex. State Bd. of Med. Exam'rs v. Dunn*, 03-03-00180-CV, 2003 WL 22721659 (Tex. App.—Austin Nov. 20, 2003, no pet.)...................................**26-27, 49, 50**

*Tex. State Bd. of Dental Exam'rs v. Sizemore,* 759 S.W.2d 114 (Tex. 1988).........**22**

*Tex. Tech Univ. Health Scis. Ctr. v. Apodaca*, 876 S.W.2d 402 (Tex. App.—El Paso 1994, writ denied).......................................................................................**13**

*TGS-NOPEC Geophysical Co. v. Combs,* 340 S.W.3d 432 (Tex. 2011)…............**40**

*United States v. Carbajal*, 290 F.3d 277 (5th Cir. 2002).......................................**12**

*United States v. Floyd*, 343 F.3d 363 (3d Cir. 2003)...............................................**12**

*Wood v. Tex. Comm'n Envtl. Quality*, No. 13-13-00189-CV, 2015 WL 1089492 (Tex. App.—Corpus Christi, Mar. 5, 2015, no pet.).......................................**26, 48**

*Zimmer US, Inc. v. Combs*, 368 S.W.3d 579 (Tex. App.—Austin 2012, no pet)....**30**

**Federal Regulations/Statutes**

42 C.F.R. § 455.2....................................................................................**12, 46**
42 C.F.R. § 455.23........................................................................**2, 11, 12, 18, 58**
42 C.F.R. § 455.23(a)(1)...........................................................................**11-12**
42 U.S.C. §1395.........................................................................................**4**
42 U.S.C. §1396.....................................................................................**4, 11**

**State Regulations**

1 Tex. Admin. Code § 155.507(c)(1).............................................................**19**
1 Tex. Admin. Code § 357.483(a)(1)-(2).......................................................**20**
1 Tex. Admin. Code § 357.488(b)................................................................**20**
1 Tex. Admin. Code § 357.497....................................................................**19**
1 Tex. Admin. Code § 357.497(e)................................................................**20**
1 Tex. Admin. Code § 371.1.......................................................................**10**
1 Tex. Admin. Code § 371.1605..................................................................**11**
1 Tex. Admin. Code § 371.1617(a)(1)(A)-(C)................................................**58**
1 Tex. Admin. Code § 371.1617(a)(3)...........................................................**20**
1 Tex. Admin. Code § 371.1617(5)(B)...........................................................**11**
1 Tex. Admin. Code § 371.1617(1)(A)...........................................................**18**
1 Tex. Admin. Code § 371.1617(1)(B)...........................................................**18**
1 Tex. Admin. Code § 371.1617(1)(I)............................................................**18**
1 Tex. Admin. Code § 371.1617(1)(K)...........................................................**18**
1 Tex. Admin. Code § 371.1617(2)(A)...........................................................**18**
1 Tex. Admin. Code § 371.1703(b)(3)............................................................**58**
25 Tex. Admin. Code § 33.71...............................................**4-5, 6, 34, 36, 39, 41**

**State Statutes**

Tex. Gov't Code § 311.002(4)....................................................................**37**
Tex. Gov't Code § 311.011(a).................................................................**38, 39**
Tex. Gov't Code § 311.011(b).................................................................**38, 41**
Tex. Gov't Code § 311.021(2) ................................................................**38, 41**

Tex. Gov't Code § 311.021(3)..................................................................**38, 41**
Tex. Gov't Code § 311.021(4)..................................................................**38, 41**
Tex. Gov't Code § 311.021(5)..................................................................**38, 41**
Tex. Gov't Code § 311.023(1)..................................................................**38, 41**
Tex. Gov't Code § 311.023(5)..................................................................**38, 41**
Tex. Gov't Code § 311.023(6)..........................................................**29, 38, 41**
Tex. Gov't Code § 312.005..............................................................................**37**
Tex. Gov't Code § 531.001........................................................................**10-11**
Tex. Gov't Code § 531.0055(b)(1)..................................................................**4**
Tex. Gov't Code § 531.1011(1).....................................................................**12**
Tex. Gov't Code § 531.102............................................................................**10**
Tex. Gov't Code § 531.102(a)........................................................................**18**
Tex. Gov't Code § 531.102(g)........................................................................**58**
Tex. Gov't Code § 531.102(g)(2)...................................................**2, 11, 18, 47**
Tex. Gov't Code § 2001.058(e)......................................................**26, 27, 59**
Tex. Gov't Code § 2001.058(e)(1)......................................................**24, 26**
Tex. Gov't Code § 2001.062(b).....................................................................**19**
Tex. Gov't Code § 2001.174..........................................................................**21**
Tex. Gov't Code § 2001.174(1)......................................................................**21**
Tex. Gov't Code § 2001.174(2)......................................................................**23**
Tex. Gov't Code § 2001.175(e)......................................................................**21**
Tex. Hum. Res. Code § 32.0291(b)..................................................**13, 18, 19**
Tex. Hum. Res. Code § 32.0291(c)..........................................................**2, 13**
Tex. Hum. Res. Code § 32.032(b)(1)............................................................**10**
Tex. Hum. Res. Code § 32.091(c)................................................................**58**
Tex. Hum. Res. Code § 36.0011(a).................................................**11, 53, 55, 56**
Tex. Hum. Res. Code § 36.0011(b)................................................................**53, 56**

## Secondary Sources

F. Scott McCown & Monica Leo, *When Can an Agency Change the Findings of Conclusions of an ALJ?: Part Two*, 51 Baylor L. Rev. 63, 69-70 (1999)……………………………………………..………………**26, 27, 50**

No. 06-15-00076-CV

# In the Court of Appeals for the Sixth Judicial District
## Texarkana, Texas

Texas Health and Human Services Commission, AND
Office of Inspector General,

*Appellants*,

v.

Antoine Dental Center,

*Appellee*.

On Appeal from the 200ᵗʰ Judicial District Court of Travis County, Texas
Cause No. D-1-GN-14-002229
*Hon. Amy Clark Meachum, Presiding*

TO THE HONORABLE SIXTH COURT OF APPEALS:

The Texas Health and Human Services Commission ("HHSC"), and the Office of Inspector General ("OIG") (collectively "State") respectfully request that this Court reverse the district court's decision, which reversed HHSC's entry of an Amended Final Order ("AFO") sustaining a payment hold against Antoine Dental Center ("Antoine") for violations of Texas law and regulations related to the Medicaid program.

HHSC Executive Commissioner Dr. Kyle Janek ("EC") acted within his authority in entering the AFO, which is supported by substantial evidence. The district court erred in reaching its decision that the AFO should be reversed because the AFO is reasonably supported by substantial evidence and because the EC acted

within its statutory authority in entering the AFO. At the district court, Antoine failed to meet its burden to show otherwise. Therefore, the AFO should be affirmed by this Court.

## STATEMENT OF THE CASE

The EC, on behalf of HHSC, issued the AFO, affirming a payment hold imposed by HHSC-OIG on Antoine. Tex Hum. Res. Code § 32.0291(c); Tex. Gov't Code § 531.102(g)(2); 42 C.F.R. § 455.23. *See* **Appendix A**, HHSC's AFO, dated May 2, 2014 (copy also at A.R. 1743-85).[1] Antoine filed a suit for judicial review appealing the AFO. The district court reversed the AFO without giving any explanation for its reversal. Aggrieved by the district court order, the State timely filed this appeal.

---

[1] The pleadings and copies of the hearing transcript, contained within HHSC's Administrative Record ("A.R."), are labeled with the Bates prefix "00001" through "2795." The A.R. was admitted as Exhibits 1 and 2 in the district court and is part of the clerk's record.

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Tex. R. App. P. 38.1(e), the State respectfully requests oral argument. Antoine's position, if accepted, would severely undermine the State's efforts to punish and deter fraud in the Medicaid program, which comprises a quarter of the State's budget. An adverse decision would likely impede the State's efforts to enforce numerous other public-welfare statutes that expressly authorize the State to sue wrongdoers in the health and medical fields. The State believes that oral argument will assist the Court's decisional process; and the importance of the matter and the intricacies of the relevant statutes and Medicaid policies warrant oral argument.

## ISSUES PRESENTED

I.    The EC acted within his discretion to correct misapplications of Medicaid law and policy by the SOAH ALJs.

II.    The EC did not exceed his authority in entering the AFO and Antoine cannot establish otherwise.

III.    Every modification made in the EC′s AFO is supported by substantial evidence and Antoine cannot establish otherwise.

## STATEMENT OF FACTS

### I.     The Texas Medicaid program provides health care for the indigent, including limited orthodontia services.

The federal government enacted the Medicaid program in 1965 to help the states provide healthcare for the indigent. Medicaid is funded jointly by federal and state government, as mandated by federal law. 42 U.S.C. § 1396.  In Texas, the agency responsible for administering Medicaid is HHSC. Tex. Gov't Code § 531.0055(b)(1).[2]

### A. Medicaid provides a limited benefit for orthodontics.

Texas Medicaid provides coverage for orthodontic services to qualifying children on a very limited basis.[3] The law restricts when Texas Medicaid will pay for orthodontic services:

> Orthodontic services for cosmetic reasons only are not a covered Medicaid service. Orthodontic services must be prior authorized and are limited to treatment of **severe handicapping malocclusion** and other related conditions as described and measured by the procedures and standards published in the TMPPM [("Texas Medicaid Provider Procedures Manual")].

---

[2]   Currently   more   than   4.5   million   Texans   are   enrolled   in   Medicaid. *See* http://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-State/texas.html, **Appendix B**. In 2013, Medicaid comprised about 26.2 percent of the Texas state budget, amounting to approximately $25.6 billion dollars. *See* Pink Book, 1-1, **Appendix C**.

[3] HHSC administers the Medicaid program pursuant to Texas's "Medicaid state plan." The state plan, is reviewed and approved by the federal Centers for Medicare & Medicaid Services. Tex. Gov't Code § 531.097.

25 Tex. Admin. Code § 33.71 (emphasis added). Since 2003, the Texas Medicaid orthodontia benefit policy has covered orthodontic services under limited scenarios. Relevant to this matter is coverage for children between the ages of 12 and 20 who have dysfunction and a severe handicapping malocclusion which is defined by an accurate and honest Handicapping Labio-lingual Deviation ("HLD") score of 26 points or greater. Texas Medicaid does not pay, nor has it ever paid, for cosmetic orthodontics. *See, e.g.*, TMPPM (2011) (Ex. R-17), Vol. 2, § 4.2.24, copy at **Appendix D**; TMPPM (2010) (Ex. R-16),Vol. 2, § 5.3.24 (same), copy at **Appendix E**; TMPPM (2009), Vol. 2, § 19.19 (Ex. R-15) (same), copy at **Appendix F**;[4] TMPPM (2008), Vol. 2 § 19.18 (Ex. R-14), copy at **Appendix G**. *See also* 25 Tex. Admin. Code § 33.71 (same). In all qualifying cases, comprehensive orthodontic treatment (i.e. "full banding" or "full braces,") is only available for children twelve years of age to twenty (at the time of prior authorization) who have lost their baby teeth. *See* Ex. R-15 at § 19.19.6; **App. F**.

---

[4] The TMPPM states:

**19.19 Orthodontic Services (THSteps):** Orthodontic services for cosmetic purposes only are not a benefit of Texas Medicaid. Orthodontic services are limited to the treatment of children who are 12 years of age and older with severe handicapping malocclusion…

**19.19.1 Benefits and Limitations:** Orthodontic services include the following: Correction of severe handicapping malocclusion as measured on the Handicapping Labiolingual Deviation (HLD) Index…A minimum score of 26 points is required for full banding approval (only permanent dentition cases are considered)…

Orthodontic services for cosmetic purposes only are not a benefit of Texas Medicaid or THSteps.

**B. Providers must obtain prior authorization by accurately and honestly representing that their patient has a severe handicapping malocclusion before they may request reimbursement for orthodontic services.**

Providers must submit a prior authorization request, and receive approval, before seeking reimbursement for orthodontic services. *See* 25 Tex. Admin. Code § 33.71; *see also* Ex. R-15 at § 19.19.2; **App. F**. "Prior authorization is a condition for reimbursement; it is not a guarantee of payment." *Id.* Providers are required to submit truthful and complete information when seeking prior authorization.[5]

The prior authorization application includes the provider's certification that a child has a severe handicapping malocclusion and the treatment is necessary to correct it. To support a finding that a child has a severe handicapping malocclusion, a provider must, *inter alia*, submit an HLD scoresheet accurately evaluating the patient. See Ex. R-15 at § 19.19.2 (2009); **App. F**. A prior authorization request is generally approved if the child has a severe handicapping malocclusion, as indicated by an honest score of 26 or more on the HLD. *See id.*[6]

---

[5] Specifically, providers are required to submit:
- An orthodontic treatment plan, which "should incorporate only the minimal number of appliances required to properly treat the case";
- "[c]ephalometric radiograph with tracing models";
- "[c]ompleted and scored HLD score sheet with diagnosis of Angle class (26 points required for approval of non-cleft palate cases.");
- Facial photographs;
- Full series of radiographs or a panoramic radiograph; diagnostic films are required.

*Id.*, at **App. F**.

[6] For a patient for whom the provider scores less than 26, the provider may submit a written narrative to qualify for benefits. This did not occur with the patients in this case

**1. Providers are required to rely on their education and training in making diagnoses, requesting prior authorization, and making claims for Medicaid reimbursement.**

The HLD allows providers to score nine specific dental conditions in a patient's mouth. The conditions identified on the HLD scoresheet are conditions that are generally recognized in dentistry, including but not limited to: ectopic eruption, cleft palate, overjet, overbite, and mandibular protrusion ("underbite"). The condition most relevant in this case is ectopic eruption.

The TMPPM instructs providers how to score using the HLD scoresheet. The instructions include a description of ectopic eruption. See, e.g., Ex. R-15 at § 19.21 (2009), at **App. F**. The TMPPM does not *define* ectopic eruption for the purposes Texas Medicaid. HHSC's policy expert Dr. Altenhoff testified that the terms in the ectopic eruption instruction are not defined, but, rather, are accorded their plain and ordinary meaning in the English language. Vol. 1 at 103:8-12, A.R. at 1914; see also R-88, Proffer of Rebuttal Testimony from Dr. Linda Altenhoff (Medicaid did not intend, at any time, for the term "'ectopic eruption' to have a different meaning when used in the evaluation of Medicaid patients than is generally understood in the practice of dentistry" and "dentists [were] expected to employ the training and education they received as dentists in applying the terms used in the Provider Manual"), **Appendix J**; and Vol. 3 at 241:5-11 (where Deputy Inspector General for Enforcement testified to the same proposition), A.R. at 2528.

### 2. "Ectopic eruption" is an exceedingly rare condition, and in the TMPPM the term is afforded the meaning generally understood in the practice of dentistry.

"Ectopic eruption" is a rare dental condition – occurring in only 1.5 to 9 percent of the population[7] – primarily affecting the first molars, upper and lower canines.[8] Scientific literature describes the low frequency of ectopic eruption occurring even once per patient. See R-51, (ectopic eruption only occurring in 1.5-1.6% of a sample population), at **App. H**. The frequency of the same rare condition occurring multiple times and/or bilaterally in the same patient is "infinitesimally smaller."[9] The chance of 100% of the patients in a sample having not only one instance of a rare condition, but always at least 6 instances, and always two or more bilateral instances, is "zero. It's not possible."[10]

OIG's orthodontic expert, Dr. Larry Tadlock, described that ectopic eruption, as explained in Dr. William Proffit's textbook *Contemporary Orthodontics*, means a tooth that erupts in the wrong place.[11] The Proffit textbook, a leading orthodontic textbook, explains that ectopic eruption is caused by malposition of a permanent

---

[7] Vol. 1 at 173:3-6, A.R. at 1984; *see also* R-51 at 8 (Thilander article describing ectopic eruption as an "anomaly" occurring in only 1.5-1.6% of a sample population of 4724 patients), **Appendix H**.

[8] Vol. 1 at 153:22-24, A.R. at 1964.

[9] Vol. 1 at 174:16-17, A.R. at 1985.

[10] *Id.* at 174:1, A.R. at 1985; R-49, Tadlock summary, at A.R. 1097-98, **Appendix I**.

[11] *Id.* at 114:18-23, A.R. at 1925.

tooth bud and most commonly occurs in the maxillary first molars.[12] "Ectopic eruption of other teeth is rare, but can result in transposition."[13] The following photographs provide examples of ectopic eruption:



R-31A (showing upper and lower ectopically-erupted canines (images of non-Antoine patients provided by Dr. Tadlock)), at A.R. 1031.[14]



*See* R-31L (showing an ectopically-erupted upper left central incisor (image of non-Antoine patient provided by Dr. Tadlock)).[15] All of the scientific literature surveyed by Dr. Tadlock describe ectopically erupted teeth as teeth that erupt "in the wrong

---

[12] *Id.* at 143:17-18, 144:13-15, A.R. at 1954.

[13] *Id.* at 145:8-10, A.R. at 1956.

[14] *See* Vol. 1 at 149 for Dr. Tadlock's description of this non-Antoine patient's condition, at A.R. 1960. *Compare* photos of Antoine patients, included *infra* at p. 18.

[15] *Id.* at 150 for Dr. Tadlock's description of this image, at A.R. 1961. *Compare* photos of Antoine patients, included *infra* at p. 18.

place."[16] Teeth can ectopically erupt in sinus cavities, or through the side of the face.[17] Based upon the well-known dental term, the vast majority of teeth that Antoine represented to Medicaid as being ectopic eruptions were not ectopic eruptions.

## II. HHSC-OIG is responsible for protecting Medicaid from waste, fraud and abuse. OIG is required by law to impose a payment hold based on a credible allegation that a provider has committed Medicaid fraud.

OIG is an independent oversight agency, administratively attached to HHSC. OIG is responsible for investigating instances of waste, fraud and abuse in health care services provided by HHSC, including Medicaid, and for enforcing state laws relating to the provision of those services. Tex. Gov't Code § 531.102; *see also* 1 Tex. Admin. Code § 371.1. Chapter 32 of the Human Resources Code authorizes the OIG to recover damages and penalties from a person who presents or causes to be presented to the department a claim that "contains a statement or representation the person knows or should know to be false." Tex. Hum. Res. Code § 32.032(b)(1).

The statutory authority for the rules governing OIG includes both chapters 32 and 36 of the Human Resources Code, and OIG may take administrative enforcement measures against a person based upon a violation of either chapter. *See*

---

[16] *Id.* at 153, at A.R. 1964.

[17] *Id.* at 146:3-8, at A.R. 1957.

Tex. Gov't Code § 531.001 *et seq.*; 1 Tex. Admin. Code § 371.1605 (2005); 1 Tex. Admin. Code § 371.1617(5)(B) (2005) (which references and incorporates the Texas Medicaid Fraud Prevention Act ("TMFPA")). Therefore, the standard in the TMFPA for determining whether a person acts with the requisite scienter to commit an unlawful act is applicable in an enforcement action brought by the OIG, including a payment hold proceeding. *See* Tex. Hum. Res. Code § 36.0011(a) (defining Culpable Mental State).[18]

OIG is required by law to impose a payment hold "on receipt of reliable evidence that the circumstances giving rise to the hold on payment involve fraud or willful misrepresentation under the state Medicaid program in accordance with 42 C.F.R. Section 455.23."[19] Tex. Gov't Code § 531.102(g)(2) (2011). "The State Medicaid agency *must* suspend all Medicaid payments to a provider after the agency determines there is a credible allegation of fraud for which an investigation is pending under the Medicaid program against an individual or entity." 42 C.F.R. §

---

[18] For purposes of this chapter, a person acts "knowingly" with respect to information if the person: (1)has knowledge of the information; (2) acts with conscious indifference to the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information. Proof of the person's specific intent to commit an unlawful act under Section 36.002 is not required in a civil or administrative proceeding to show that a person acted "knowingly" with respect to information under this chapter. *Id.*

[19] The mandatory payment-hold framework was introduced through provisions of the Affordable Care Act, which amended the Social Security Act. Section 1862(o) broadly requires suspension of payments pending an investigation of credible allegations of fraud. 42 U.S.C. § 1396b(i)(2)(c). Section 1903(2)(c) provides for withholding of federal funds where the State fails to implement section 1862(o). 42 U.S.C. § 1395y(o)

455.23(a)(1) (emphasis added).

Fraud is defined in the Government Code as "an intentional deception or misrepresentation made by a person with the knowledge that the deception could result in some unauthorized benefit to the person or to another person, *and includes any act that constitutes fraud under applicable* federal or *state law*." Tex. Gov't Code § 531.1011(1)[20] (emphasis added). The definition incorporates unlawful acts under the TMFPA.

A credible allegation of fraud "may be an allegation, which has been verified by the State, from any source, including but not limited to the following: . . . claims data mining [,] . . . patterns identified through provider audits [or] law enforcement investigations." 42 C.F.R. § 455.2. An allegation is credible if it has "indicia of reliability and the State Medicaid agency has reviewed all allegations, facts, and evidence carefully and acts judicially on a case-by-case basis." *Id.*

Evidence is presumed to have indicia of reliability and may be adopted by a court "without further inquiry if the defendant fails to demonstrate by competent rebuttal evidence that the information is materially untrue, inaccurate or unreliable." *United States v. Floyd*, 343 F.3d 363, 372-73 (3rd Cir. 2003) (citing *United States v. Carbajal*, 290 F.3d 277, 287 (5th Cir. 2002)).

---

[20] In 2015, the legislative amended this statute to delete the italicized language. The amendment did not take effect until September 2015; therefore, it is not applicable to this case.

OIG has additional authority to impose a payment hold if there is "reliable evidence" a provider "committed fraud or willful misrepresentation regarding a claim for reimbursement." Tex. Hum. Res. Code § 32.0291(b) (2003).[21] The authority in Human Resources Code chapter 32 is duplicative of the authority in Government Code chapter 531.  However, § 32.0291(c) includes the standard for maintaining the payment hold: "The department shall discontinue the hold unless the department makes a *prima facie* showing at the hearing that the evidence relied on by the department in imposing the hold is relevant, credible and material to the issue of fraud or willful misrepresentation." Tex. Hum. Res. Code § 32.0291(c) (emphasis added).[22]

This means in a payment hold hearing, the OIG must present *prima facie* evidence that is relevant, credible and material, that the provider acted with: (1) knowledge of the truth or falsity of its representations; (2) conscious indifference to the truth or falsity of its representations; **_or_** (3) reckless disregard of the truth or falsity of its representations. Tex. Hum. Res. Code §§ 32.0291(c), 36.011. (emphasis added).

---

[21] Effective September 1, 2013 section 32.0291(b) of the Human Resources Code was amended. A new subsection (c) was added to the statute. The changes are prospective and do not apply to this case, which was heard in May 2013.

[22] *See In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d 218, 223 (Tex. 2004) ("The prima facie standard requires only the 'minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true.' *Tex. Tech Univ. Health Scis. Ctr. v. Apodaca,* 876 S.W.2d 402, 407 (Tex. App.—El Paso 1994, writ denied). ").

**III.    Antoine billed Texas Medicaid for more than $8 million in orthodontia services over a three-year period, and OIG placed Antoine on payment hold.**

Between November 1, 2008 and August 1, 2011, Medicaid paid Antoine over $8,104,875.00, FoF 3, **App. A** at p. 3, at A.R. 1748. OIG initiated an investigation of Antoine in 2011. Vol. 3, 195:1, A.R. at 2482. During the time period of the investigation, Antoine treated approximately 6,550 Medicaid patients. Vol. 3 at 200:12, A.R. at 2487. During its investigation, OIG collected a statistically valid random sample[23] of 63 of Antoine′s Medicaid patient files. Vol. 3 at 200:20-208:7, A.R. at 2787.

The 63 patient files, which included diagnostic materials (x-rays, color photographs, three-dimensional models, etc.) were independently reviewed by two orthodontic experts: Dr. Charles Evans and Dr. Larry Tadlock. Based on the expert review of the 63-patient sample, OIG instituted a 100% payment hold on Antoine′s claims for reimbursement.[24] FoF 32, **App. A** at p. 13, at A.R.1756.

Both orthodontic experts relied upon their education and training in

[23] OIG's statistically valid sampling methodology was not at issue in the payment hold hearing. The only evidence regarding the validity of OIG's sampling and extrapolation procedure is uncontroverted. *See* testimony of Deputy Inspector General for Enforcement, Vol 3, at 201-209, A.R. at 2488-96.

[24] Dr. Tadlock reviewed the sample after the payment hold was instituted, for purposes of testifying at the payment hold hearing regarding the patient files.

reviewing the patient files to evaluate the patients' conditions, and each expert individually followed the TMPPM criteria for the corresponding years of service (2008-2011). Both experts ***independently*** concluded Antoine inflated HLD scores submitted to Medicaid. Vol. 3 at 289:23-290:3, 295:22-296:2, A.R. at 2576-77, 2582-83. OIG presented the following evidence, based on the experts' review of the 63 patients:

- Of the 63 patients, Antoine scored 61 (96.8%) as having severe handicapping malocclusions, i.e., extreme deviations from the norm. See R-49, at A.R. 1097-98, **App. I.**

- Antoine certified that 61 patients had six or more ectopically-erupted teeth. Ex. P-64.01 through P-64.63; R-49, at A.R. 1097-98, **App. I.**

- Antoine scored at least 50% of the allowable teeth as ectopic on each and every HLD scoresheet Antoine submitted for authorization. See R-49, at A.R. 1097-98, **App. I.**

- No patient in the sample was eligible for Medicaid-covered comprehensive orthodontics without Antoine's scoring for ectopic eruption; further, Antoine did not submit any narratives for any of the 61 patients, even if services could be justified on other bases. Ex. P- 64.01 through P-64.63; Vol. 4 at 70:13-19, A.R. at 2698.

- Dr. Kanaan scored 27 of the 63 patients' HLDs. Of those 27 patients, he scored 23 (85%) with the same eight teeth ectopic. Vol. 3 at 43-70, A.R. at 2330-57. Ex. P-64.01 through P- 64.63; R-49, at A.R. 1097-98, **App. I**.

- Antoine submitted prior authorization requests for comprehensive orthodontics under the code D8080 for 61 of the 63 patients. Ex. P- 64.01 through P-64.63; Vol. 1, 176:14-20, 177:1-16, A.R. at 1987-88.

Dr. Larry Tadlock, D.D.S.,[25]testified:

---

[25] Dr. Tadlock is a board-certified orthodontist. He is an Assistant Clinical Professor of

- Antoine's HLD scoresheets were false and misrepresented the condition of the patient's teeth. Vol. 1 at 176:14- 20, 177:1-16, A.R. at 1987-88.

- 61 of 63 HLD scoresheets were incomprehensible because ectopic eruption is a rare condition. Only 1.5-9% of the population has even one ectopic tooth. Vol. 1 at 173:3-6, A.R. at 1984; see also R-51 at 8 (Thilander article describing ectopic eruption as an "anomaly" that occurs in only 1.5-1.6% of a sample population of 4724 patients), **App. H**.

- For ectopic eruption to occur more than once in the same patient is "infinitesimally smaller." Vol. 1 at 174:16-18, A.R. at 1985. See also R-31L, *supra*, at p. 9.

- Because ectopic eruption is rare, occurring in between 1.5-9% of the population, the chances of 61 patients in the 63-patient sample having 6 or more ectopic anterior teeth is "not possible." Vol. 1 at 173:3-6, 175:1, A.R. at 1984, 1986.

- The chance of 100% of patients in a sample having always at least six instances of ectopic eruption, and always two or more bilateral instances, is "zero. It's not possible." Vol. 1 at 175:1, 176:23, A.R. at 1986-87; R-49, Tadlock summary, at A.R. 1097-98, **App. I**.

The following shows Antoine's scoring of patients in the 63-patient sample:

**Patient 1**:

Pre-treatment intra-oral photos of Antoine Patient 1, P-01-0001:[26]

---

Orthodontics at Baylor College of Dentistry, responsible for supervising patient care, teaching orthodontic residents, and performing research on orthodontics. He is one of only eight directors of the American Board of Orthodontics ("ABO") in the United States. As an ABO Director, Dr. Tadlock is responsible for creating, writing, and administering board certification exam for orthodontists. Specific to his experience with Medicaid, Dr. Tadlock has treated Medicaid patients who were accepted and treated at Baylor. He estimates he has assessed "several hundred" HLD scoresheets for potential Medicaid patients while at Baylor. Vol. 1 at 146-48, A.R. at 1957-59.

[26] Dr. Tadlock concluded "[t]his patient's occlusion is near perfect. . . . it might qualify as passing the certification process from the American Board of Orthodonti[cs]. Vol. 1 at 158:18-23. *Compare* photos of true ectopic eruptions, included *supra* at p. 9.

  

Antoine's HLD scoresheet representing that Patient 1 has 8 ectopic teeth. P 01-0013:

| See definitions/instructions to score (previous page) | | | x5 | | = | Ψ |
|---|---|---|---|---|---|---|
| **Open Bite** in mm. | | | | | = | ∅ |
| See definitions/instructions to score (previous page) | | | x4 | | | |
| **Ectopic Eruption** (Anteriors Only) | | 21 \| 12 | | | | 24 |
| Reminder: Points cannot be awarded on the same arch for Ectopic Eruption and Crowding | | 21 \| 12 | Each tooth x3 | | = | |
| **Anterior Crowding** | | | | | = | ∅ |
| 10 point maximum total for both arches _combined_ | Max. | Mand. | = 5 pts.each arch | | = | ∅ |

**Patient 6**:

Pre-treatment intra-oral photos of Antoine Patient 6. P-06-0003:[27]

  

06-0001

| **Ectopic Eruption** (Anteriors Only) | | | x4 | | = | |
|---|---|---|---|---|---|---|
| Reminder: Points cannot be awarded on the same arch for Ectopic Eruption and Crowding | | 21 \| 12 | | | | 24 |
| **Anterior Crowding** | | 21 \| 12 | Each tooth x3 | | = | |
| 10 point maximum total for both arches _combined_ | Max. | Mand. | = 5 pts.each arch | | = | |
| **Labio-Lingual Spread** in mm. | | | | | | |
| TOTAL | | | | | = | |
| Diagnosis | | | | | | |

---

[27] This patient does not have a single ectopic tooth according to Dr. Tadlock, and does not have a severe handicapping malocclusion. Vol. 1 at 160:14-24, A.R.at 1971.

**Patient 59**:

Pre-treatment intra-oral photos of Antoine Patient 59, <u>P-59-0018:</u>



P-01023

Antoine's HLD scoresheet representing that Patient 59 has 10 ectopic teeth. <u>P-59-0017</u>:

| Open Bite in mm. | | | | | |
|---|---|---|---|---|---|
| See definitions/Instructions to score (previous page) | | | x4 | = | Q |
| Ectopic Eruption (Anteriors Only) | 21 | 12 | | | 30 |
| Reminder: Points cannot be awarded on the same arch for Ectopic Eruption and Crowding | 321 | 123 | Each tooth x3 | = | |
| Anterior Crowding | Max. | Mand. | = 5 pts.each arch | = | Q |
| 10 point maximum total for both arches combined | | | | = | 0 |

OIG based its decision to impose the payment hold on *prima facie* evidence that Antoine fraudulently or willfully misrepresented HLD scores in prior authorization requests, in violation of Tex. Gov't Code § 531.102(a), and 1 Tex. Admin. Code §§ 371.1617(1)(A), (B), (I).[28]

---

[28] OIG also found that Antoine billed for services not reimbursable, in violation of 1 Tex. Admin. Code § 371.1617(1)(K); and failed to maintain and provide required records, in violation of 1 Tex. Admin. Code § 371.1617(2)(A). As a result, Antoine failed to comply with Medicaid program requirements, and a payment hold was authorized under the Inspector General's discretionary authority. However, the Inspector General's authority to impose discretionary payment holds was challenged and then struck in *Harlingen Family Dentistry v. Tex. Health & Human Servs. Comm'n*, 452 S.W.3d 479 (Tex. App.—Austin 2014, pet. filed). Therefore, the State confines its arguments to the mandatory payment hold under the credible allegation of fraud standard as codified in 42 C.F.R. § 455.23, Tex. Gov't Code § 531.102(g)(2) (2011), and Tex. Hum. Res. Code § 32.0291(b).

**IV.** **Antoine requested a hearing on the payment hold, and, after the hearing and the ALJs' recommendation that HHSC order OIG to lift the hold, the EC reversed the PFD and ordered the hold to remain in place.**

Antoine requested a hearing to appeal the payment hold. SOAH ALJs Howard Seitzman and Catherine Egan conducted a hearing in May 2013. The issue was whether OIG presented *prima facie* evidence that was relevant, credible and material that Antoine committed fraud or willful misrepresentations. Tex. Hum. Res. Code § 32.0291(b).

The burden was not on the OIG to actually prove fraud or willful misrepresentations; rather, the question was only whether OIG brought forward *prima facie* evidence sufficient to maintain the payment hold.[29]

After the hearing, ALJs Seitzman and Egan issued a PFD recommending that HHSC order OIG to lift the payment hold. PFD, dated Nov. 4, 2013, A.R. at 1193-1238. OIG timely filed Exceptions to the PFD. Tex. Gov't Code § 2001.062(b); 1 Tex. Admin. Code §§ 155.507(c)(1), 357.497. *See* Exceptions, dated Nov. 22, 2013, A.R. at 1257-1344. Antoine filed a Response to OIG's Exceptions, and the ALJs issued a letter recommending an insignificant modification to their PFD. *See* Letter, dated Jan. 16, 2014, A.R. at 1375-76.

---

[29] The substantive allegations of Medicaid fraud against Antoine are pending in a separate lawsuit brought by the State against Antoine and five other groups of provider defendants. *State of Texas v. Nazari*, Cause No. D-1-GN-14-005380 (53rd Dist. Ct., Travis County, Texas).

HHSC issued a Final Order, adopting the OIG's Exceptions and maintaining the payment hold. *See* Order, dated Feb. 27, 2013, A.R. at 1387-1422. HHSC's Final Order was issued by HHSC ALJ Rick Gilpin, who the EC designated to review the PFD and issue the final agency decision. *See* 1 Tex. Admin Code § 371.1617(a)(3); 1 Tex. Admin Code § 357.483(a)(1)-(2). Subsequently, OIG filed a motion for rehearing. Mot., dated Apr. 2, 2014, A.R. at 1552-1650.[30] After reviewing the record, the EC issued the AFO. *See* Am. Final Order, dated, May 2, 2014, at **App. A**, and A.R. at 1744-85.

Antoine filed a motion for rehearing, which HHSC overruled. A.R. at 1787-1810. Antoine then filed for judicial review in district court. After briefing and argument, but without the submission of any evidence other than the administrative record, the district court entered a judgment stating that the EC′s AFO is reversed. The district court gave no explanation for the reversal. This appeal followed.

---

[30] Antoine also filed a motion for rehearing, erroneously with SOAH instead of with HHSC Appeals Division. Mot., dated Mar. 17, 2014, A.R. at 1423-65; *see also* Tex. Gov't Code § 2001.146 (motions for rehearing procedures); 1 Tex. Admin. Code § 357.488(b) (Filing and Serving of Documents ("Documents are considered filed only when received by the HHSC Appeals Division. . ."); 1 Tex. Admin. Code § 357.497(e) ("When the judge issues a proposal for decision, the referring agency's rules govern final orders and motions for rehearing."). Because Antoine filed the motion for rehearing in the wrong forum, the motion was a nullity, and the EC was free to disregard it.

## STANDARD OF REVIEW

The test for review of an agency action is not whether the agency reached the correct conclusion, but whether some reasonable basis for the agency's action exists in the record. *State v. Pub. Util. Comm'n*, 883 S.W.2d 190, 203 (Tex. 1994) (citing *R.R. Comm'n v. Pend Oreille Oil & Gas Co.*, 817 S.W.2d 36, 41 (Tex. 1991)).

The district court reviewed HHSC's AFO under the substantial evidence rule. Tex. Gov't Code § 2001.174. The Administrative Procedure Act ("APA") provides that the district court "may not substitute its judgment for the judgment of the state agency on the weight of the evidence on questions committed to agency discretion but . . . may affirm the agency decision in whole or in part" if the order is supported by substantial evidence. Tex. Gov't Code § 2001.174(1). The district court's review was limited to the administrative record. Tex. Gov't Code § 2001.175(e). This Court also reviews the AFO under the substantial evidence rule, without deference to the judgment of the district court. *Tex. Dep't. of Pub. Safety v. Alfred*, 209 S.W.3d 101, 103 (Tex. 2006) (per curiam). *Employees Ret. Sys. of Texas v. Garcia*, 454 S.W.3d 121, 132 (Tex. App.—Austin 2014 pet. denied).

The Court may affirm the AFO on any grounds that would support the decision, and is not "bound by the reasons given by an agency in its order, provided there is a valid basis for the action taken by the agency." *Tex. Health Facilities Comm'n. v. Charter Med.-Dallas, Inc.*, 665 S.W.2d 446, 452 (Tex. 1984); *see also*

21

*Tex. Emp't Comm'n v. Hays*, 360 S.W.2d 525, 527 (Tex. 1962). The Court may uphold the AFO based on any legal basis shown in the record. *Bd. of Trs. of the Emps. Ret. Sys. v. Benge*, 942 S.W.2d 742, 744 (Tex. App.—Austin 1997, writ denied). If reasonable minds could have reached the conclusion that the EC reached on the record presented, the AFO must be upheld. *Bd. of Law Exam'rs v. Stevens*, 868 S.W.2d 773, 777-788 (Tex. 1994), *cert. denied, Stevens v. Bd. of Law Exam'rs*, 512 U.S. 1206, 114 S. Ct. 2676 (1994); *Tex. State Bd. of Med. Exam'rs v. Birenbaum*, 891 S.W.2d 333, 337 (Tex. App.— Austin 1995, writ denied).

In applying the substantial evidence standard to the AFO, the Court may not substitute its judgment for that of the EC as to the weight of the evidence on questions committed to his discretion. *Stevens*, 868 S.W.2d at 778; *Gulf States Utils. Co. v. Pub. Util. Comm'n*, 841 S.W.2d 459, 474 (Tex. App.—Austin 1992, writ denied). Although substantial evidence is more than a mere scintilla, ***the evidence may actually preponderate against the agency decision and yet still amount to substantial evidence*** supporting the result reached by the agency. *State v. Pub. Util. Comm'n*, 883 S.W.2d at 204; *City of El Paso v. Pub. Util. Comm'n*, 883 S.W.2d 179, 185 (Tex. 1994); *see also Tex. State Bd. of Dental Exam'rs v. Sizemore,* 759 S.W.2d 114, 116 (Tex. 1988).

The Court presumes that substantial evidence supports the AFO, and the burden is on Antoine to overcome this presumption. *Graff Chevrolet Co. v. Tex.*

*Motor Vehicle Bd.,* 60 S.W.3d 154, 159 (Tex. App.—Austin 2001, pet. denied);

*Lewis v. Southmore Savings Ass'n,* 480 S.W.2d 180, 183 (Tex. 1972); *see also City*

*of El Paso v. Pub. Util. Comm'n*, 883 S.W.2d at 184.

The AFO should be reversed or remanded ***only*** if the absence of substantial

evidence has prejudiced Antoine's substantial rights. *Locklear v. Tex. Dep't of Ins.*,

30 S.W.3d 595, 597 (Tex. App.—Austin 2000, no pet.). The Court may only reverse

or remand a matter "for further proceedings": if substantial rights of Antoine have

been prejudiced because the administrative findings, inferences, conclusions, or

decisions are:

(A)   in violation of a constitutional or statutory provision;
(B)   in excess of the agency's statutory authority;
(C)   made through unlawful procedure;
(D)   affected by other error of law;
(E)   not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or
(F)   arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Tex. Gov't Code § 2001.174(2).

In the district court, Antoine argued that the EC exceeded his authority when

he reversed several of the ALJs' findings of fact and conclusions of law. Whether

the EC exceeded his authority is a question of law to be decided *de novo*. *See, e.g.*,

*Tex. Ass'n of Psychological Assocs.v. Tex. State Bd. of Exam'rs of Psychologists*,

439 S.W.3d 597, 602 (Tex. App.— Austin 2014, no pet.) (court reviews exercise

of authority *de novo*).

## SUMMARY OF THE ARGUMENT

This case presents the issue of whether the EC acted within his authority when he issued the AFO to maintain the payment hold on Antoine. Because the EC was fully authorized to correct the ALJs' misapplications of Medicaid law and policy he did not exceed his authority when he rejected their PFD and issued the AFO. *See* Tex. Gov't Code § 2001.058(e)(1); *Froemming v. Tex. State Bd. of Dental Exam'rs*, 380 S.W.3d 787, 793 (Tex. App.—Austin 2012, no pet.); *Sanchez v. Tex. State Bd. of Med. Exam'rs*, 229 S.W.3d 498, 516 (Tex. App.—Austin 2007, no pet.); *see also Akin v. Tex. State Bd. of Dental Exam'rs*, No. 03-14-00390-CV, 2015 WL 1611803, at *4-5 (Tex. App.—Austin Apr. 9, 2015, no pet. hist.). Further, the AFO is supported by substantial evidence in all respects.

In reviewing the decision to issue the AFO, the Court must assume that the AFO is valid; and to overcome the presumption of validity, Antoine has the burden to establish that the AFO is not supported by substantial evidence or that the EC exceeded his statutory authority in issuing the AFO. *See Graff Chevrolet*, 60 S.W.3d at 159 (plaintiff has burden of proving that agency's order is not supported by substantial evidence). In the district court, Antoine did not even argue that the AFO is not supported by substantial evidence. Instead, Antoine confined its argument and briefing to the issue of whether the EC exceeded his authority in changing the ALJs' findings of fact. Because Antoine did not brief or argue

substantial evidence in the district court that issue has been waived. *See Akin*, 2015 WL 1611803, at \*3 n.1   Nonetheless, the State will show that the AFO is fully supported by substantial evidence in the administrative record that: (a) the ALJs misinterpreted and misapplied Texas law and Medicaid policy, and (b) the OIG's determination to impose the payment hold was based on *prima facie* evidence that was relevant, credible and material to the question of fraud or willful misrepresentation.

The State urges the Court to reverse the district court—i.e. reinstate the AFO—on the basis that Antoine cannot carry its burden to establish that the AFO was not supported by substantial evidence, nor can Antoine establish that the EC exceeded his statutory authority.

## ARGUMENT

I. **The EC acted within his discretion to correct misapplications of Medicaid law and policy by the SOAH ALJs.**

The APA governs contested proceedings before HHSC. The APA expressly defines the EC's discretion to change ALJs' proposed findings of fact and conclusions of law after contested case hearings. The APA provides, in pertinent part:

> (e)    A state agency may change a finding of fact or conclusion of law made by the administrative law judge, or may *vacate* or *modify* an order issued by the administrative law judge, only if the agency determines:

> (1) *that the administrative law judge did not properly apply or interpret applicable law, agency rules, written policies provided under Subsection (c), or prior administrative decisions;*
>
> (2) *that a prior administrative decision on which the administrative law judge relied is incorrect or should be changed*; or
>
> (3) that a technical error in a finding of fact should be changed.

Tex. Gov't Code § 2001.058(e) (emphasis added). Thus, the EC was authorized to change the ALJs' incorrect legal and policy determinations. *See* Tex. Gov't Code § 2001.058(e)(1); *see also Froemming*, 380 S.W.3d at 793; *Akin*, 2015 WL 1611803, at *4-5, *5 n.6; *Smith v. Montemayor*, 2003 WL 21401591, at *8 (Tex. App.—Austin June 19, 2003, no pet.); *Wood v. Tex. Comm'n Envtl. Quality*, No. 13-13-00189-CV, 2015 WL 1089492, at *11 (Tex. App.— Corpus Christi, Mar. 5, 2015, no pet. hist.)

Consistent with the concept that agencies determine the meaning of their policies and the laws they are committed to enforce, agencies have broad discretion to modify "legislative facts" in PFDs.[31] *See Tex. State Bd. of Med. Exam'rs v. Dunn*, 03-03-00180-CV, 2003 WL 22721659, at *3 (Tex. App.—

---

[31] A "legislative fact" is a mixed question of fact and law and defining terms is an agency function. F. Scott McCown & Monica Leo, *When Can an Agency Change the Findings of Conclusions of an ALJ?: Part Two*, 51 Baylor L. Rev. 63, 69-70 (1999) (hereinafter "McCown & Leo"). A finding of fact is a "legislative fact" where the finding affects not just one specific case, but is actually an explication of agency policy and therefore may be applied to other cases or implicates agency policy. *Id*.

Austin Nov. 20, 2003, no pet.) ("agencies are 'relatively' free to review and correct an ALJ's 'legislative facts,' which 'provide a foundation for developing law, rules, or policies and, consequently, affect the outcome of many cases.'") (quoting *McCown & Leo*, at 68-69); *see also Sanchez*, 229 S.W.3d at 515-16; *Exxon Corp. v. Railroad Comm'n,* 993 S.W.2d 704, 710 (Tex. App.—Austin 1999, no pet.); *Montemayor*, 2003 WL 2140151, *8.

The ALJs misconstrued Medicaid policy, ignored evidence, disregarded competent testimony proffered by OIG, and created "expert" testimony not offered by Antoine. The EC, acting with sound discretion, corrected the ALJs' erroneous interpretations, and their flawed findings and conclusions that flowed from their initial errors. The EC fully explained each modification, as required by the APA, demonstrating the substantial evidence necessary to support his modifications. *See* Tex. Gov't. Code § 2001.058(e).

**A. The proper interpretation of Texas Medicaid policy is a question of law to be determined by the EC. The EC properly interpreted Medicaid policy in harmony with the governing statutes and regulations, and Antoine has shown no basis for the Court to deviate from the EC's correct interpretation.**

The proper interpretation and application of regulatory/statutory provisions governing Medicaid and Medicaid policy are questions of law committed to the discretion of the EC - not the ALJs. Thus, the EC was not bound to accept the ALJs' erroneous determinations regarding Medicaid policy concerning "ectopic

eruption." *See, e.g.*, *R.R. Comm'n of Tex. v. Tex. Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 629 (Tex. 2011) ("We must uphold the enforcing agency's construction if it is reasonable and in harmony with the statute."); *Sw. Pharm. Solutions, Inc., v. Tex. Health & Human Servs. Comm'n*, 408 S.W.3d 549, 557-58 (Tex. App.—Austin 2013, pet. denied); *Froemming*, 380 S.W.3d at 793; *Akin*, 2015 WL 1611803, at \*4-5.

The *Akin* court approved the board's modifications of the ALJ's proposed finding and conclusion because the ALJ failed to properly interpret or apply the statute to facts in evidence. *Id.* While the ALJ in *Akin* found Akin did not commit a dishonest act, the board provided examples of evidence that showed the dentist was dishonest or practicing dentistry illegally, and the district court upheld the board's order reversing the ALJ's PFD. *Id. Akin* court also quoted with approval *Montemayor*, 2003 WL 21401591, at \*8. *Akin*, 2015 WL 1611803, at \*5 n.6

In the instant case, in reversing the AFO (without explanation), the district court implicitly determined the EC's interpretation of Medicaid rules—especially those related to ectopic eruption—was unreasonable and not in harmony with the statutes he interpreted. The State presented substantial evidence at the district court, discussed *infra*, through the admission of the administrative record,[32] that the EC's interpretation of the Medicaid rules is reasonable and followed long-held

---

[32] No additional evidence was presented at the district court.

principles of statutory construction. Antoine presented nothing to counter the EC's reasonable interpretation; therefore, the district court should not have disturbed the EC's decision.

**B. The EC's corrections of the ALJs' errors in interpreting Medicaid policy are entitled to respect from the Court.**

The EC's interpretation of the proper scope and limitations of Texas Medicaid orthodontia policy is entitled to respect from the Court. *See Texas Citizens*, 336 S.W.3d at 624; *see also Atascosa Cnty. v. Atascosa Cnty. Appraisal Dist.,* 990 S.W. 2d 255, 258 (Tex. 1999); *Gomez v. Tex. Educ. Agency*, 354 S.W.3d 905, 913-17 (Tex. App.—Austin 2011, pet. denied); *Sw. Pharm.*, 408 S.W.3d at 562; Tex. Gov't Code § 311.023(6).

Where a statute is ambiguous, the Court must give serious consideration to the interpretation of an agency charged with its enforcement. *Texas Citizens*, 336 S.W.3d at 625. In *Texas Citizens*, the Supreme Court held:

> We have never expressly adopted the *Chevron* or *Skidmore* doctrines for our consideration of a state agency's construction of a statute, but we agree with the Commission that the analysis in which we engage is similar. In our "serious consideration" inquiry, we will generally uphold an agency's interpretation of a statute it is charged by the Legislature with enforcing, "'so long as the construction is reasonable and does not contradict the plain language of the statute.'"

*Id.* (citations omitted). Deference to the agency's interpretation is particularly important where, as here, the policies, rules and statutes in question concern a

matter within the core expertise of the agency. *See Zimmer US, Inc. v. Combs*, 368 S.W.3d 579, 586 (Tex. App.—Austin 2012, no pet.)

*Southwest Pharmacy* is also instructive. The plaintiff pharmacy providers challenged HHSC rules pertaining to Medicaid pharmacy reimbursements. The outcome of the dispute turned, in part, on construction of the phrase "medical assistance" as defined in Government Code chapter 531, Human Resources Code chapter 32, and the rules adopted thereunder. *Sw. Pharm.*, 408 S.W.3d at 560-61. In siding with HHSC, the court noted that the disputed statutory language must not be read in isolation, but rather, must be analyzed "in the context of the statutes as a whole." *Id.* "We must consider the role of the provisions in the full Medicaid statutory scheme and in . . . context. . . And we must construe the provisions in a way that is consistent with their underlying purpose and the policies they are intended to promote." *Id*. at 561. The court further noted:

> Even if we were to conclude that there is vagueness, ambiguity, or room for policy determinations in these statute and rules, we would conclude that HHSC's interpretation of the relevant code provisions and agency rules is reasonable, in harmony with the statutes and rules, and entitled to deference. We defer to the agency's interpretation unless it is plainly erroneous or inconsistent with the language of the statute or rule.. ***As the agency designated to administer Medicaid, HHSC is charged with overseeing a complex regulatory scheme, and deference to its construction is particularly important***. An agency's construction does not have to be "the only-- or the best-- interpretation in order to warrant . . . deference." Considering the entire statutory scheme, the

goals and policies behind it, and the legislative history and intent, we would conclude that HHSC's interpretation is reasonable, does not conflict with the provisions' language, and is entitled to deference.

*Id.* at 561-62 (emphasis added) (internal citations omitted). Here, the EC's interpretation of the meaning of ectopic eruption is reasonable, and is consistent with Medicaid policy and applicable laws.

As explained in the AFO, the EC determined that "ectopic eruption" is a term of art in the dental profession and should be interpreted for Medicaid just as it is generally recognized in the field of dentistry, and consistent with the expert opinions of Dr. Tadlock, Dr. Altenhoff and the Dr. Proffit textbook. The EC's interpretation of ectopic eruption is narrow, objective not subjective, and consistent with Medicaid's orthodontic policy of providing benefits to children with dysfunctional severe handicapping malocclusions rather than providing benefits to children who have solely cosmetic needs. If the EC did not correct the ALJ's erroneous interpretation of ectopic eruption, dental providers would be able to apply a broad, subjective standard and use that subjective standard to qualify nearly any patient regardless of need or Medicaid's other limitations solely on the basis of "ectopic eruption." Such a scenario would fly in the face of Medicaid's clear policy of providing limited orthodontic benefits only for severe handicapping conditions and not providing benefits for cosmetic reasons only.

The EC's policy interpretation is also squarely within his core area of

expertise as the chief executive of the agency in charge of Texas Medicaid. Therefore, it is entitled to deference from the Court. *Texas Citizens*, 336 S.W. at 629; *Sw. Pharm.*, 408 S.W.3d at 561-62; *Garcia*, 454 S.W.3d at 137. This proper interpretation by the EC is the lynchpin of the modifications to the ALJs' PFD, as discussed *infra*.

**II.    The EC did not exceed his authority in entering the AFO and Antoine cannot establish otherwise.**

Antoine cannot establish that the EC exceeded his authority in entering the AFO. The standard of review for an abuse of discretion by a state agency is whether the agency's final decision: (1) ignores the factual record; (2) relies on facts not in evidence; or (3) is not rationally connected to the factual record. *City of El Paso*, 883 S.W.2d at 184; *State v. Pub. Util. Comm'n*, 883 S.W.2d at 201; *Heritage on the San Gabriel v. Tex. Comm'n on Envt'l Quality*, 393 S.W.3d 417, 423 (Tex. App.—Austin 2012, pet. denied), (quoting *City of Waco v. Tex. Comm'n Envtl. Quality*, 346 S.W.3d 781, 819-20 (Tex. App.—Austin 2011, pet. denied)).

The AFO is squarely based on the factual record from the SOAH hearing. The AFO is 42 pages long and is replete with references to uncontested evidence. **App. A**. Further, no reasonable argument can be made that the AFO relies on facts not in evidence or that it is rationally unrelated to the evidence. In short, there is no credible argument that the EC abused his discretion in rendering the AFO.

All of the EC's modifications in the AFO were made to correct misunderstandings and misapplications of Medicaid law and policy by the ALJs. Substantial evidence exists to show the EC correctly maintained the payment hold, and Antoine cannot present evidence to the contrary; therefore, the Court should uphold the AFO.

**A. The ALJs misunderstood and misapplied Texas Medicaid law and policy and the EC corrected the misunderstanding with a proper construction of law and policy.**

The ALJs incorrectly concluded that OIG failed to present *prima facie* evidence that is "credible, reliable, or verifiable, or that has indicia of reliability" that Antoine engaged in fraud or willful misrepresentation in filing its requests for prior authorization and claims for payment with Texas Medicaid. Consequently the ALJs recommended that the EC order the OIG to lift the payment hold in its entirety. *See* PFD proposed FoF Nos. 48-50, at pp. 40-41, A.R. at 1234- 35.

The ALJs' incorrect findings, conclusions, and ultimate recommendation rested on their erroneous determination that Texas Medicaid adopted a "special" definition of the term "ectopic eruption" that is subjective and broader than the meaning of the phrase in the general practice of dentistry. This is clearly at odds with the EC's interpretation that ectopic eruption means the same thing in Texas Medicaid as it does in the general practice of dentistry. In making this determination, the ALJs ignored the plain language of the policy and the testimony

of the only witnesses qualified to testify what Texas Medicaid policy means. The ALJs' mistaken construction of ectopic eruption effectively destroys the limitations of Texas law and Medicaid policy which restrict orthodontia to children who suffer from a "severe handicapping malocclusion." 25 Tex. Admin. Code § 33.71.

Rather than concluding that the definition of ectopic eruption is subjective, the ALJs should have adopted the agency's own construction, as presented by agency staff witnesses and by the State's testifying expert.[33] The record presented by the State shows that the TMPPM's instruction regarding ectopic eruption is not vague and is consistent with the widely recognized understanding of ectopic eruption. *See* Vol.1, 236:3-15, A.R. at 2047 (Dr. Tadlock testifying that the definition of ectopic eruption is learned at every dental school and in every orthodontic program in the country);[34] *see also* Vol. 2 at 84:23-24, A.R. at 2135

---

[33] Dr. Tadlock is the only board-certified orthodontist who testified in this case. He is one of only eight directors nationally on the American Board of Orthodontists and is the incoming Chair of the ABO clinical committee, which administers the clinical exam to orthodontic residents nationally. Vol. 1, at 133:10-134:20, A.R. at 1944-45.

[34] Dr. Tadlock reviewed nearly 1,300 articles discussing "ectopic eruption." Vol. 1, at 152:1-154:11, A.R. at 1963-65. As Dr. Tadlock noted, "The bottom line is this, there are no references to teeth that are rotated or tipped. There *are -- ectopic eruption in every article is a tooth that is away from, it is out of place, it is in the wrong place.* Not most of them, many of -- not most of them, all of them." *Id*. at 153:1-6 (emphasis added), A.R. at 1864; *see also* 154:4-11, A.R. at 1965 ("*But in every case, they are teeth that are out of the position,* they are not here in turn; they are out, they are somewhere else. *That's the definition of ectopic eruption that existed that started in 1938 or somewhere before then. It has existed in its same form since then, up to '87 when Dr. Proffit wrote its eruption in the wrong place, and that definition has not changed.*") (emphasis added).

(where Antoine's expert Dr. Orr acknowledged that "ectopic" means "out of place," and that this meaning is found "in medicine all over.").

The administrative record reflects HHSC's long-standing requirement that medical and dental terms be interpreted for Medicaid purposes just as those terms are construed for non-Medicaid patients. Ex. R-14, (2008 TMPPM) at § 1.2.5, at **App. G**; Ex. R-15 (2009 TMPPM), at § 1.4.5, at **App. F**; Vol. 1, 93:2-9, 94:16-23, 111:11-14, A.R. at 1904-05; Vol. 3, 193:5-194:1, 241:5-11, 249:11-250:19, A.R. at 2480-81, 2528, 2536-37.

Dr. Tadlock's testimony that ectopic eruption is generally understood within the dental/orthodontic profession as a "tooth that is out of place," is not only supported by the medical literature and the testimony of the State's Medicaid policy witness, Dr. Altenhoff, it is also the *only* competent expert testimony of record. *See generally* Dr. Tadlock's testimony at Vol. 1, at 152:1-154:11, A.R. at 1963-65; *see also* Vol. 3, 240:22-241:4, A.R. at 2527-28 (testimony that Dr. Altenhoff is the person most knowledgeable about Medicaid policy), and Vol. 3, 174:19-175:7 (Antoine's dentist Dr. Kanaan acknowledging that Dr. Altenhoff is the expert on what Medicaid covers and does not cover), A.R. at 2461-62.[35]

The ALJs' error in disregarding the testimony of Drs. Tadlock and

---

[35] When asked by the ALJ if conditions would qualify as ectopic eruption after the January 2012 clarifying amendment, Dr. Kanaan answered: "You would need to ask Dr. Altenhoff." Vol. 3, 174:19-175:4, A.R. at 2461-62.

Altenhoff was magnified because they misconstrued what Antoine's orthodontist, Dr. Kanaan actually said. The ALJs incorrectly asserted that Dr. Kanaan concluded that Patients 36, 37, 42, 43, and 47 each presented a "severe handicapping malocclusion." *See* PFD at 26-27, A.R. at 1220-21. This statement is not supported by the evidentiary record. Of these patients, the only ones for which Dr. Kanaan made such statement were Patients 36 and 47. Vol. 3, at 149:3-4, A.R. at 2436 (describing Patient 36 as a "100 percent dysfunctional handicapping case"); Vol. 3, at 161:23-162:6, A.R. at 2448-49 (opining that Patient 47 presented "dental necessity, medical necessity, hundred -- hundred percent handicap malocclusion"). For the other patients, Dr. Kanaan merely stated that the patient, in his opinion, needed orthodontic treatment. Vol. 3, at 156:16-19 (Patient 37) (answering "100 percent, 120 percent" when asked patient had a "true orthodontic need"), A.R. at 2443; Vol. 3, at 155:1-6 (Patient 42) (answering "correct, hundred percent" when asked if case was an example of "true orthodontic need"), A.R. at 2442; Vol. 3, at 159:12-16 (Patient 43) (agreeing that the patient had a "true orthodontic need for braces"), A.R. at 2446. This distinction is more than a semantic one, as the standard for Medicaid coverage is "severe handicapping malocclusion" and not merely "true orthodontic need." *See* 25 Tex. Admin. Code § 33.71.

Taken together, testimony and evidence presented at the administrative

hearing, coupled with deference that should be given to the EC's interpretation of Texas Medicaid policy,[36] illustrate that: (a) the ALJ's incorrectly interpreted and applied Medicaid policy; (b) the EC was authorized to correct misapplications of law and policy; and (c) the EC did not exceeded his authority in correcting the ALJs. As a result, the Court should affirm the AFO.

## 1. The rules of statutory construction govern questions of agency policy and administrative rules.

In determining the proper scope and limitations of Medicaid policy, and the administrative rules of HHSC implementing Medicaid policy, the Court is guided by the rules governing statutory construction. *See Boswell v. Brazos Electric Power*, 910 S.W.2d 593, 599-600 (Tex. App.—Fort Worth 1995, writ denied); Tex. Gov't Code § 311.002(4).

In construing a statute, the primary objective is to ascertain and give effect to the intent of the legislature. *Cont'l Cas. Ins. Co. v. Functional Restoration Assocs.*, 19 S.W.3d 393, 402 (Tex. 2000) (citing *Liberty Mut. Ins. Co. v. Garrison Contractors, Inc.*, 966 S.W.2d 482, 484 (Tex.1998)); *Texas Citizens*, 336 S.W.3d at 624; Tex. Gov't Code § 312.005. In so doing, courts look first to the plain and common meaning of the statute's words. *See* Tex. Gov't Code § 311.005; *Fitzgerald v. Advanced Spine Fixation Sys., Inc.,* 996 S.W.2d 864, 865 (Tex.1999).

---

[36] Discussed *infra*.

Courts will consider the entire statute, not simply the disputed portions. *State v. Terrell*, 588 S.W.2d 784, 786 (Tex.1979). Each provision must be construed in the context of the entire statute of which it is a part. *Bridgestone/Firestone, Inc. v. Glyn-Jones*, 878 S.W.2d 132, 133 (Tex.1994)

The Code Construction Act, Government Code chapter 311, provides additional guidelines for statutory interpretation. For instance, words and phrases should be read in context, not in isolation. Tex. Gov't Code § 311.011(a). Words and phrases that have acquired a technical or particular meaning shall be construed accordingly. Tex. Gov't Code § 311.011(b). The entire statute is intended to be effective. Tex. Gov't Code § 311.021(2). A just and reasonable result is intended; one that is feasible of execution. Tex. Gov't Code §§ 311.021(3), (4). The public interest is favored over any private interest. Tex. Gov't Code § 311.021(5).

In construing a statute a court may consider: (1) the object sought to be obtained; (2) the consequences of a particular construction; and (3) an agency's construction of a statute that is committed to the agency for enforcement. Tex. Gov't Code §§ 311.023(1), (5), (6).

> **2. The ALJs ignored statutes, rules, and evidence and made fundamental errors in interpreting and applying Texas Medicaid policy. The misapplications were properly corrected by the EC.**

The EC acted within his authority and sound discretion when he applied principles of statutory construction and declined to adopt the ALJs'

misconstruction of Texas Medicaid policy. The EC corrected fundamental errors in the ALJs' interpretation of Texas Medicaid Policy.

First, the ALJs erroneously determined that the TMPPM includes a special definition of ectopic eruption that is capable of different interpretations in different circumstances. Under this interpretation, the ALJs found that Antoine's scoring of twisted and rotated teeth as ectopic was acceptable. However twisted and rotated teeth are normal and do not impair function. *See, e.g.*, note 34, *supra*. Therefore, the ALJs' misinterpretation runs afoul of the plain language of Texas Medicaid policy, as set forth in the TMPPM and in HHSC rules, which clearly states the Medicaid orthodontia benefit is limited to cases where the patient presents a "severe handicapping malocclusion." 25 Tex. Admin. Code § 33.71; Ex. R-15 at § 19.19, at **App. F**. Furthermore, the ALJs' erroneous interpretation violates a fundamental requirement that law and agency policy should be construed consistently with their plain language. *Texas Citizens*, 336 S.W.3d at 624. It was therefore proper for the EC to correct these misinterpretations.

Second, the specific instruction regarding "ectopic eruption" should have been construed by the ALJs in the overall context of Medicaid's limited orthodontia benefit policy. Tex. Gov't Code § 311.011(a). Instead, the ALJs examined the ectopic eruption discussion in the TMPPM in isolation, and without regard to the remainder of the TMPPM or overall objectives of Texas Medicaid

policy. In fact, the ALJs applied an interpretation of the meaning of ectopic eruption that was not only contrary to plain language of Medicaid law and policy, it was also fundamentally at odds with the overall objective of the policy. The ALJs' liberal interpretation of the meaning of ectopic eruption[37] was erroneous because it violated the TMPPM's clear direction that providers should be *conservative* in scoring the HLD. *See, e.g.*, Ex. R-15 at § 19.21, at **App. F**. ("Providers should be conservative in scoring. Liberal scoring will not be helpful in the evaluation and approval of the case.").[38] Moreover, the ALJs' construction of "ectopic eruption" in isolation from the overall context of Medicaid's policy also violated the requirement to consider the disputed portions of the policy within the policy as a whole. *Bridgestone/Firestone, Inc. v. Glyn-Jones*, 878 S.W.2d 132, 133 (Tex. 1994).

The ALJs' construction of Medicaid policy violated several additional

---

[37] The absurdity of the ALJs' construction is illustrated by Antoine's expert, Dr. Orr, who testified that in his broad reading of the Manual's instruction ". . . to me, semantically it has a limitless interpretation as far as the recognition by competent dentists of teeth out of position." Vol. 2, 148:23-149:2, A.R. at 2199-2200. The ALJs' interpretation of the instruction renders the word "unusual" in the instruction meaningless, a result that violates canons of statutory construction. *See, e.g.*, *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011). As Dr. Tadlock testified, based on medical literature, nearly 80 percent of the population has teeth that are crooked to some degree, and therefore there is nothing "unusual" for teeth to erupt in a manner that is not straight or ideal. Vol. 1, at 157, A.R. at 1968.

[38] The idea that HHSC would eviscerate Medicaid orthodontic policy and benefit limitations by promulgating a new and more liberal definition of a widely understood term — is, at best counterintuitive.

tenets of statutory construction in the Code Construction Act:

- The ALJs ignored the meaning of ectopic eruption generally understood in the dental profession, in violation of Tex. Gov't Code § 311.011(b) (terms that have acquired technical or particular meanings shall be construed accordingly);

- The ALJs' broad interpretation of ectopic eruption rendered the limiting language in State regulations (e.g., 25 Tex. Admin. Code § 33.71) and in Medicaid policy (*e.g.*, Ex. R-15, at § 19.19, at **App. F**) ineffective, in violation of Tex. Gov't Code § 311.021(2) (the entire statute is presumed to be effective);

- The ALJs' interpretation leads to an "ectopic eruption in the eye of the beholder" standard, which is absurd given scarce Medicaid resources and HHSC statements regarding the limited nature of the orthodontic benefit. Opening the definition to the subjective interpretation of providers ("if the provider says its ectopic eruption, then it's ectopic eruption") also deprives Medicaid policy makers of their statutory and regulatory responsibility for defining the scope of the benefit. Thus the ALJs' interpretation violates Tex. Gov't Code § 311.021(3) (a just and reasonable result is intended), and Tex. Gov't Code § 311.021(4) (a result feasible of execution is intended);

- The ALJs' construction favors only the private pecuniary interests of unscrupulous providers, at the expense of taxpayers and truly eligible Medicaid recipients. Thus, the ALJs' interpretation violates Tex. Gov't Code § 311.021(5) (public interest is favored over any private interest);

- The ALJs failed to consider the purposes of Medicaid policy: their construction does not advance the goal of preserving scarce Medicaid dollars by limiting orthodontic reimbursements to cases of severe handicapping malocclusion. Thus, the ALJs' interpretation violates Tex. Gov't Code § 311.023(1) (a court considers the object sought to be obtained by the statute); and

- The ALJs failed to consider the consequences of their interpretation. Under their interpretation, any provider's prior authorization request for comprehensive orthodontia will be approved, so long as the provider scores the HLD with a 26 or greater – without regard to the true condition of the patient. This has far reaching implications for the Medicaid program, particularly in light of the ALJs' acknowledgement (proposed FoF No. 25) that HHSC's Medicaid claims processing contractor, TMHP, abrogated its responsibility to review clinical data submitted with prior authorization requests. The ALJs' interpretation violates Tex. Gov't Code § 311.023(5) (a court considers the consequence of a particular construction).

41

It was therefore proper for the EC to correct these misinterpretations.

Finally, the ALJs' interpretation of the Medicaid meaning of ectopic eruption was contrary to HHSC's long-held and consistent construction of the phrase. OIG presented evidence during the hearing that a January 2012 amendment to the TMPPM language addressing ectopic eruption was intended to clarify the Medicaid program's long-standing interpretation, not to implement a substantive change in policy. *See* testimony of Dr. Linda Altenhoff, Vol, 1 at 93:2-9, 94:16-23, A.R. at 1904-05; and testimony of Deputy Inspector General for Enforcement, Vol. 3 at 193:5-194:1, 294:21-23, A.R. at 2480-81, 2581. This testimony from Medicaid program officials was uncontroverted.

Nevertheless, the ALJs erroneously concluded that the January 2012 language was intended to effect a substantive change to the "definition" of ectopic eruption. In the district court, Antoine characterized the ALJs' determinations regarding the effect of the January 2012 language change as a finding of adjudicative fact that the EC was not allowed to alter. Antoine is wrong. Whether the language change in the TMPPM was intended to be substantive or clarifying is a question of law, committed to the discretion of the EC. *Sw. Pharm. Solutions,* 408 S.W.3d at 561-62; *Boswell*, 910 S.W.2d at 599-600. It was therefore proper for the EC to correct these misinterpretations.

**B. Substantial evidence exists to show that Antoine committed fraud or made willful misrepresentations necessary to maintain the payment hold. The EC properly corrected the ALJs′ errors, and Antoine cannot establish that the EC exceeded his authority.**

The ALJs erroneously determined that there exists a special definition for ectopic eruption under the Medicaid Program—a definition that, as described *supra*, is inconsistent with Medicaid's limited orthodontic benefit. As a result, they found that none of the HLD scoresheets Antoine submitted included false statements or misrepresentations. Consequently, they wrongly concluded that Antoine's conduct was neither fraudulent nor willfully misrepresentative.

In reaching this conclusion, the ALJs ignored substantial evidence of Antoine's conduct, disregarded the testimony of the OIG's expert, and impermissibly created "expert" opinions from the testimony of Antoine's Drs. Nazari and Kanaan.

Antoine did not address the issue of substantial evidence in its district court brief. Accordingly, Antoine waived any argument that the AFO is not supported by substantial evidence. *See Akin*, 2015 WL 1611803, at *3 n.1. This alone should be enough to affirm the AFO. Nevertheless, the State will show that the AFO is fully supported by substantial evidence, and in so showing will establish that the district court erred in reversing the AFO.

## 1. Providers have a duty to know and follow law and policy.

In reaching their flawed interpretation of Medicaid policy, the ALJs ignored Antoine's duty, as a matter of law, to understand and comply with Medicaid requirements, standards, and procedures. *See Heckler v. Community Health Servs.,* 467 U.S. 51, 63-65 (1984)*. Heckler* involved the Government's recovery of payments incorrectly made to a Medicare provider, who contended the Government was estopped from recovering because the provider relied on authorization by a fiscal intermediary. *Id.* at 53, 60. The *Heckler* Court rejected the availability of estoppel. *Heckler* found that the provider had lost no legal right because it was never entitled to the money in the first place. *Id.* at 61-62.[39] *Heckler* also found that the provider had a duty to know the provisions under which it received government funds. *Id.* at 64. The Court noted:

> Justice Holmes wrote: "Men must turn square corners when they deal with the Government" (citing *Rock Island, A. & L.R. Co. v. United States*, 254 U.S. 141, 143 (1920)). This observation has its greatest force when a private party seeks to spend the Government's money. Protections of the public fisc requires that those who seek public funds act with scrupulous regard for the requirements of law; respondent could expect no less than to be held to the most demanding standards in its quest for public funds. This is consistent with the general rule that those who deal with the Government are expected to know the law and may not rely on the conduct of Government agents contrary to law.

---

[39] *See also Personal Care Products, Inc. v. Hawkins*, 635 F. 3d 155 (5th Cir. 2001) (noting that providers have no property interest in Medicaid reimbursement receivables).

*Id.* at 63; *see also N. Mem'l Med. Ctr. v. Gomez*, 59 F. 3d 735, 739 (8th Cir. 1995) (participants in the Medicaid program have a "duty to familiarize themselves with the legal requirements" of Medicaid procedures). Providers may not claim after getting caught in a lie that they interpreted a term in a manner that contradicts Medicaid policy, federal and state law, and the industry-wide understanding of the term. Likewise, Antoine's misrepresentations were not excused and should not have been given credit by the ALJs. The EC was well within his authority to correct the ALJs misapplication and misinterpretations of Medicaid policy. Therefore, the Court should affirm the AFO.

### 2. Dr. Kanaan's scoring pattern shows, at a minimum, he acted with conscious disregard or reckless indifference to the truth or falsity of his representations of patient conditions.

Dr. Kanaan's scoring pattern shows substantial and reliable evidence of fraud: he scored 27 of the 63 patients in the sample, and of those 27 patients, Dr. Kanaan scored 23 (85%) as having the *same eight teeth ectopic*. Vol. 3 at 43-70, A.R. at 2330-57. Ex. P-64.01 through P-64.63; R-49, Tadlock summary, at A.R. 1097-98, **App. I**. The rate of occurrence of ectopic eruption in the cases scored by Dr. Kanaan flies in the face of expert testimony from disinterested orthodontists that, according to the scientific literature, ectopic eruption is rare and the incidence of **even one tooth** ectopic occurs only in between 1.5 and 9

percent of the population.[40] The chances that 85% of Dr. Kanaan's patients would each have the same eight ectopic teeth, when less than 10% percent of the population has even one ectopic tooth, is infinitesimal. *See* Dr. Tadlock's testimony, Vol. 1 at 174-175, A.R. at 1985-86. Although the ALJs made passing note of Dr. Kanaan's scoring pattern, they failed to draw any inferences from this conduct, nor did they explain how this evidence relates to the OIG's burden to continue the payment hold.[41]*See* 42 C.F.R. § 455.2 (a Medicaid agency may receive credible allegations of fraud from any source, including "patterns identified through provider audits.").[42]

Additionally, OIG presented reliable evidence that Antoine submitted fraudulently scored HLD scoresheets for 61 of the 63 patients by falsely

---

[40] Dr. Kanaan testified the ectopic eruption is so rare that he has never treated a private-pay patient for a single ectopically-erupted tooth. Vol. 3 at 96:6-9, A.R. at 2383. Yet, he also testified that he does not diagnose Medicaid and private-pay patients differently. *Id.* at 17:22-25, A.R. at 2304. Dr. Kanaan even testified that the very same mouth that has ectopically-erupted teeth for Medicaid purposes is a prime example – the very example he uses on his other practice's website– of crowding. Vol. 3 at 20:25-21:1, A.R. at 2307-08 (the photo on his website is an example of crowding), 21:5-20, A.R. at 2308 (explaining that the photo is of ADC's Medicaid patient), 25:5-25:8, A.R. at 2312 (stating that he scored this patient as ectopic).

[41] None of the patients in the sample were eligible for Medicaid-covered comprehensive orthodontics without Antoine's score for ectopic eruption: excluding those ectopic eruption scores, Antoine's sample HLD scores ranged from 0 to 19. *See* R-49, Tadlock summary, at A.R. 1097-98, **App. I**. Assuming *arguendo* that each of these patients had two instances of the rare condition of anterior ectopic eruption, they still would not have been eligible for Medicaid-covered comprehensive orthodontics, as they could not achieve the qualifying score of 26.

[42] The evidentiary burden on OIG in this proceeding is very low. The evidence must have "indicia of reliability." In other words, it is reliable unless rebutted and shown to be immaterial, untrue, inaccurate or unreliable

representing that each of these 61 patients had six or more ectopically-erupted teeth. *See* R-49, Tadlock summary, at A.R. 1097-98, **App. I**. In light of the commonly understood meaning of ectopic eruption as established by the testimony of Dr. Tadlock and Dr. Altenhoff, the egregiousness of Antoine's scoring pattern shows reliable *prima facie* evidence of fraud or willful misrepresentations and satisfied the OIG's burden to maintain the payment hold. Tex. Gov't Code § 531.102(g)(2).

### 3. The ALJs compounded their errors by relying on "experts" who misunderstood and misapplied Texas Medicaid policy.

The ALJs expressly declined to rely on Antoine's proffered experts, Orr and Ornish, for their determinations regarding ectopic eruption. PFD at 28, A.R. at 1222. Instead the ALJs attempted to refute Dr. Tadlock's expert testimony by citing to the testimony of Drs. Nazari and Kanaan. However, Antoine did not proffer or qualify either Dr. Nazari or Dr. Kanaan as an expert, and the ALJs erred in considering them experts.[43] *See also Petitioner's Expert Designations* (listing

---

[43] The State objected to Dr. Kanaan being treated as an expert witness. Vol. 3 at 128:2-5, A.R. at 2415. The ALJs abused their discretion when they considered Dr. Kanaan's testimony as an expert. Vol. 3 at 128:6-16 (ALJ: "Well he [Dr. Kanaan] may not have been offered as an expert but he certainly is qualified as an expert as much as any other."). The ALJs, *sua sponte* designated Dr. Kanaan as an expert. Vol. 3 at 129: 3-5, 19-22, A.R. at 2416 (allowing a treatise to be shown to Dr. Kanaan to show "what the expert relied on" and "showing in part what Dr. Kanaan relied upon in forming his expert opinions"). Nor did Antoine ever offer or qualify Dr. Kanaan as an expert witness. Because of the ALJs' abuse of discretion in designating a party opponent as an expert, the EC acted well within his discretion in correcting any proposed findings or conclusions that were predicated on the ALJs' erroneous ruling.

As for Dr. Nazari, Antoine never offered him as an expert. Vol. 4, A.R. 2633-2794. The ALJs in their PFD, again *sua sponte*, designated Dr. Nazari as an expert. *See* PFD at 28 (discussing Dr.

Dr. Orr and Dr. Ornish), A.R. at 356-74. The ALJs also failed to note Dr. Nazari's testimony that he learned to score the HLD index "for Medicaid" from Dr. Orr. Vol. 4 at 137:17-25, A.R. at 2765.[44] Thus, even though the ALJs putatively did not rely on Orr and Ornish, their reliance on Dr. Nazari is misplaced because his opinions are derivative of Dr. Orr, who incorrectly opined that Texas Medicaid adopted a special liberal definition of ectopic eruption.[45] The ALJs therefore erred by relying on providers, for their interpretation of Medicaid policy; and by disregarding the testimony of Medicaid policy witnesses and qualified experts. *See Sw. Pharm.*, 408 S.W.3d at 561-62; *Wood v. Tex. Comm'n Envtl. Quality*, 2015 WL 1089492, at *6.

---

Nazari's testimony as an expert), A.R. at 1222. The EC correctly modified any findings or conclusions relying on the ALJs' erroneous designation of Dr. Nazari as an "expert."

[44] Dr. Nazari testified the methodology he applied for ectopic eruption was to include any teeth that were "rotated, the slanted leaning teeth" based on what he learned from Dr. Orr a decade prior. Vol. 4, at 102:22-103:4, 138:18-23, A.R. at 2730-31, 2766 (including "twisted or turned or crooked" teeth). This description, comports with neither the generally-accepted scientific understanding of the term "ectopic eruption" nor the instruction of the TMPPM which refers to "an unusual pattern of eruption."

[45] The ALJs summarily, and incorrectly, stated that the HLD scores of Dr. Orr and Dr. Ornish, , were "generally similar" to Antoine's scores and that their testimony was "cumulative" of the testimony of Drs. Nazari and Kanaan; the ALJs asserted that they did not rely upon the testimony of either Dr. Orr or Dr. Ornish. PFD at 28, A.R. at 1222. OIG objected to this supposed cursory treatment of Antoine's experts for two reasons. First, the evidence shows Dr. Nazari's understanding of HLD scoresheets was directly based on training he received from Dr. Orr. Vol. 4, at 137-38, A.R. at 2765-66; *See also* Respondent's Closing Brief at 13, 33-37, A.R. at 1001, 1021-22. Second, it is factually incorrect to conclude that Dr. Ornish's scores were "generally similar" to Antoine's– in fact, Dr. Ornish, the only expert orthodontist retained by Antoine, scored 13 of the 63 Antoine patients as having an HLD score less than 26. Thus, *Antoine's own expert* opined that nearly 21 percent of the Antoine patients did not qualify for Medicaid based on the HLD score.

**III.    Every modification made in the EC′s AFO is supported by substantial evidence and Antoine cannot establish otherwise.**

For each modification that he made to the ALJs' PFD, the EC met the requirements to support his changes to the PFD in his AFO. *See e.g.*, *Flores v. Emps. Ret. Sys. of Tex.*, 74 S.W.3d 532, 540 (Tex. App.—Austin 2002, pet. denied); *Pierce v. Tex. Racing Comm'n*, 212 S.W.3d 745, 755 (Tex. App.—Austin 2006, pet. denied); s*ee also Dunn*, 2003 WL 22721659, at *1. There must be a rational connection between an underlying agency policy and the altered finding of fact or conclusion of law. *See*, *e.g.*, *Heritage on the San Gabriel*, 393 S.W.3d at 440-4; *State v. Mid-South Pavers, Inc.,* 246 S.W.3d 711, 728 (Tex. App.–Austin 2007, pet. denied); *Levy v. Tex. State Bd. of Medical Exam'rs*, 966 S.W.2d 813, 816 (Tex. App.–Austin 1998, no pet.).

In the district court, Antoine specifically claimed that the EC erred in changing Findings of Fact 45-50 and Conclusion of Law 13. Because Antoine limited its arguments to those findings of fact and conclusion of law, it has waived argument as to any other changes the EC made to the AFO. Each of the EC's modifications to the contested findings and conclusions was authorized by law and fully supported by substantial evidence in the record.

### A. Finding of Fact No. 45

Finding of Fact No. 45 reads:

**In reviewing the 63 ADC patient files in the statistically valid**

**random sample, Dr. Tadlock applied the definition of ectopic eruption that is generally recognized within the dental profession and scored the patients as instructed by the Manuals. Dr. Tadlock properly applied Medicaid policy.**

As proposed by the ALJs, proposed FoF No. 45 read: "*Dr. Tadlock did not apply the Manual's definition of ectopic eruption in scoring the HLD index for the 63 patients.*" A.R. at 1234.

The EC was authorized to modify proposed FoF No. 45 because it addresses a mixed question of fact and law, and is therefore a "legislative finding."[46] *See Sanchez*, 229 S.W.3d at 515-16; *Dunn*, 2003 WL 22721659, at *3 (quoting McCown & Leo, at 68-69); *Montemayor*, 2003 WL 2140151, *8.

The ALJs' proposed FoF No. 45 was a legislative finding because it was expressly premised on the erroneous and impermissible interpretation that Texas Medicaid policy incorporates a special definition for ectopic eruption. The ALJs' proposed FoF No. 45 had two incorrect assumptions: (1) Medicaid had a special definition for ectopic eruption; and (2) Dr. Tadlock failed to apply Medicaid policy. Neither assumption is accurate.

The EC fully explained the reasons for his modification of FoF No. 45 in his AFO. *See* **App. A**, at pp. 21-23, A.R. at 1764-66. This explanation provides the substantial evidence needed to support the AFO. Antoine cannot establish a

---

[46] *See* McCown & Leo, *supra* note 31.

lack of substantial evidence on the part of the EC, and consequently, the Court should affirm the AFO.

### B. Finding of Fact No. 46.

Finding of Fact No. 46 reads:

**Despite the SOAH ALJs finding Dr. Nazari's testimony to be credible, Dr. Nazari did not properly follow Medicaid policy in his identification of ectopic eruptions; the overwhelming evidence of the consistent pattern of inflated HLD scores submitted by ADC establishes prima facie evidence that is reliable, relevant and material that ADC's misrepresentations of medical necessity constitute willful misrepresentations.**

As proposed by the ALJs FoF No. 46 stated: *Dr. Nazari was a credible witness and properly utilized the Manuals' definition in scoring the HLD index.*

Finding of Fact No. 46 is a legislative finding because it is founded on the (erroneous) presumption that Texas Medicaid policy incorporates a special definition for ectopic eruption. The ALJs' proposed finding had two components: (1) Medicaid had a special definition for ectopic eruption; and (2) Dr. Nazari properly followed Medicaid policy in scoring his patients. Neither element is accurate.

The EC modified the ALJs' proposed FoF No. 46 because the ALJs relied on the faulty proposition that Medicaid adopted a special definition for ectopic eruption. Further, Dr. Nazari's testimony reveals that he did not properly apply Medicaid policy to the scoring of his patients. Vol. 4, at 103:13-16, 104:1-4, 145:9-

10, A.R. at 2731-32, 2773, where Dr. Nazari testified that orthodontics for Medicaid patients is different than orthodontics for non- Medicaid patients.[47] Further, Dr. Nazari was unable to define a "severe handicapping malocclusion." *Id.*, at 144:17-145:6, A.R. at 2772-73. The EC fully explained his reasons for modifying FoF No. 46. *See* **App. A**, at pp. 23-24, A.R. at 1766-67. This provides the substantial evidence needed to support the AFO. Antoine cannot establish a lack of substantial evidence on the part of the EC, and consequently, the Court should affirm the AFO.

### C. Finding of Fact No. 47.

Finding of Fact No. 47 reads:

**Despite the SOAH ALJs finding Dr. Kanaan's testimony to be credible, Dr. Kanaan did not properly follow Medicaid policy in his identification of ectopic eruptions; the overwhelming evidence of the consistent pattern of inflated HLD scores submitted by ADC establishes prima facie evidence that is reliable, relevant and material that ADC's misrepresentations of medical necessity constitute willful misrepresentations.**

As proposed by the ALJs FoF No. 23 stated: *Wael Kanaan, D.D.S. an orthodontist who worked with ADC was a credible witness and properly utilized the Manuals' definition of ectopic eruption in scoring the HLD index.*

Finding of Fact No. 47 is a legislative finding because it is founded on the

---

[47] In this regard, Dr. Nazari's testimony differed from Dr. Kanaan's. Dr. Kanaan testified that Medicaid patients and non-Medicaid patients should be diagnosed and treated to the same standard; yet, in practice he did not follow that guidance. *See supra* note 40.

(erroneous) presumption that Texas Medicaid policy incorporates a special definition for ectopic eruption. The ALJs′ proposed finding had two components: (1) Medicaid had a special definition for ectopic eruption; and (2) Dr. Kanaan properly followed Medicaid policy in scoring his patients. Neither element is accurate.

First, the EC corrected the ALJs' error of law regarding Medicaid policy. Then, he appropriately applied the law to the facts in the record. In their PFD, the ALJs acknowledged that Dr. Kanaan scored 23 of 27 patients exactly the same way—with the <u>same eight teeth </u>being scored as ectopic in all 23 patients. PFD at p.25, A.R. at 1219. Although they recognized this pattern by Dr. Kanaan, the ALJs failed to correctly apply the law to the facts. Dr. Kanaan's approach to Medicaid patients, at the very least, indicates that Dr. Kanaan was reckless in his scoring, or indifferent to the actual standards for qualifying a Medicaid patient. Dr. Kanaan's scoring 23 out of 27 patients exactly the same way constitutes *prima facie* evidence that he acted with the requisite scienter to commit fraud or willful misrepresentations. *See* Tex. Hum. Res. Code § 36.0011(b), defining Culpable Mental State:

> A person acts knowingly with respect to information if the person:
>
> (1)    has knowledge of the information;
> (2)    acts with conscious indifference to the truth or falsity of the information; or
> (3)    acts in reckless disregard of the truth or falsity of the

information. Tex. Hum. Res. Code § 36.0011(a).

In his AFO the EC fully explained the reasons for his changes to FoF No. 47. *See* **App. A**, at pp. 24-26, A.R. at 1767-69. This provides the substantial evidence needed to support the AFO. Antoine cannot establish a lack of substantial evidence on the part of the EC, and consequently, the Court should affirm the AFO.

### D. Finding of Fact No. 48.

Finding of Fact No. 48 reads:

**HHSC-OIG presented evidence that is credible, reliable, and verified, and that has indicia of reliability when analyzed consistently with Texas law and Medicaid policy, that ADC knowingly incorrectly scored the HLD index on orthodontic prior approval requests submitted to Texas Medicaid.**

As proposed by the ALJs, FoF No. 48 stated: *There is no evidence that is credible, reliable, or verifiable, or that has indicia of reliability, that ADC incorrectly scored the HLD Index to obtain Texas Medicaid benefits for patients or to obtain Texas Medicaid payments.*

The EC was authorized to change FoF No. 48 because it is a mixed finding of fact and law. The finding incorporates two components: (1) a statement regarding whether Antoine properly scored the HLD index ("*There is no evidence . . . that ADC incorrectly scored the HLD . . .*"); and (2) a statement regarding Antoine's intent ("*. . . to obtain Texas Medicaid benefits for parents or to obtain*

54

*Texas Medicaid benefits.*"). As to both components, the ALJs' proposed finding reflected a misunderstanding of: (a) Texas Medicaid policy; (b) the OIG's burden of proof in a payment hold proceeding; and (c) the standard for proving scienter under the TMFPA.

In contravention of HHSC policy, the ALJs erroneously determined that Texas Medicaid adopted a liberal interpretation of Medicaid policy with respect to ascertaining whether a patient exhibits ectopic eruption. Upon accepting the "anything goes" standard propounded by Drs. Orr, Nazari and Kanaan, the ALJs then found no error, much less a willful error in Antoine's scoring. The lynch-pin to this finding was the ALJs' misunderstanding, and misapplication, of the limits of Texas Medicaid's orthodontia policy. The ALJs compounded their error by misapplying Texas law: specifically, the ALJs misapplied the OIG's burden of proof at the proceeding, and they ignored the TMFPA standard for scienter of conscious indifference or reckless disregard. *See* Tex. Hum. Res. Code § 36.0011(a).

At the payment hold hearing, the OIG bore the burden of presenting *prima facie* evidence of fraud or willful misconduct. *Prima facie* evidence is "evidence that, until its effect is overcome by other evidence, will suffice as proof of a fact in issue." *Rehak Creative Servs. v. Witt*, 404 S.W.3d 716, 726 (Tex. App.—Houston [l4th Dist.] 2013, pet. denied). The OIG satisfied its burden by presenting

evidence of Antoine's scoring pattern for the HLD scoresheets. *See* R-49, Tadlock summary, at A.R. 1097-98, **App. I**. Section 36.0011 of the TMFPA, as noted *supra*, defines the culpable mental state the State must establish to prove unlawful acts. The State must show the person acted with knowledge of the truth or falsity of information; **or** with conscious indifference to the truth or falsity of the information; **or** with reckless disregard of the truth or falsity. Tex. Gov't Code § 36.0011(a). Importantly, the State is not required to show the person's specific intent to commit an unlawful act. *Id.*, § 36.0011(b).

Therefore, in correctly applying Medicaid policy and Texas law to the evidence, the EC was fully authorized to correct the ALJs' erroneous finding: (1) that there was not credible, reliable, verified evidence with indicia of reliability that Antoine incorrectly scored HLD indices; (2) that there was no evidence Antoine did so for the purpose of obtaining Medicaid benefits.

As required by law, the EC fully explained the rationale for his changes. *See* **App. A**, at pp. 26-28, A.R. at 1769-71. This explanation provides the substantial evidence needed to support the AFO. Antoine cannot establish a lack of substantial evidence on the part of the EC, and consequently, the Court should affirm the AFO.

### E. Finding of Fact No. 49.

Finding of Fact No. 49 reads:

**HHSC-OIG presented *prima facie* evidence that is credible, reliable, and verified, and that has indicia of reliability when analyzed consistently with Texas law and Medicaid policy, that [Antoine] committed fraud or willful misrepresentations to Texas Medicaid.**

As proposed by the ALJs, FoF No. 49 stated: *There is no evidence that is credible, reliable, or verifiable, or that has indicia of reliability, that [Antoine] committed fraud or engaged in willful misrepresentation with respect to the 63 [Antoine] patients in this case.*

The EC was authorized to change FoF No. 49 because it is a mixed finding of fact and law. The ALJs' proposed finding incorporated their misunderstanding of Medicaid policy, and misapplication of Texas law, to the evidence. The EC explained the reasons for his changes to FoF No. 49. *See* **App. A**, at pp. 28-30, A.R. at 1771-73. This explanation provides the substantial evidence needed to support the AFO. Antoine cannot establish a lack of substantial evidence on the part of the EC, and consequently, the Court should affirm the AFO.

### F. Finding of Fact No. 50.

Finding of Fact No. 50 reads:

**HHSC-OIG presented *prima facie* evidence that is credible, reliable, and verified, and that has indicia of reliability when analyzed consistently with Texas law and Medicaid policy, that ADC committed fraud or wilful misrepresentations in filing requests for prior authorization with TMHP for a substantial majority of patients in the OIG audit sample.**

As proposed by the ALJs, FoF No. 50 stated: *There is no evidence that is credible,*

*reliable, or verifiable, or that has indicia of reliability, that ADC committed fraud or misrepresentation in filing requests for prior authorization with TMHP for the 63 patients at issue in this case.*

The EC was authorized to change FoF No. 50 because it is a mixed finding of fact and law. The ALJs' proposed finding incorporated their misunderstanding of Medicaid policy, and misapplication of Texas law, to the evidence. As with FoF No. 49, the EC explained the rationale for his changes. *See* **App. A**, at pp. 30-31, A.R. at 1773-74. This explanation provides the substantial evidence needed to support the AFO. Antoine cannot establish a lack of substantial evidence on the part of the EC, and consequently, t the Court should affirm the AFO.

### G. Conclusion of Law No. 13.

Conclusion of Law No. 13 in the AFO reads:

**HHSC-OIG should maintain the payment hold against ADC for alleged fraud or willful misrepresentation, and program violations. Tex. Gov't Code § 531.102(g) (2011); 42 CFR § 455.23 (2011); Tex. Hum. Res. Code § 32.091(c) (2003); 1Tex. Admin. Code §§ 371.1703(b)(3), and (b)(5), 371.1617(a)(1)(A)-(C), (I), (K), (2)(A), (5)(A), (5)(G) (2005).**

As proposed by the ALJs, CoL No. 13 stated: *HHSC-OIG lacks authority to maintain the payment hold against ADC for alleged fraud or misrepresentation. Tex. Gov't Code § 531.102(g) (2011); 42 CFR § 455.23 (2011); Tex. Hum. Res. Code § 32.091(c) (2003); 1 Tex. Admin. Code §§371.1703(b)(3), 371.1617(a)(1)(A)-(C) (2005).)*

The EC was authorized to change CoL No. 13 because it was a pure question of law committed to the discretion of the agency. Further, to the extent that CoL No. 13 was actually a recommendation from the ALJs, and not a true conclusion of law, the EC was fully authorized to modify it. *See Granek v. Texas State Bd. of Med. Exam'rs,* 172 S.W.3d 761, 781 (Tex. App.—Austin 2005, no pet.); *Akin*, 2015 WL 1611803, \*5; *see also Pierce v. Tex. Racing Comm'n*, 212 S.W.3d at 754 n.7 ("We need not decide, however, whether the ALJ had authority to recommend a penalty in a racing commission case because, regardless of whether the ALJ's conclusion of law was authorized, the Commission was statutorily authorized to modify or reject it." (citing Tex. Gov't Code § 2001.058(e))).

As required by the APA and black letter Texas law, the EC fully explained the reasons for his change to CoL No. 13. *See* **App. A**, at pp. 39-40, A.R. at 1782-83. This explanation provides the substantial evidence needed to support the AFO. Antoine cannot establish a lack of substantial evidence on the part of the EC, and consequently, the Court should affirm the AFO.

## PRAYER

WHEREFORE, the State prays that the Court find that the AFO is fully supported by substantial evidence, and the EC did not exceed his authority in entering the AFO. The State respectfully prays that this Court reverse the honorable district court and affirm the EC's AFO in all respects.

Respectfully submitted,

OFFICE OF THE ATTORNEY GENERAL

CHARLES E. ROY
First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Civil Litigation


/s/ Raymond C. Winter
RAYMOND C. WINTER
Chief, Civil Medicaid Fraud
Division State Bar No. 21791950
Phone: (512) 936-1709
Fax: (512) 370-9477
raymond.winter@texasattorneygeneral.gov
REYNOLDS B. BRISSENDEN
State Bar No. 24056969
reynolds.brissenden@texasattorneygeneral.gov
Phone: (512) 936-2158
NOAH REINSTEIN
State Bar No. 24089769
noah.reinstein@texasattorneygeneral.gov
Phone: (512) 463-3457

Assistant Attorneys General
Office of the Attorney General of
Texas Civil Medicaid Fraud Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548

*ATTORNEYS FOR TEXAS HEALTH AND HUMAN SERVICES COMMISSION AND OFFICE OF THE INSPECTOR GENERAL*

60

## CERTIFICATE OF COMPLIANCE

I certify pursuant to Tex. R. App. P. 9.4(i) that this Brief, excluding the: caption, identity of parties and counsel, statement regarding oral argument, table of contents, index of authorities, statement of the case, statement of issues presented, signature, proof of service, certification, certificate of compliance, and appendix has **14,450** words.  This Brief was prepared using Microsoft Word 2010 and I have relied on the word count from that program.

/s/ Raymond C. Winter
Raymond C. Winter

## CERTIFICATE OF SERVICE

I certify that I have on this the 9th day of November, 2015, served copies of this Appellant's Brief to the following:

Jason Ray
Riggs & Ray, PC
506 W. 14th Street, Suite A
Austin, Texas 78701
jray@r-alaw.com

J.A. "Tony" Canales
Canales & Simonson, PC
2601 Morgan Avenue
P.O. Box 5624
Corpus Christi, Texas 78465
tonycanales@canalessimonson.com

/s/ Raymond C. Winter
Raymond C. Winter

## INDEX OF APPENDIX

APPENDIX A      Amended Final Order

APPENDIX B      Medicaid.gov Website, Statistics

APPENDIX C      Excerpts from Tex. Medicaid and CHIP in Perspective, 10th Ed., Feb. 2015

APPENDIX D      2011 Tex. Medicaid Provider Procedures Manual - Excerpts

APPENDIX E      2010 Tex. Medicaid Provider Procedures Manual - Excerpts

APPENDIX F      2009 Tex. Medicaid Provider Procedures Manual - Excerpts

APPENDIX G      2008 Tex. Medicaid Provider Procedures Manual – Excerpts

APPENDIX H      Exhibit R-51. *Prevalence of malocclusion and orthodontic treatment need in children and adolescents in Bogota, Colombia. An epidemiological study related to different states of dental development*. Birgit Thilander, 2001, European J. of Orthodontics.

APPENDIX I      Spreadsheet of dental scores submitted by Antoine

APPENDIX J      Exhibit R-88. HHSC-OIG's Proffer of Rebuttal Testimony from Dr. Linda Altenhoff

# Appendix A



TEXAS HEALTH AND HUMAN SERVICES COMMISSION

KYLE L. JANEK, M.D.
EXECUTIVE COMMISSIONER

May 2, 2014

J. A. "Tony" Canales
Canales & Simonson
2601 Morgan Avenue
P O Box 5624
Corpus Christi, Texas 78465

Steven Johnson
Associate Counsel
Office of Inspector General
P O Box 85200, MC: 135-8
Austin, Texas 78708-5200

Dan Hargrove
Waters & Kraus, LLP
3219 McKinney Avenue
Dallas, Texas 75201

Jason D. Ray
Riggs, Aleshire, Ray, P.C.
700 Lavaca, Suite 9200
Austin, Texas 78701

James Moriarty
Moriarty Leyendecker, PC
4119 Montrose Blvd, Suite 250
Houston, Texas 77006

Thomas H. Watkins
Husch Blackwell
111 Congress Avenue, Suite 1400
Austin, Texas 78701

Raymond C. Winter
Civil Medicaid Fraud Division
Office of Attorney General
P O Box 12548
Austin, Texas 78711-2548

Gentlemen:

Enclosed is the signed amended Final Order in *Antoine Dental Care v. Texas Health and Human Services Commission, Office of Inspector General*, HHSC-OIG Case No. P2011131652384891.

Sincerely,

Chris Traylor
Chief Deputy Commissioner

| | | |
|---|---|---|
| ANTOINE DENTAL CENTER,<br>*Petitioner* | §<br>§<br>§ | BEFORE THE |
| v. | §<br>§<br>§ | TEXAS HEALTH AND HUMAN<br>SERVICES COMMISSION |
| TEXAS HEALTH & HUMAN<br>SERVICES COMMISSION, OFFICE<br>OF INSPECTOR GENERAL,<br>*Respondent* | §<br>§<br>§<br>§<br>§<br>§ | APPEALS DIVISION |

## AMENDED FINAL ORDER

On this ⏻7⏻ day of 𝑀𝑎𝑦_____, 2014, came to be considered the above-styled case before the Executive Commissioner of the Texas Health and Human Services Commission (HHSC).

Before the Executive Commissioner are: the Proposal for Decision (PFD) issued by the SOAH ALJs Howard S. Seitzman and Catherine C. Egan ("SOAH ALJs"), dated November 4, 2013; the Inspector General's Exceptions to the PFD, dated November 22, 2013; the Response to the Inspector General's Exceptions filed by Antoine Dental Center ("ADC"), dated December 6, 2013; the SOAH ALJs' letter amending their PFD, dated January 16, 2014; the first Final Order issued by HHSC ALJ Rick Gilpin, dated February 27, 2014; the Motion for Rehearing filed with HHSC by the Office of Inspector General, dated April 2, 2014; and the record in the case at SOAH. *See* Tex. Gov't Code Ann. §§ 2001.060, 2001.062 (West 2013).

On February 27, 2014, after consideration of the PFD, the pleadings of the parties and record, the HHSC-ALJ issued a Final Order in this case. The HHSC-ALJ served notice of the Final Order on all parties by letter dated March 12, 2014. *See* Tex. Gov't Code § 2001.142(b) (requiring a state agency to serve a party with a copy of an order that may become final first class mail). On April 2, 2014, the Inspector General filed a timely Motion for Rehearing with the HHSC Appeals Division. Tex. Gov't Code § 2001.146(a) (requiring a party to file a motion for rehearing within twenty days after the party receives notice of an order that may become final).

1

001744

After considering the additional arguments raised in the Motion for Rehearing, and in accordance with Tex. Gov't Code § 2001.058(e), the Executive Commissioner issues this Amended Final Order.

The Executive Commissioner finds that the SOAH ALJs did not properly apply or interpret applicable Texas Medicaid policy and applicable laws governing the Medicaid program and this proceeding. Tex. Gov't Code § 2001.058(e)(1).

Specifically, the Executive Commissioner finds that the SOAH ALJs erred in interpreting Texas Medicaid policy as allowing Medicaid providers to apply a special interpretation to the meaning of the phrase "ectopic eruption." The SOAH ALJs' determination that ectopic eruption has a special meaning for the purposes of Medicaid eligibility that is different from, and more liberal than, the interpretation of the phrase in the general practice of dentistry contravenes Texas Medicaid policy and Texas and federal law. *See, e.g.*, 25 Tex. Admin. Code § 33.71(a) (2008) (Orthodontic Services and Prior Authorization) (providing that Medicaid's orthodontia benefit is limited to cases presenting severe handicapping malocclusion); *see also* Ex. R-14, 2008 TMPPM, § 1.2.5, Compliance with Federal Legislation (mandating that providers must "furnish covered Medicaid services in the same manner, to the same extent. and of the same quality as services provided to other patients"). The SOAH ALJs misapplied applicable law, agency rules, and policies, and then misinterpreted the testimony of witnesses regarding the limitations of Medicaid policy and regarding the meaning of ectopic eruption. *See* Tex. Gov't Code § 2001.058(e)(1); *Southwest Pharm. Solutions, Inc. v. Tex. HHSC,* 408 S.W.3d 549, 562 (Tex. App.—Austin 2013, pet. denied) ("As the agency designated to administer Medicaid, HHSC is charged with overseeing a complex regulatory scheme, and deference to its construction is particularly important." (citing *R.R. Comm'n v. Tex. Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 629 (Tex. 2011)).

The Executive Commissioner further finds that the SOAH ALJs erred to the extent that they impermissibly misinterpreted and misapplied applicable law, rules, and policy which resulted in wrongly dismissing *prima facie* evidence that satisfies the evidentiary requirements to maintain a payment hold. *See* Tex. Gov't Code § 2001.058(e)(1). The Executive Commissioner finds that the Inspector General presented relevant, credible, and material evidence that ADC submitted fraudulent or willfully misrepresented prior authorization requests and claims for reimbursement; ADC submitted claims for services not reimbursable; and ADC failed to maintain or provide records as required by law.

The Executive Commissioner further finds that the SOAH ALJs erred to the extent that they relied on certain findings of fact in HHSC's final order in *Harlingen Family Dental v. Texas Health and Human Services Commission, Office of Inspector General.*

2

001745

*See* Order signed by HHSC-ALJ S. Nash Fekety, dated Jan. 7, 2013, in HHSC Appeals Division, Cause No. 12-0789-K. The Executive Commissioner has determined that certain of the findings in the *Harlingen Family Dental* case incorrectly stated the law, rules, and Medicaid policy and cannot be relied on in this case. *See* Tex. Gov't Code § 2001.058(e)(2). Specifically, the Executive Commissioner concludes that Finding of Fact No. 29 in the *Harlingen Family Dental* case was erroneous to the extent that it suggested that the Inspector General's retained expert Dr. Charles Evans was not qualified to be an expert because he did not treat Medicaid patients. That finding was erroneous and cannot be relied on in this case because State and federal laws require Medicaid patients to be treated to the same standard of care as patients in the general population. *See, e.g.*, 25 Tex. Admin. Code § 33.71(a) (providing that Medicaid's orthodontia benefit is limited to cases presenting severe handicapping malocclusion); *see also* Ex. R-14, 2008 TMPPM, § 1.2.5, Compliance with Federal Legislation (mandating that providers must "furnish covered Medicaid services in the same manner, to the same extent, and of the same quality as services provided to other patients"). Accordingly, the fact that Dr. Evans did not treat Medicaid patients in his practice may not be used in properly evaluating his qualifications (skill, knowledge, experience, and training) as an expert in this case. To the extent that the SOAH ALJs in the instant case relied on Finding of Fact No. 29 from *Harlingen* in their analysis of this case and of Dr. Evans, they erred.

In addition, Finding of Fact No. 31 in the *Harlingen Family Dental* case erroneously stated and applied Texas law and Medicaid policy, to the extent that the finding suggested Medicaid policy interprets "ectopic eruption" differently and more expansively (or more liberally) than the condition is interpreted in the general practice of dentistry. As noted above, the *Harlingen Family Dental* decision applied the law and policy erroneously and cannot be relied on in this case. Tex. Gov't Code § 2001.058(e)(2).

*Harlingen Family Dental* Finding of Fact No. 33 was also erroneous to the extent that it explained away evidence of fraud by impermissibly claiming Dr. Evans was not a qualified expert witness. The *Harlingen Family Dental* ALJ opined that Dr. Evans has not treated Medicaid patients in his private practice and that Dr. Evans scored the HLD indices in the *Harlingen Family Dental* sample in accordance with the common interpretation in the general practice of dentistry, as opposed to the "more expansive" interpretation that the *Harlingen Family Dental* ALJ erroneously claimed had been adopted by HHSC. Thus, because the *Harlingen Family Dental* ALJ relied on these faulty premises, *Harlingen Family Dental* Finding of Fact No. 33 was a misapplication of

3

001746

law. To the extent that the SOAH ALJs relied on the *Harlingen Family Dental* case for their understanding of Medicaid policy, they erred. *Id.*

The Executive Commissioner expressly disapproves of *Harlingen Family Dental* Findings of Fact Nos. 29, 31, and 33 and declares that these findings were incorrectly decided and should not be relied on in this case or any other case. *See* Tex. Gov't Code § 2001.058(e)(2) (authorizing an agency to modify a PFD when it relies on a prior administrative decision that is "incorrect or should be changed").

The Executive Commissioner also finds that the SOAH ALJs failed to both properly articulate and then properly apply the Inspector General's evidentiary burden to the evidence presented. In order to maintain the payment hold, the Inspector General is required to present *prima facie* evidence that is relevant, credible, and material to the issue of fraud or willful misrepresentation, or *prima facie* evidence that ADC has committed other, non-fraudulent program violations. *See* Tex. Hum. Res. Code Ann. § 32.0291(c) (Vernon 2003) (amended 2013) ("The department shall discontinue the hold *unless the department makes a prima facie showing at the hearing that the evidence relied on by the department in imposing the hold is relevant, credible, and material to the issue of fraud or wilful misrepresentation*.") (emphasis added); *see also* Tex. Gov't Code § 531.102(g)(2) ("the [Inspector General] shall impose without prior notice a payment hold on claims for reimbursement submitted by a provider . . . on the determination that a credible allegation of fraud exists"); 42 C.F.R. § 455.23 ("The State Medicaid agency must suspend all Medicaid payments to a provider after the agency determines there is a credible allegation of fraud for which an investigation is pending under the Medicaid program against an individual or entity unless the agency has good cause to not suspend payments or to suspend payment only in part."); 1 Tex. Admin. Code § 371.1703(b) (2005) (Recovery of Overpayments) ("A payment hold on payments of future claims submitted for reimbursement will be imposed, without prior notice, after it is determined that prima facie evidence exists to support the payment hold.").

Specifically, the Executive Commissioner finds that the Inspector General presented prima facie evidence of acts and omissions by ADC justifying the imposition of a 100% payment hold, and that ADC failed to rebut such evidence. Tex. Hum. Res. Code § 32.0291(c); Tex. Gov't Code § 531.102(g)(2); 42 C.F.R. § 455.23.

The Executive Commissioner finds that when Medicaid policy and Texas laws are properly interpreted and properly applied to the facts of record in this case the Inspector General has met his evidentiary burden to maintain a 100% payment hold. Indeed, the Executive Commissioner finds that a 100% payment hold is required by law. Tex. Hum. Res. Code § 32.0291(c); Tex. Gov't Code § 531.102(g)(2); 42 C.F.R. § 455.23.

For these reasons, the Executive Commissioner declines to adopt the SOAH ALJs' proposed findings of fact 10, 21, 26, 29, 39-42, 42, 44-50, 54-55, 57, and proposed conclusions of law 4, 10, 13, 14, and 16. Instead, the Executive Commissioner finds that

4

001747

the Inspector General's Exceptions have merit and should be granted. Further, the Executive Commissioner determines that the Inspector General's payment hold should be maintained at 100%.

It is now therefore ORDERED as follows:

## FINDINGS OF FACT

1. Behzad Nazari, D.D.S., has owned Antoine Dental Center (ADC) since 1998. ADC has two dental clinics in Houston, Texas, that treat Medicaid and private pay clients.

2. Between November 1, 2008, and August 31, 2011, ADC provided dental and orthodontic services to Medicaid patients as a Texas Medicaid Provider holding Provider Identification Nos. 1905432, 2187031, 1952657, and 0908162.DC.

3. During this period, ADC billed Texas Medicaid approximately $8,104,875.75 for orthodontic services.

4. In 2010, approximately 70% of ADC's patients were Medicaid patients.

5. The federal government and the State of Texas share the cost of Texas Medicaid, with the federal government contributing approximately 60% of the payments for Medicaid services.

6. The Texas Health and Human Service Commission (the Commission) is the single agency responsible for the administration of the Texas Medical Assistance Program (Texas Medicaid) and does so by contracting with healthcare providers, claims administrators, and other contractors.

7. During the times in question in this case, Texas Medicaid Health Partnership (TMHP) was the contracted Texas Medicaid claims administrator.

8. During all applicable periods, the Commission's Office of Inspector General (HHSC-OIG) was responsible for monitoring and investigating allegations of fraud, waste, and abuse associated with the Texas Medicaid program.

9. As part of the enrollment process, a provider agreed to comply with the terms of the annual Texas Medicaid Provider Procedures Manual (Manual) and the bulletin updates issued every two months.

10. **Medicaid orthodontia services are limited to treatment of children aged 12 to 20 years with severe handicapping malocclusions and other related conditions, unless an exemption is expressly sought by the provider.**[1]

---

[1] By letter dated January 16, 2014, the SOAH ALJs replied to the Inspector General's Exceptions and notified the Executive Commissioner that their original proposed finding of fact number 10 should be revised to read: *According to the Manual, the intent of the Medicaid dental program was to provide dental care to clients 20 years of age or younger.* For the reasons stated in this Amended Final Order, the

5

001748

(The SOAH ALJs' proposed FoF No. 10 stated: *According to the Manual, the intent of the Medicaid orthodontia program was to provide orthodontic care to clients 20 years of age or younger with severe handicapping malocclusion to improve function.*)

Reason for Change:

The proposed finding is not simply a case-specific finding of fact that determines the "who, what, when, where and how" of this case. Rather, in purporting to recite Medicaid policy, the proposed finding addresses a mixed question of fact and law and is a so-called "legislative finding."[2] As such, the Executive Commissioner has "complete discretion" to modify the proposed finding. *Tex. Dep't of Licensing & Regulation* v. *Thompson*, 03-11-00316-CV, 2013 WL 3791486, at *6 (July 18, 2013, pet. filed) ("'An agency enjoys *complete discretion* in modifying an ALJ's findings and conclusions when those findings and conclusions reflect a lack of understanding or misapplication of the existing laws, rules, or policies.'" (quoting *Smith* v. *Montemayor*, 03-02-00466-CV, 2003 WL 21401591, at *26-27 (Tex. App.—Austin June 19, 2003, no pet.) (emphasis added)); Tex. Gov't Code § 2001.058(e)(1).

The Executive Commissioner modifies proposed FoF No. 10 because it misstates Medicaid policy. *See* Tex. Gov't Code § 2001.058(e)(1) (state agency may change a finding of fact or conclusion of law if the ALJ did not "properly apply or interpret applicable law, agency rules, [or] written policies"). Proposed finding of fact number 10 misstates Texas Medicaid policy, as codified in 25 Tex. Admin. Code § 33.71 and in the Texas Medicaid Provider Procedures Manual (TMPPM). As codified in 25 Tex. Admin. Code § 33.71(a), orthodontia services are a limited benefit:

> (a) Orthodontic services for cosmetic reasons only are not a covered Medicaid service. Orthodontic services must be prior authorized and are limited to treatment of severe handicapping malocclusion and other related conditions as described and measured by the procedures and standards published in the TMPPM.

For most of the time period in question, November 1, 2008 to August 1, 2011, Medicaid orthodontia services were limited to children twelve years of age and

---

Executive Commissioner also declines to adopt the SOAH ALJs recommended FoF No. 10, as stated in their January 16, 2014 letter to the Executive Commissioner.

[2] A "legislative fact" is a mixed question of fact and law and defining terms is an agency function. F. Scott McCown & Monica Leo, *When Can an Agency Change the Findings of Conclusions of an ALJ?: Part Two*, 51 Baylor L. Rev. 63, 69-70 (1999). A finding of fact is a "legislative fact" where the finding affects not just one specific case, but is actually an explication of agency policy and therefore may be applied to other cases or implicates agency policy. *Id.*

001749

older. *See* Ex. R-15 at 19-38 § 19.19.1 (2009 TMPPM). As written, the proposed finding does not accurately reflect Medicaid policy. Specifically, the proposed finding of fact omits the 12 year age threshold for children eligible for orthodontia, erroneously suggesting by implication that *any* child under 20 is eligible. Therefore, proposed finding of fact number 10 should be modified to more accurately reflect the limited benefit of Medicaid orthodontia as articulated in 25 Tex. Admin. Code § 33.71(a); *see* Tex. Gov't Code § 2001.058(e)(1), (3) (allowing an agency to change a PFD to correct errors of law or policy or technical errors in a proposed finding of fact). *See also, e.g.,* Ex. R-17, TMPPM (2011), Vol. 2, § 4.2.24; Ex. R-16, TMPPM (2010), Vol. 2, § 5.3.24; Ex. R-15, TMPPM (2009), Vol. 2, § 19.19; Ex. R-14, TMPPM (2008), Vol. 2 § 19.19.

A correct understanding of the limitations of Texas Medicaid's orthodontia benefit is especially important in this case, where there are a number of examples of ADC requesting full banding (braces) for children under 12 years of age.[3] *See, e.g.,* Ex. R-15 TMPPM (2009) § 19.19.1 (2009 TMPPM) (comprehensive orthodontic treatment restricted to clients who are 12 years of age or older or clients who have exfoliated all primary dentition). The SOAH ALJs may not incorrectly revise or incorrectly interpret the meaning of the agency's policies. *See Southwest Pharm.,* 408 S.W.3d at 557-58; *R.R. Comm'n of Tex.* v. *Tex. Citizens,* 336 S.W.3d at 624. The new finding of fact accurately reflects the policy of Texas Medicaid of providing a very limited benefit and thus advances the goal of preserving scarce Medicaid dollars by articulating the limited orthodontic benefit. Tex. Gov't Code § 311.023(1).

The SOAH ALJs also erred to the extent that they relied on the *Harlingen Family Dental* decision, particularly, FoF 29, 31, and 33, for their understanding of the scope and limitations of Texas Medicaid policy. The Executive Commissioner disapproves of these findings, and expressly concludes that they were based on an incorrect interpretation and application of Texas law and Medicaid policy, and therefore, cannot be relied on. Tex. Gov't Code § 2001.058(e)(2).

An accurate understanding of the scope and limitations of Texas Medicaid policy is critically important to the outcome of this dispute. The fundamental allegation brought by the Inspector General is that ADC has submitted claims for prior approval (PA) and for reimbursement that are not authorized under Medicaid policy or Texas law. Allegations cannot be properly evaluated if the fact finder does not properly interpret and apply a policy. Therefore, there is a rational connection between the correct articulation of Medicaid policy and the altered finding of fact, which accurately reflects that policy. *See, e.g., Heritage on the San Gabriel Homeowners Assoc.* v. *TCEQ,* 393 S.W.3d 417, 440-41 (Tex. App.—Austin 2012, pet denied); *State* v. *Mid-South Pavers, Inc.,* 246 S.W.3d 711, 728

---

[3] ADC request full banding (braces), D8080, for three patients, P-15, P-56, and P-60 who were under 12 years of age at time of treatment.

7

(Tex. App.–Austin 2007, pet. denied); *Levy v. Tex. State Bd. of Med. Exam'rs*, 966 S.W.2d 813, 816 (Tex. App.–Austin 1998, no pet.).

11. In 2008 through 2011, Texas Medicaid paid the providers of orthodontic services on a fee-for-service basis.

12. To be reimbursed for orthodontic services, the Manual required dental providers to first obtain prior authorization from TMHP.

13. In making prior authorization decisions in orthodontia cases, TMHP relied in part on a Handicapping Labio-lingual Deviation (HLD) score sheet contained in the Manual to determine whether orthodontic services qualified for Medicaid coverage.

14. The Manual required providers to complete and submit the HLD score sheet to TMHP together with a prior authorization request and the supporting clinical materials including the treatment plan, cephalometric radiograph with tracing models, facial photographs, radiographs, the model (or cast) of the patient's teeth if a model was made, and any additional pertinent information to evaluate the request.

15. The HLD Index is an index measuring the existence or absence of handicapping malocclusion and its severity, and is a tool used by Medicaid to measure whether a patient qualifies for the public funding program. It is not intended to be diagnostic or treatment tool.

16. The Manual described the categories of the HLD Index, and instructed providers on how to score those categories.

17. The HLD score sheet assigned a certain number of points for the following observed conditions: cleft palate, severe traumatic deviations, overjet, overbite, mandibular protrusion, open bite, ectopic eruption, anterior crowding, and labio-lingual spread in millimeters.

18. Orthodontic services provided solely for cosmetic reasons were not covered under the Texas Medicaid program.

19. Although Texas Medicaid generally restricted orthodontic treatment to children 12 years of age or older who no longer had primary teeth, a provider could request that TMHP approve prior authorization for interceptive treatment or for treatment for a child who qualified for another exception under the program.

20. In general, orthodontic benefits were limited to the treatment of children 12 years of age or older with a severe handicapping malocclusion. If the HLD Index score did not meet the 26-point threshold, a provider could submit a narrative to establish the medical necessity of the treatment.

21. **Notwithstanding TMHP's responsibility for reviewing the filed material to evaluate whether the orthodontic services were medically necessary before**

8

001751

**granting prior authorization, ADC was required to submit accurate HLD scoresheets and PA requests substantiating the patient's condition as meeting Medicaid's requirements.**

(The SOAH ALJs' proposed FoF No. 21 stated: *TMHP was responsible for reviewing the filed material to evaluate whether the orthodontic services were medically necessary before granting prior authorization.*)

Reason for Change:

The proposed finding is not simply a case-specific finding of fact that determines the "who, what, when, where and how" of this case. Rather, the proposed finding addresses a mixed question of fact and law and is a so-called "legislative finding." As such, the Executive Commissioner has "complete discretion" to modify the proposed finding. *Tex. Dep't of Licensing & Regulation* v. *Thompson*, 2013 WL 3791486, at *6 ("'An agency enjoys *complete discretion* in modifying an ALJ's findings and conclusions when those findings and conclusions reflect a lack of understanding or misapplication of the existing laws, rules, or policies.'" (quoting *Smith* v. *Montemayor*, 2003 WL 21401591, at *26-27 (emphasis added)); Tex. Gov't Code § 2001.058(e)(1).

The Executive Commissioner modifies proposed FoF No. 21 because the proposed finding rests upon an incorrect legal premise. The proposed finding of fact suggests that TMHP is solely responsible for the disposition of an orthodontic prior approval (PA) request. The implication of this proposed finding is that if there were any errors in the PAs at issue in this case, TMHP's approvals somehow made the State at fault for ADC's errors. Further, ADC argued at the hearing, and the ALJs' proposed finding of fact seems to suggest, that once TMHP has approved a PA request, ADC cannot be held liable for its veracity or accuracy.

Proposed finding of fact number 21 is erroneous because it misstates, misinterprets, and misapplies Texas law. The black letter law in Texas is crystal clear: the equitable defenses of estoppel and laches do not run against the State in the exercise of its sovereign powers. *See State* v. *Durham*, 860 S.W.2d 63, 67 (Tex. 1993).[4] *See also* Tex. Gov't Code § 2001.058(e)(1) ("A state agency may

---

[4] The Executive Commissioner notes that numerous Travis County District Courts have ruled on the applicability of equitable defenses, such as estoppel, laches, waiver, ratification and limitations, in actions brought by the Office of Attorney General under the authority of the TMFPA. In each of these cases, the district courts have ruled that these defenses are not available as a matter of law. *See, e.g., State of Texas ex rel. Ven-A-Care of the Fla. Keys, Inc.* v. *Roxane Labs., Inc. et al,* Cause No. GV-002327 (53rd Judicial Dist. Ct. Travis County, Tex. Aug. 15, 2003) (Order granting Plaintiffs' First Amended Motion for Partial Summary Judgment, which addressed, among others, defenses of limitations, estoppel, laches, waiver, and failure to mitigate); *State of Texas ex. rel. Ven-A-Care of the Fla. Keys, Inc. v. Sandoz, Inc.,* Cause No. D-1-GV-07-001259 (201st Judicial Dist. Ct., Travis County, Tex. Dec. 14, 2009) (tentative rulings made from bench granting State's partial motion for summary judgment concerning viability of equitable defenses against the state (limitations, estoppel, laches, ratification)); *State of Texas ex rel. Ven-A-Care of the Fla. Keys, Inc.* v. *Alpharma USPD,* Cause No. D-1-GV-08-001566 (419th Judicial Dist. Ct., Travis

9

001752

change a finding of fact or conclusion of law . . . if . . .[the ALJ] did not properly apply or interpret applicable law.").

The proposed finding also ignores the responsibility ADC had to submit truthful and accurate documentation to the State (including the responsibility expressly stated in the Provider Agreement and agreed to by ADC and/or its providers), including accurate HLD scoresheets and PA requests. *See also* Ex. R-14, TMPPM (2008), § 1.2.7 Provider Certification/Assignment ("Texas Medicaid service providers are required to certify compliance with or agree to various provisions of state and federal laws and regulations. After submitting a signed claim to TMHP, the provider certifies the following: . . . The information on the claim form is *true, accurate, and* complete.") (emphasis added).

ADC produced no evidence or legal authority to show it was somehow allowed to provide fraudulent or false statements, submit claims for non-reimbursable services, or engage in any conduct in violation of the applicable Medicaid program rules, based on the mere fact TMHP approved ADC's prior authorization claims. *See id.* (Ex. R-14, TMPPM (2008), § 1.2.7 Provider Certification/Assignment); *see also Heckler* v. *Community Health Servs.,* 467 U.S. 51, 63-65 (1984) (a provider has the responsibility to "familiarize itself with the legal requirements for cost reimbursement").

The SOAH ALJs also erred to the extent that they relied on the *Harlingen Family Dental* decision, particularly, FoF 29, 31, and 33, for their understanding of the scope and limitations of Texas Medicaid policy. The Executive Commissioner disapproves of these findings, and expressly concludes that they were based on an incorrect interpretation and application of Texas law and Medicaid policy, and therefore, cannot be relied on. Tex. Gov't Code § 2001.058(e)(2).

Therefore, the Executive Commissioner finds that the PFD's proposed finding of fact number 21 errs because it misstates Texas law and suggests that ADC is excused for submitting false information if TMHP approved ADC's PA requests. Given the issues in this payment hold proceeding, there is therefore a rational connection between Texas law and the altered finding of fact. *See, e.g., Heritage on the San Gabriel Homeowners Assoc. v. TCEQ,* 393 S.W.3d at 440-41; *State v. Mid-South Pavers, Inc.,* 246 S.W.3d at 728; *Levy v. Tex. State Bd. of Med. Exam'rs,* 966 S.W.2d at 816.

22. The Manual clarified that prior authorization of an orthodontic service did not guarantee payment. To receive payment, the provider still had to show that the

---

County, Tex. Dec. 13, 2010) (order striking defense of failure to mitigate); *State of Texas ex rel. Allen Jones* v. *Janssen Pharm., Inc.,* Cause No. D-1-GV-04-001288 (250th Judicial Dist. Ct., Travis County, Tex. Feb. 23, 2011) (order striking defenses of failure to mitigate and limitations); *State of Texas ex. rel. Gonzalez v. Mego,* Cause No. D-1-GV-11-000740 (201st Judicial Dist. Ct., Travis County, Tex. Sept. 30, 2013) (two orders, striking defendants' estoppel, laches, and waiver defenses).

10

001753

orthodontic procedure was medically necessary under the terms and conditions of the Manual.

23. After ADC provided the orthodontic treatment to the patients in this case, TMHP approved payment.

24. On August 29, 2008, HHSC-OIG issued a performance audit report regarding TMHP's prior authorization process for the period between September 1, 2006, and March 31, 2008, finding that TMHP's prior authorization process did not comply with the Manual (the 2008 audit report).

25. In the 2008 audit report, HHSC-OIG found that TMHP's prior authorization staff failed to review the supporting material submitted by providers with their prior authorization requests, as required, and that TMHP's staff did not have the dental credentials necessary to evaluate whether the supporting documentation submitted by providers supported the HLD score.

26. **The Provider Agreement required ADC and its providers to certify to be truthful; to abide by the Medicaid rules; and to submit true, complete, and accurate information that can be verified by reference to source documentation maintained by ADC.**

(The SOAH ALJs' proposed FoF No. 26 stated: *ADC was unaware of the 2008 audit report and HHSC-OIG's assertion that TMHP was not properly performing prior authorization evaluations.*)

Reason for Change:

The Executive Commissioner modifies the SOAH ALJs' Proposed FoF No. 26 because the proposed finding rests upon an incorrect legal premise. As such, the Executive Commissioner has "complete discretion" to modify the proposed finding. *Tex. Dep't of Licensing & Regulation* v. *Thompson*, 2013 WL 3791486, at *6 ("'An agency enjoys *complete discretion* in modifying an ALJ's findings and conclusions when those findings and conclusions reflect a lack of understanding or misapplication of the existing laws, rules, or policies.'" (quoting *Smith* v. *Montemayor*, 2003 WL 21401591, at *26-27 (emphasis added)); Tex. Gov't Code § 2001.058(e)(1).

The proposed finding suggests that ADC could not have intentionally submitted false information to TMHP because ADC did not know that TMHP was failing to properly review PA requests. This is a misstatement of Texas law. As a threshold matter, the Inspector General does not have to show that ADC made false statements and material misrepresentations with the specific intent to defraud Medicaid. *See* Tex. Hum. Res. Code Ann. § 36.0011(b) (West 2013) (Culpable Mental State: specific intent to defraud is not required). Instead, the Inspector General's burden in this payment hold proceeding is to show by prima facie evidence that when ADC submitted false information to Texas Medicaid that

11

either (1) ADC knew the information was false; (2) ADC acted with conscious indifference to the truth or falsity of the information; or (3) ADC acted with reckless disregard of the truth or falsity of the information. *Id.* (a)(1)-(3).

The SOAH ALJs also erred to the extent that they relied on the *Harlingen Family Dental* decision, particularly, FoF 29, 31, and 33, for their understanding of the scope and limitations of Texas Medicaid policy. The Executive Commissioner disapproves of these findings, and expressly concludes that they were based on an incorrect interpretation and application of Texas law and Medicaid policy, and therefore, cannot be relied on. Tex. Gov't Code § 2001.058(e)(2).

Moreover, given the allegations at issue in this payment hold proceeding, and the actual standard under the TMFPA, there is therefore a rational connection between Texas law and the altered finding of fact. *See, e.g., Heritage on the San Gabriel Homeowners Assoc. v. TCEQ,* 393 S.W.3d at 440-41; *State v. Mid-South Pavers, Inc.,* 246 S.W.3d at 728; *Levy v. Tex. State Bd. of Med. Exam'rs,* 966 S.W.2d at 816.

27. In 2011, HHSC-OIG conducted a data analysis of paid Medicaid claims in Texas and determined that ADC was one of the top providers in the state with high utilization of orthodontia billing between 2008 and 2011. As a result, HHSC-OIG initiated a fraud investigation against ADC.

28. HHSC-OIG retained Charles Evans, D.D.S., an orthodontist, to review the clinical records for the 63-patient sample collected by HHSC-OIG for whom ADC filed prior authorization requests during the relevant period.

29. **The HLD score sheets for the 63 patients in the random sample were completed by ADC's orthodontist, Wael Kanaan, D.D.S. and Dr. Nazari, who is not an orthodontist, and in each case they scored the patient as having a score of 26 or more points. The greatest number of points was associated with the category of "ectopic eruption."**

(The SOAH ALJs' proposed FoF No. 29 stated: *The HLD score sheets for the 63 patients were completed by ADC's orthodontist, Wael Kanaan, D.D.S. and Dr. Nazari, and in each case the patient scored 26 or more points. The greatest number of points was associated with the category of "ectopic eruption."*)

Reason for Change:

The Executive Commissioner modifies the proposed finding because it mischaracterizes by omission which party has responsibility for completing the HLD score sheets – the provider. As such, the Executive Commissioner has "complete discretion" to modify the proposed finding. *Tex. Dep't of Licensing & Regulation v. Thompson,* 2013 WL 3791486, at *6 ("'An agency enjoys *complete discretion* in modifying an ALJ's findings and conclusions when those findings and conclusions reflect a lack of understanding or misapplication of the existing

12

001755

laws, rules, or policies.'" (quoting *Smith* v. *Montemayor*, 2003 WL 21401591, at *26-27 (emphasis added)); Tex. Gov't Code § 2001.058(e)(1).

Here, Drs. Kanaan and Nazari scored the HLD scoresheets, and represented to the State the accuracy of the scores. R-83; R.R. Vol. 3 at 46-70, 96-97; R.R. Vol. 4 at 99-100. As written, the proposed fact impermissibly minimizes the active and responsible role providers have in scoring patients. Texas Medicaid depends upon the providers to submit accurate documentation to the State; thus, providers bear the responsibility to score the patients. *See* Tex. Gov't Code § 2001.058(e)(1); *see also* Ex. R-14, TMPPM (2008), § 1.2.7 Provider Certification/Assignment ("Texas Medicaid service providers are required to certify compliance with or agree to various provisions of state and federal laws and regulations. After submitting a signed claim to TMHP, the provider certifies the following: . . . The information on the claim form is *true, accurate, and complete*.") (emphasis added).

Proposed FoF No. 29 is also misleading because it omits the fact that Dr. Nazari is not an orthodontist. Therefore, the Executive Commissioner is fully authorized to correct this technical error (by omission) in FoF No. 29. Tex. Gov't Code § 2001.058(e)(3).

The SOAH ALJs also erred to the extent that they relied on the *Harlingen Family Dental* decision, particularly, FoF 29, 31, and 33, for their understanding of the scope and limitations of Texas Medicaid policy. The Executive Commissioner disapproves of these findings, and expressly concludes that they were based on an incorrect interpretation and application of Texas law and Medicaid policy, and therefore, cannot be relied on. Tex. Gov't Code § 2001.058(e)(2).

Given the issues in this payment hold proceeding, and the requirements of Texas law and Medicaid policy, there is therefore a rational connection between Texas law and the altered finding of fact. *See, e.g., Heritage on the San Gabriel Homeowners Assoc. v. TCEQ*, 393 S.W.3d at 440-41; *State v. Mid-South Pavers, Inc.*, 246 S.W.3d at 728; *Levy v. Tex. State Bd. of Med. Exam'rs*, 966 S.W.2d at 816.

30. Dr. Evans concluded that in all 63 cases, the clinical records did not support the scoring on the HLD score sheets submitted with the prior authorization requests because of the score assigned to the ectopic eruption category. Dr. Evans did not testify in this matter.

31. Although HHSC-OIG represented that its field investigators interviewed ADC's office staff, dentists, and the patients and their parents/guardians, it did not present this evidence during the hearing.

32. Based in large part on Dr. Evans' conclusions, on April 4, 2012, HHSC-OIG issued a letter to ADC notifying ADC that it was imposing a 100% payment hold on all future Medicaid reimbursements due to a credible allegation of fraud for claims ADC submitted from November 1, 2008 through August 31, 2011.

13

001756

33. ADC timely requested a hearing to contest the payment hold, and the matter was referred to the State Office of Administrative Hearings (SOAH) on November 7, 2012.

34. HHSC-OIG referred ADC to the Medicaid Fraud Control Unit of the Office of the Attorney General (MFCU), and on March 29, 2012, MFCU opened an investigation.

35. On January 15, 2013, HHSC-OIG issued its First Amended Notice of Hearing to ADC. The notice contained a statement of the time, place, and nature of the hearing; a statement of the legal authority and jurisdiction under which the hearing was to be held; a reference to the particular sections of the statutes and rules involved; and a short plain statement of the matters asserted.

36. The hearing on the merits was held May 28 through 31, 2013, before Administrative Law Judges Catherine C. Egan and Howard S. Seitzman at the State Office of Administrative Hearings (SOAH) in the William P. Clements Building, 300 West 15th Street, Fourth Floor, Austin, Texas. ADC appeared through its attorneys of record, J.A. Tony Canales, Hector Canales, Robert M. Anderton, Philip H. Hilder, William B. Graham, James G. Rytting, and Thomas Watkins. HHSC-OIG was represented by outside counsel Dan Hargrove, Caitlyn Silhan, James R. Moriarty, Ketan Kharod; by Assistant Attorneys General Raymond C. Winter and Margaret M. Moore, from the Office of Attorney General of Texas, and by Enrique Varela and John R. Medlock, from HHSC-OIG.

37. In the 2008 through 2011 Manuals (Manuals), the HLD index described the term "ectopic eruption" as "an unusual pattern of eruption, such as high labial cuspids or teeth that are grossly out of the long axis of the alveolar ridge." The Manuals instructed providers not to include (score) teeth from an arch if the provider counted the arch in the category for anterior crowding. For each arch, the Manual further instructed that either the ectopic eruption or anterior crowding could be scored, but not both.

38. The Manuals' references to high labial cuspids and teeth grossly out of the long axis of the alveolar ridge were nonexclusive examples of ectopic eruption.

39. **The Manual requires providers to apply the HLD scoring methodology in accordance with their professional training, education and generally accepted standards in the dental profession. Among those standards is the standard for identifying ectopic eruption.**

(The ALJs' proposed FoF No. 39 stated: *The Manual's definition of ectopic eruption in the 2008 through 2011 Manual required subjective judgment to interpret.*)

Reason for Change:

14

001757

The proposed finding addresses a mixed question of fact and law, and is a "legislative finding." As such, the Executive Commissioner has "complete discretion" to modify it. *Tex. Dep't of Licensing & Regulation* v. *Thompson*, 2013 WL 3791486, at *6 ("'An agency enjoys *complete discretion* in modifying an ALJ's findings and conclusions when those findings and conclusions reflect a lack of understanding or misapplication of the existing laws, rules, or policies.'" (quoting *Smith* v. *Montemayor*, 2003 WL 21401591, at *26-27 (emphasis added)); Tex. Gov't Code § 2001.058(e)(1).

The Executive Commissioner modifies Proposed FoF No. 39 because it is erroneous for two reasons. First, the TMPPM's discussion of ectopic eruption is an instruction, not a definition. *See, e.g.*, R.R., Vol. 1 at 103:8-12 (terms in the ectopic eruption instruction are not defined but are accorded their plain and ordinary meaning in the English language); R.R., Vol. 1 at 111: 12-14 (providers must understand the manual by virtue of their professional training). This error reflects a misinterpretation of law and policy by the SOAH ALJs. *See* Tex. Gov't Code § 2001.058(e)(1); *Thompson*, 2013 WL 3791486, at *6; *Southwest Pharm.*, 408 S.W.3d at 557-58.

Second, the proposed finding erroneously suggests that it was Texas Medicaid policy to adopt a distinct "definition" of ectopic eruption in the TMPPM that differed from ectopic eruption as generally understood within the dental profession. The proposed finding would violate state and federal law because creation of a different set of standards applicable only to Medicaid patients would violate both Texas and federal law. *See, e.g.*, 1 Tex. Admin. Code § 354.1131(h); *see also* RR., Vol. 3, 250:8-19; Ex. R-14 (2008 TMPPM), § 1.2.5; Ex. R-15 (2009 TMPPM), § 1.4.5 ("Compliance with Federal Legislation. Reminder: *Each provider must furnish covered Medicaid services in the same manner, to the same extent, and of the same quality as services provided to other patients. Services made available to other patients must be made available to Texas Medicaid clients if the services are benefits of the Texas Medicaid Program.*"). And in fact, all published policy documents promulgated by HHSC require providers to apply the same standards of care to Medicaid patients they apply with the population at large. *See, e.g.*, Ex. R-16, at § 1.6; Ex. R-15, § 19.2.

Third, the SOAH ALJs' proposed finding suggests that the determination of whether a patient exhibited ectopic eruption was left entirely to the subjective opinion of the treating dentist. This is wrong because Medicaid policy documents and the testimony of agency witnesses shows that dentists were instructed to use their education, training, and experience in evaluating patients. *See, e.g.*, R.R., Vol. 1 at 103:8-12 (terms in the ectopic eruption instruction are not defined but are accorded their plain and ordinary meaning in the English language); R.R., Vol. 1 at 111: 12-14 (providers must understand the manual by virtue of their professional training).

15

001758

It is the province of HHSC to determine what Medicaid policy is, and is not; the SOAH ALJs have no authority to wrongly determine Medicaid policy. *Southwest Pharm.*, 408 S.W.3d at 557-58 ("[W]e must uphold an enforcing agency's construction if it is reasonable and in harmony with the statute . . . This deference is particularly important in construing a complex statutory scheme like Medicaid.") (citing *R.R. Comm 'n of Tex. v. Tex. Citizens*, 336 S.W.3d at 624 (court will defer to agency's construction of statute that is committed to agency for enforcement, as long as the interpretation is reasonable and not contrary to the statute's plain language); *see also Atascosa Cnty. v. Atascosa Cnty. Appraisal Dist.*, 990 S.W. 2d 255, 258 (Tex. 1999) (courts may not accept interpretations of a statute that defeat the purpose of the legislation so long as another reasonable interpretation exists); Tex. Gov't Code § 311.023(6).

The SOAH ALJs also erred to the extent that they relied on the *Harlingen Family Dental* decision, particularly, FoF 29, 31, and 33, for their understanding of the scope and limitations of Texas Medicaid policy. The Executive Commissioner disapproves of these findings, and expressly concludes that they were based on an incorrect interpretation and application of Texas law and Medicaid policy, and therefore, cannot be relied on. Tex. Gov't Code § 2001.058(e)(2).

An accurate understanding of the scope and limitations of Texas Medicaid policy is critically important to the outcome of this dispute. The fundamental allegation brought by the Inspector General is that ADC has submitted claims for PA and for reimbursement that are not authorized under Medicaid policy or Texas law. Allegations cannot be properly evaluated if the fact finder does not properly interpret and apply a policy. Therefore, there is a rational connection between the correct articulation of Medicaid policy and the altered finding of fact, which accurately reflects that policy. *See, e.g., Heritage on the San Gabriel Homeowners Assoc. v. TCEQ*, 393 S.W.3d at 440-41; *State v. Mid-South Pavers, Inc.*, 246 S.W.3d at 728; *Levy v. Tex. State Bd. of Med. Exam'rs*, 966 S.W.2d at 816.

40.  **The Manual's instruction regarding ectopic eruption was amended, effective January 1, 2012 (2012 Manual), to include the following sentence: Ectopic eruption does not include teeth that are rotated or teeth that are leaning or slanted especially when the enamel-gingival junction is within the long axis of the alveolar ridge. This amendment clarified existing Texas Medicaid policy regarding conditions qualifying as ectopic eruption and did not substantively change Texas Medicaid policy.**

(The SOAH ALJs' proposed FoF No. 40 stated: *The Manual's definition of ectopic eruption was amended, effective January 1, 2012 (2012 Manual), to include the following sentence: Ectopic eruption does not include teeth that are rotated or teeth that are leaning or slanted especially when the enamel-gingival junction is within the long axis of the alveolar ridge.*)

Reason for Change:

16

001759

Finding of Fact No. 40 concerns an interpretation of HHSC's intent in adopting changes to Medicaid policy. As such, the proposed finding addresses a mixed question of law and fact and is a "legislative finding." The Executive Commissioner has complete discretion to modify the proposed finding. *Tex. Dep't of Licensing & Regulation* v. *Thompson*, 2013 WL 3791486, at \*6 ("'An agency enjoys *complete discretion* in modifying an ALJ's findings and conclusions when those findings and conclusions reflect a lack of understanding or misapplication of the existing laws, rules, or policies.'" (quoting *Smith* v. *Montemayor*, 2003 WL 21401591, at \*26-27 (emphasis added)); Tex. Gov't Code § 2001.058(e)(1).

The Executive Commissioner modifies the proposed finding because (i) the TMPPM's discussion of ectopic eruption is a scoring instruction, not a definition; and (ii) the proposed FoF misleadingly suggests that the 2012 amendment was substantive and not clarifying. These errors reflect a misinterpretation of law and Medicaid policy by the SOAH ALJs. *See* Tex. Gov't Code § 2001.058(e)(1); *Tex. Dep't of Licensing & Regulation* v. *Thompson*, 2013 WL 3791486, at \*6; *Southwest Pharm.*, 408 S.W.3d at 557-58. First, the TMPPM provides a scoring instruction, not definition. *See, e.g.*, R.R., Vol. 1 at 103:8-12 (terms in the ectopic eruption instruction are not defined but are accorded their plain and ordinary meaning in the English language); R.R., Vol. 1 at 111: 12-14 (providers must understand the manual by virtue of their professional training).

Second, as proposed by the SOAH ALJs, FoF No. 40 erroneously suggests that the January 2012 amendment to the language in the Manual signified a substantive, rather than clarifying, change. The 2012 amendment to the instructions in the TMPPM clarified existing Medicaid policy; the amendment did not effect a substantive change. *See* R.R., Vol, 1 at 93:2-9, 94:20-23 (Dr. Altenhoff), R.R., Vol. 3 at 193:18-194:1; 294:21-23 (Jack Stick). It is the province of HHSC to determine what Medicaid policy is, and is not; the SOAH ALJs have no authority to wrongly determine Medicaid policy. *Southwest Pharm.*, 408 S.W.3d at 557-58 ("[W]e must uphold an enforcing agency's construction if it is reasonable and in harmony with the statute . . . This deference is particularly important in construing a complex statutory scheme like Medicaid.") (citing *R.R. Comm 'n of Tex.* v. *Tex. Citizens*, 336 S.W.3d at 624 (court will defer to agency's long-standing construction of statute that is committed to agency for enforcement, as long as the interpretation is reasonable and not contrary to the statute's plain language); *see also Atascosa Cnty.* v. *Atascosa Cnty. Appraisal Dist.*, 990 S.W. 2d 255, 258 (Tex. 1999) (courts may not accept interpretations of a statute that defeat the purpose of the legislation so long as another reasonable interpretation exists); Tex. Gov't Code § 311.023(6).

The SOAH ALJs also erred to the extent that they relied on the *Harlingen Family Dental* decision, particularly, FoF 29, 31, and 33, for their understanding of the scope and limitations of Texas Medicaid policy. The Executive Commissioner

17

001760

disapproves of these findings, and expressly concludes that they were based on an incorrect interpretation and application of Texas law and Medicaid policy, and therefore, cannot be relied on. Tex. Gov't Code § 2001.058(e)(2).

An accurate understanding of the scope and limitations of Texas Medicaid policy is critically important to the outcome of this dispute. The fundamental allegation brought by the Inspector General is that ADC has submitted claims for PA and for reimbursement that are not authorized under Medicaid policy or Texas law. These allegations cannot be properly evaluated if the finder of fact does not understand the policy. Therefore, there is a rational connection between the correct articulation of Medicaid policy and the altered finding of fact, which accurately reflects that policy. *See, e.g., Heritage on the San Gabriel Homeowners Assoc. v. TCEQ*, 393 S.W.3d at 440-41; *State v. Mid-South Pavers, Inc.*, 246 S.W.3d at 728; *Levy v. Tex. State Bd. of Med. Exam'rs*, 966 S.W.2d at 816.

41.  **The language in the Manuals provided instructions to dentists and orthodontists to score ectopic eruption consistently with the standards for ectopic eruption that are generally recognized in the dental profession.**

(The SOAH ALJs' proposed FoF No. 41 stated: *The language in the Manuals provided a definition of ectopic eruption solely for use in scoring the HLD index to qualify for payment.*)

Reason for Change:

Finding of Fact No. 41 finding addresses a mixed question of law and fact and is a "legislative finding." The Executive Commissioner has complete discretion to modify the proposed finding. *Tex. Dep't of Licensing & Regulation v. Thompson*, 2013 WL 3791486, at *6 ("'An agency enjoys *complete discretion* in modifying an ALJ's findings and conclusions when those findings and conclusions reflect a lack of understanding or misapplication of the existing laws, rules, or policies.'" (quoting *Smith v. Montemayor*, 2003 WL 21401591, at *26-27 (emphasis added)); Tex. Gov't Code § 2001.058(e)(1).

The Executive Commissioner modifies Proposed FoF No. 41 for two reasons. First, the TMPPM's discussion of ectopic eruption is an instruction, not a definition. *See, e.g.*, R.R., Vol. 1 at 103:8-12 (terms in the ectopic eruption instruction are not defined but are accorded their plain and ordinary meaning in the English language); R.R., Vol. 1 at 111: 12-14 (providers must understand the manual by virtue of their professional training). This error reflects a misinterpretation of law and policy by the SOAH ALJs. *See* Tex. Gov't Code § 2001.058(e)(1); *Thompson*, 2013 WL 3791486, at *6; *Southwest Pharm.*, 408 S.W.3d at 557-58.

Second, the proposed finding erroneously suggests that it was Texas Medicaid policy to adopt a distinct "definition" of ectopic eruption in the TMPPM that differed from ectopic eruption as generally understood within the dental

18

001761

profession. The SOAH ALJs' proposed finding would violate state and federal law because creation of a different set of standards applicable only to Medicaid patients would violate both Texas and federal law. *See, e.g.,* 1 Tex. Admin. Code § 354.1131(h); *see also* RR, Vol. 3, 250:8-19; Ex. R-14 (2008 TMPPM), § 1.2.5; Ex. R-15 (2009 TMPPM), § 1.4.5 ("Compliance with Federal Legislation. Reminder: *Each provider must furnish covered Medicaid services in the same manner, to the same extent, and of the same quality as services provided to other patients. Services made available to other patients must be made available to Texas Medicaid clients if the services are benefits of the Texas Medicaid Program.*"). And in fact, all published policy documents promulgated by HHSC require providers to apply the same standards of care to Medicaid patients they apply with the population at large. *See, e.g.,* Ex. R-16, at § 1.6; Ex. R-15, § 19.2.

Rather than impermissibly employing a special or unique definition of ectopic eruption solely for use in the Medicaid context, HHSC policy makers instead instructed providers to use their training, education, experience, and definitions generally understood in the practice of dentistry in qualifying and treating Medicaid patients and to serve these patients in the same manner as other patients. *See, e.g.,* R.R., Vol. 1 at 103:8-12 (terms in the ectopic eruption instruction are not defined but are accorded their plain and ordinary meaning in the English language); R.R., Vol. 1 at 111: 12-14 (providers must understand the manual by virtue of their professional training).

The SOAH ALJs also erred to the extent that they relied on the *Harlingen Family Dental* decision, particularly, FoF 29, 31, and 33, for their understanding of the scope and limitations of Texas Medicaid policy. The Executive Commissioner disapproves of these findings, and expressly concludes that they were based on an incorrect interpretation and application of Texas law and Medicaid policy, and therefore, cannot be relied on. Tex. Gov't Code § 2001.058(e)(2).

An accurate understanding of the scope and limitations of Texas Medicaid policy is critically important to the outcome of this dispute. The fundamental allegation brought by the Inspector General is that ADC has submitted claims for PA and for reimbursement that are not authorized under Medicaid policy or Texas law. These allegations cannot be properly evaluated if the finder of fact does not understand the policy. Therefore, there is a rational connection between the correct articulation of Medicaid policy and the altered finding of fact, which accurately reflects that policy. *See, e.g.. Heritage on the San Gabriel Homeowners Assoc. v. TCEQ,* 393 S.W.3d at 440-41; *State v. Mid-South Pavers, Inc.,* 246 S.W.3d at 728; *Levy v. Tex. State Bd. of Med. Exam'rs,* 966 S.W.2d at 816.

42. **The Manual did not address how an orthodontist diagnosed or treated a patient, but only instructed providers to score anterior teeth consistently with the generally understood definition of ectopic eruption in the orthodontic profession.**

19

001762

(The SOAH ALJs' proposed FoF No. 42 stated: *The Manuals did not address how an orthodontist diagnosed or treated a patient, but only defined ectopic eruption for scoring the HLD score sheet to determine a Texas Medicaid patient's eligibility for orthodontic treatment.*)

Reason for Change:

Proposed FoF No. 42 addresses a mixed question of fact and law, and is therefore a so-called "legislative finding." Because the SOAH ALJs' proposed finding of fact number 42 reflects a misinterpretation and gross misapplication of Texas Medicaid policy, the Executive Commissioner has complete discretion to modify the proposed finding. *Tex. Dep't of Licensing & Regulation* v. *Thompson*, 2013 WL 3791486, at *6 ("'An agency enjoys *complete discretion* in modifying an ALJ's findings and conclusions when those findings and conclusions reflect a lack of understanding or misapplication of the existing laws, rules, or policies.'" (quoting *Smith* v. *Montemayor*, 2003 WL 21401591, at *26-27 (emphasis added)); Tex. Gov't Code § 2001.058(e)(1).

The Executive Commissioner modifies Proposed FoF No. 42 for two reasons. First, the TMPPM's discussion of ectopic eruption is an instruction, not a definition. This error reflects a misinterpretation of law and policy by the SOAH ALJs. *See* Tex. Gov't Code § 2001.058(e)(1); *Thompson*, 2013 WL 3791486, at *6; *Southwest Pharm.*, 408 S.W.3d at 557-58.

Second, the proposed finding erroneously suggests that it was Texas Medicaid policy to adopt a distinct "definition" of ectopic eruption in the TMPPM that differed from ectopic eruption as generally understood within the dental profession. The SOAH ALJs' proposed finding would violate state and federal law because creation of a different set of standards applicable only to Medicaid patients would violate both Texas and federal law. *See, e.g.,* 1 Tex. Admin. Code § 354.1131(h); *see also* R.R. Vol. 3, 250:8-19; Ex. R-14 (2008 TMPPM), § 1.2.5; Ex. R-15 (2009 TMPPM), § 1.4.5 ("Compliance with Federal Legislation. Reminder: *Each provider must furnish covered Medicaid services in the same manner, to the same extent, and of the same quality as services provided to other patients. Services made available to other patients must be made available to Texas Medicaid clients if the services are benefits of the Texas Medicaid Program.*"). And in fact, all published policy documents promulgated by HHSC require providers to apply the same standards of care to Medicaid patients they apply with the population at large. *See, e.g.,* Ex. R-16, at § 1.6; Ex. R-15, § 19.2. The Manuals did, in fact, instruct providers to use their training and education in the treatment of Medicaid patients and to treat those patients in the same manner as other patients. Ex. R-15 (2009 TMPPM), § 1.4.5. The Executive Commissioner is therefore authorized to correct this error by the ALJs. *See* Tex. Gov't Code § 2001.058(e)(1), (3) (allowing an agency to change a PFD to correct errors of law or policy or technical errors in a proposed finding of fact).

20

001763

The SOAH ALJs also erred to the extent that they relied on the *Harlingen Family Dental* decision, particularly, FoF 29, 31, and 33, for their understanding of the scope and limitations of Texas Medicaid policy. The Executive Commissioner disapproves of these findings, and expressly concludes that they were based on an incorrect interpretation and application of Texas law and Medicaid policy, and therefore, cannot be relied on. Tex. Gov't Code § 2001.058(e)(2).

An accurate understanding of the scope and limitations of Texas Medicaid policy is critically important to the outcome of this dispute. The fundamental allegation brought by the Inspector General is that ADC has submitted claims for PA and for reimbursement that are not authorized under Medicaid policy or Texas law. These allegations cannot be properly evaluated if the finder of fact does not understand the policy. Therefore, there is a rational connection between the correct articulation of Medicaid policy and the altered finding of fact, which accurately reflects that policy. *See, e.g., Heritage on the San Gabriel Homeowners Assoc. v. TCEQ*, 393 S.W.3d at 440-41; *State v. Mid-South Pavers, Inc.*, 246 S.W.3d at 728; *Levy v. Tex. State Bd. of Med. Exam'rs*, 966 S.W.2d at 816.

43. After HHSC-OIG imposed the payment hold on ADC, it hired Larry Tadlock, D.D.S., an orthodontist, to review the 63 patients previously reviewed by Dr. Evans.

44. After reviewing the patients' HLD score sheets, Dr. Tadlock found only one patient, Patient 15, who met the 26-point threshold.[5]

45. **In reviewing the 63 ADC patient files in the statistically valid random sample, Dr. Tadlock applied the definition of ectopic eruption that is generally recognized within the dental profession and scored the patients as instructed by the Manuals. Dr. Tadlock properly applied Medicaid policy.**

(The SOAH ALJs' proposed FoF No. 45 stated: *Dr. Tadlock did not apply the Manuals' definition of ectopic eruption in scoring the HLD index for the 63 ADC patients.*)

Reason for Change:

Proposed finding of fact number 45 addresses a mixed question of fact and law, and is a "legislative finding." The Executive Commissioner has complete discretion to modify the proposed finding. *Tex. Dep't of Licensing & Regulation v. Thompson*, 2013 WL 3791486, at *6 ("'An agency enjoys *complete discretion* in modifying an ALJ's findings and conclusions when those findings and conclusions reflect a lack of understanding or misapplication of the existing laws,

---

[5] By letter dated January 16, 2014, the SOAH ALJs replied to the Inspector General's Exceptions and notified the Executive Commissioner that their original proposed finding of fact number 44 should be revised. The Executive Commissioner adopts the ALJs' recommendations regarding revised proposed finding of fact number 44.

001764

rules, or policies.'" (quoting *Smith* v. *Montemayor*, 2003 WL 21401591, at \*26-27 (emphasis added)); Tex. Gov't Code § 2001.058(e)(1).

The Executive Commissioner modifies Proposed FoF No. 45 for two reasons. First, the TMPPM's discussion of ectopic eruption is an instruction, not a definition. This error reflects a misinterpretation of law and policy by the SOAH ALJs. *See* Tex. Gov't Code § 2001.058(e)(1); *Thompson*, 2013 WL 3791486, at \*6; *Southwest Pharm.*, 408 S.W.3d at 557-58.

Second, the proposed finding erroneously suggests that it was Texas Medicaid policy to adopt a distinct "definition" of ectopic eruption in the TMPPM that differed from ectopic eruption as generally understood within the dental profession. The SOAH ALJs' proposed finding would violate state and federal law because creation of a different set of standards applicable only to Medicaid patients would violate both Texas and federal law. *See, e.g.,* 1 Tex. Admin. Code § 354.1131(h); *see also* R.R., Vol. 3, 250:8-19; Ex. R-14 (2008 TMPPM), § 1.2.5; Ex. R-15 (2009 TMPPM), § 1.4.5 ("Compliance with Federal Legislation. Reminder: *Each provider must furnish covered Medicaid services in the same manner, to the same extent, and of the same quality as services provided to other patients. Services made available to other patients must be made available to Texas Medicaid clients if the services are benefits of the Texas Medicaid Program.*"). And in fact, all published policy documents promulgated by HHSC require providers to apply the same standards of care to Medicaid patients they apply with the population at large. *See, e.g.,* Ex. R-16, at § 1.6; Ex. R-15, § 19.2.

Also, the proposed finding misconstrues Dr. Tadlock's testimony. In fact, Dr. Tadlock's testimony shows that in his view, the Manual's instructions are consistent with the generally understood definition of ectopic eruption. R.R., Vol. 1, 202:21-203:10. This error reflects a misinterpretation of law and policy by the SOAH ALJs, a misinterpretation that resulted in misconstruing Dr. Tadlock's testimony. Tex. Gov't Code § 2001.058(e)(1).

The SOAH ALJs also erred to the extent that they relied on the *Harlingen Family Dental* decision, particularly, FoF 29, 31, and 33, for their understanding of the scope and limitations of Texas Medicaid policy. The Executive Commissioner disapproves of these findings, and expressly concludes that they were based on an incorrect interpretation and application of Texas law and Medicaid policy, and therefore, cannot be relied on. Tex. Gov't Code § 2001.058(e)(2).

An accurate understanding of the scope and limitations of Texas Medicaid policy is critically important to the outcome of this dispute. The fundamental allegation brought by the Inspector General is that ADC has submitted claims for PA and for reimbursement that are not authorized under Medicaid policy or Texas law. These allegations cannot be properly evaluated if the finder of fact does not understand the policy. Therefore, there is a rational connection between the correct articulation of Medicaid policy and the altered finding of fact, which accurately

22

001765

reflects that policy. *See, e.g., Heritage on the San Gabriel Homeowners Assoc. v. TCEQ*, 393 S.W.3d at 440-41; *State v. Mid-South Pavers, Inc.*, 246 S.W.3d at 728; *Levy v. Tex. State Bd. of Med. Exam'rs*, 966 S.W.2d at 816.

46. **Despite the SOAH ALJs finding Dr. Nazari's testimony to be credible, Dr. Nazari did not properly follow Medicaid policy in his identification of ectopic eruptions; the overwhelming evidence of the consistent pattern of inflated HLD scores submitted by ADC establishes prima facie evidence that is reliable, relevant and material that ADC's misrepresentations of medical necessity constitute willful misrepresentations.**

(The SOAH ALJs' proposed FoF No. 46 stated: *Dr. Nazari was a credible witness and properly utilized the Manuals' definition in scoring the HLD index.*)

Reason for Change:

Proposed FoF No. 46 addresses a mixed question of fact and law, and, as such, is a so-called "legislative finding." Therefore, the Executive Commissioner has complete discretion to modify it. *Tex. Dep't of Licensing & Regulation v. Thompson*, 2013 WL 3791486, at *6 ("'An agency enjoys *complete discretion* in modifying an ALJ's findings and conclusions when those findings and conclusions reflect a lack of understanding or misapplication of the existing laws, rules, or policies.'" (quoting *Smith v. Montemayor*, 2003 WL 21401591, at *26-27 (emphasis added)); Tex. Gov't Code § 2001.058(e)(1).

The Executive Commissioner modifies Proposed FoF No. 46 for two reasons. First, the TMPPM's discussion of ectopic eruption is an instruction, not a definition. *See, e.g.*, R.R., Vol. 1 at 103:8-12 (terms in the ectopic eruption instruction are not defined but are accorded their plain and ordinary meaning in the English language); R.R., Vol. 1 at 111: 12-14 (providers must understand the manual by virtue of their professional training). This error reflects a misinterpretation of law and policy by the SOAH ALJs. *See* Tex. Gov't Code § 2001.058(e)(1); *Tex. Dep't of Licensing & Regulation v. Thompson*, 2013 WL 3791486, at *6; *Southwest Pharm.*, 408 S.W.3d at 557-58.

Second, the proposed finding erroneously suggests that it was Texas Medicaid policy to adopt a distinct "definition" of ectopic eruption in the TMPPM that differed from ectopic eruption as generally understood within the dental profession. The SOAH ALJs' proposed finding would violate state and federal law because creation of a different set of standards applicable only to Medicaid patients would violate both Texas and federal law. *See, e.g.,* 1 Tex. Admin. Code § 354.1131(h); *see also* RR., Vol. 3, 250:8-19; Ex. R-14 (2008 TMPPM), § 1.2.5; Ex. R-15 (2009 TMPPM), § 1.4.5 ("Compliance with Federal Legislation. Reminder: *Each provider must furnish covered Medicaid services in the same manner, to the same extent, and of the same quality as services provided to other patients. Services made available to other patients must be made available to*

23

*Texas Medicaid clients if the services are benefits of the Texas Medicaid Program.*"). And in fact, all published policy documents promulgated by HHSC require providers to apply the same standards of care to Medicaid patients they apply with the population at large. *See, e.g.,* Ex. R-16, at § 1.6; Ex. R-15, § 19.2.

Moreover, contrary to Texas Medicaid policy requirements that providers treat Medicaid patients to the same standard of care as the general population, Dr. Nazari testified that orthodontics for Medicaid patients is different than orthodontics for non-Medicaid patients. R.R., Vol. 4, at 103:13-16, 104:1-4, 145:9-10. Further, Dr. Nazari was unable to define a "severe handicapping malocclusion." *Id.* at 144:17-145:6. This testimony reflects that, though Dr. Nazari may be viewed by the finder of fact as credible, Dr. Nazari was unable to properly apply Texas Medicaid policy to the scoring of patients.

The SOAH ALJs also erred to the extent that they relied on the *Harlingen Family Dental* decision, particularly, FoF 29, 31, and 33, for their understanding of the scope and limitations of Texas Medicaid policy. The Executive Commissioner disapproves of these findings, and expressly concludes that they were based on an incorrect interpretation and application of Texas law and Medicaid policy, and therefore, cannot be relied on. Tex. Gov't Code § 2001.058(e)(2).

The proposed finding reflects a fundamental misunderstanding and misapplication of Texas Medicaid policy by the SOAH ALJs. An accurate understanding of the scope and limitations of Texas Medicaid policy is critically important to the outcome of this dispute. The fundamental allegation brought by the Inspector General is that ADC has submitted claims for PA and for reimbursement that are not authorized under Medicaid policy or Texas law. These allegations cannot be properly evaluated if the fact finder does not properly interpret and apply a policy. Therefore, there is a rational connection between the correct articulation of Medicaid policy and the altered finding of fact, which accurately reflects that policy. *See, e.g., Heritage on the San Gabriel Homeowners Assoc. v. TCEQ,* 393 S.W.3d 417, 440-41 (Tex. App.—Austin 2012, pet denied); *State v. Mid-South Pavers, Inc.,* 246 S.W.3d 711, 728 (Tex. App.–Austin 2007, pet. denied); *Levy v. Tex. State Bd. of Med. Exam'rs,* 966 S.W.2d 813, 816 (Tex. App.—Austin 1998, no pet.).

47. **Despite the SOAH ALJs finding Dr. Kanaan's testimony to be credible, Dr. Kanaan did not properly follow Medicaid policy in his identification of ectopic eruptions; the overwhelming evidence of the consistent pattern of inflated HLD scores submitted by ADC establishes prima facie evidence that is reliable, relevant and material that ADC's misrepresentations of medical necessity constitute willful misrepresentations.**

(The SOAH ALJs' proposed FoF No. 23 stated: *Wael Kanaan, D.D.S. an orthodontist who worked with ADC was a credible witness and properly utilized the Manuals' definition of ectopic eruption in scoring the HLD index.*)

24

001767

Reason for Change:

Proposed FoF No. 47 addresses a mixed question of fact and law, and is a so-called "legislative finding." Therefore, the Executive Commissioner has complete discretion to modify it. *Tex. Dep't of Licensing & Regulation* v. *Thompson*, 2013 WL 3791486, at *6 ("'An agency enjoys *complete discretion* in modifying an ALJ's findings and conclusions when those findings and conclusions reflect a lack of understanding or misapplication of the existing laws, rules, or policies.'" (quoting *Smith* v. *Montemayor*, 2003 WL 21401591, at *26-27 (emphasis added)); Tex. Gov't Code § 2001.058(e)(1).

The Executive Commissioner modifies Proposed FoF No. 47 for three reasons. First, the TMPPM's discussion of ectopic eruption is an instruction, not a definition. *See, e.g.*, R.R., Vol. 1 at 103:8-12 (terms in the ectopic eruption instruction are not defined but are accorded their plain and ordinary meaning in the English language); R.R., Vol. 1 at 111: 12-14 (providers must understand the manual by virtue of their professional training). This error reflects a misinterpretation of law and policy by the SOAH ALJs. *See* Tex. Gov't Code § 2001.058(e)(1); *Thompson*, 2013 WL 3791486, at *6; *Southwest Pharm.*, 408 S.W.3d at 557-58.

Second, the proposed finding erroneously suggests that it was Texas Medicaid policy to adopt a distinct "definition" of ectopic eruption in the TMPPM that differed from ectopic eruption as generally understood within the dental profession. The SOAH ALJs' proposed finding would violate state and federal law because creation of a different set of standards applicable only to Medicaid patients would violate both Texas and federal law. *See, e.g.*, 1 Tex. Admin. Code § 354.1131(h); *see also* RR., Vol. 3, at 250:8-19; Ex. R-14 (2008 TMPPM), § 1.2.5; Ex. R-15 (2009 TMPPM), § 1.4.5 ("Compliance with Federal Legislation. Reminder: *Each provider must furnish covered Medicaid services in the same manner, to the same extent, and of the same quality as services provided to other patients. Services made available to other patients must be made available to Texas Medicaid clients if the services are benefits of the Texas Medicaid Program.*"). And in fact, all published policy documents promulgated by HHSC require providers to apply the same standards of care to Medicaid patients they apply with the population at large. *See, e.g.*, Ex. R-16, at § 1.6; Ex. R-15, § 19.2.

For example, Dr. Kanaan testified that the word "handicapping" in the phrase "severe handicapping malocclusion" means "extreme deviation from the norm." R.R., Vol. 3, at 101:3-8. Yet, of the 63 patients in the statistically valid random sample, Kanaan agreed that of his patients he scored at least seven ectopic teeth in each patient, a rate of 100%. *Id.*, 97:5-8. This testimony reflects that, though Dr. Kanaan may be viewed by the finder of fact as credible, Dr. Kanaan did not properly apply Texas Medicaid policy to the scoring of patients.

25

Third, Dr. Kanaan scored 23 of 27 patients exactly the same way—with the same eight teeth being scored as ectopic. R-83; Vol. 3 at 43-70. The SOAH ALJs acknowledged this undisputed evidence. PFD, at 25. This evidence of Dr. Kanaan's pattern of scoring is prima facie evidence that Dr. Kanaan acted with requisite knowledge under the TMFPA. Tex. Hum. Res. Code § 36.0011(b). The Executive Commissioner is authorized, therefore, to correct the SOAH ALJs' error. Tex. Gov't Code § 2001.058(e)(1).

The SOAH ALJs also erred to the extent that they relied on the *Harlingen Family Dental* decision, particularly, FoF 29, 31, and 33, for their understanding of the scope and limitations of Texas Medicaid policy. The Executive Commissioner disapproves of these findings, and expressly concludes that they were based on an incorrect interpretation and application of Texas law and Medicaid policy, and therefore, cannot be relied on. Tex. Gov't Code § 2001.058(e)(2).

The proposed finding reflects a fundamental misunderstanding and misapplication of Texas law and Medicaid policy by the SOAH ALJs. An accurate understanding of the scope and limitations of Texas Medicaid policy is critically important to the outcome of this dispute. The fundamental allegation brought by the Inspector General is that ADC has submitted claims for PA and for reimbursement that are not authorized under Medicaid policy or Texas law. These allegations cannot be properly evaluated if the fact finder does not properly interpret and apply a policy. Therefore, there is a rational connection between the correct articulation of Medicaid policy and the altered finding of fact, which accurately reflects that policy. *See, e.g., Heritage on the San Gabriel Homeowners Assoc. v. TCEQ*, 393 S.W.3d 417, 440-41 (Tex. App.—Austin 2012, pet denied); *State v. Mid-South Pavers, Inc.*, 246 S.W.3d 711, 728 (Tex. App.–Austin 2007, pet. denied); *Levy v. Tex. State Bd. of Med. Exam'rs*, 966 S.W.2d 813, 816 (Tex. App.–Austin 1998, no pet.).

48. **HHSC-OIG presented evidence that is credible, reliable, and verified, and that has indicia of reliability when analyzed consistently with Texas law and Medicaid policy, that ADC knowingly incorrectly scored the HLD index on orthodontic prior approval requests submitted to Texas Medicaid.**

(The SOAH ALJs' proposed FoF No. 48 stated: *There is no evidence that is credible, reliable, or verifiable, or that has indicia of reliability, that ADC incorrectly scored the HLD Index to obtain Texas Medicaid benefits for patients or to obtain Texas Medicaid payments.*)

Reason for Change:

Proposed FoF No. 48 addresses a mixed question of fact and law, and is a so-called "legislative finding." Therefore, the Executive Commissioner has complete discretion to modify it. *Tex. Dep't of Licensing & Regulation v. Thompson*, 2013 WL 3791486, at *6 ("'An agency enjoys *complete discretion* in modifying an

26

ALJ's findings and conclusions when those findings and conclusions reflect a lack of understanding or misapplication of the existing laws, rules, or policies.'" (quoting *Smith* v. *Montemayor*, 2003 WL 21401591, at \*26-27 (emphasis added)); Tex. Gov't Code § 2001.058(e)(1).

The Executive Commissioner modifies Proposed FoF No. 48 because the SOAH ALJs misinterpreted and misapplied Texas law and Medicaid policy. First, the proposed finding misapplies law and Medicaid policy by stating that there is no evidence that ADC incorrectly scored the HLD index. In fact, the evidence shows that the HLD scores submitted by Drs. Nazari and Kanaan were incorrect because of their interpretation of ectopic eruption. *See, e.g.*, testimony of Dr. Tadlock at RR, Vol. 1, at 173:3-6; 174:6-175:1; 176:14-20; 177:1-16; *see also* testimony of Dr. Nazari, RR, Vol. 4, at 144:17-145:6; and testimony of Dr. Kanaan, RR, Vol. 3, at 43-70. The totality of the evidence, which includes the testimony of ADC's own witnesses, as well as the Inspector General's fact witnesses and experts, is much more than *prima facie*, and is relevant, credible and material. *See* Tex. Hum. Res. Code § 32.0291(c).

Second, the proposed finding is erroneous because implicit in it are the assumptions that the definition of ectopic eruption is wholly open to subjective interpretation, and that Texas Medicaid adopted a "special" definition of ectopic eruption that was more liberal than the generally accepted definition of ectopic eruption in the orthodontic profession (and contrary to the TMPPM's instruction to providers to be "conservative" in their scoring). These errors reflect misinterpretations and misapplications of law and Medicaid policy by the SOAH ALJs.

Third, Dr. Kanaan scored 23 of 27 patients exactly the same way—with the same eight teeth being scored as ectopic. R-83; Vol. 3 at 43-70. Further, the SOAH ALJs acknowledged this undisputed evidence. PFD, at 25. This evidence of Dr. Kanaan's pattern of scoring is prima facie evidence that Dr. Kanaan acted with requisite knowledge under the TMFPA. Tex. Hum. Res. Code § 36.0011(b). The Executive Commissioner is authorized, therefore, to correct the SOAH ALJs' error. Tex. Gov't Code § 2001.058(e)(1).

Finally, this proposed finding reflects a further misapplication of law in suggesting that the Inspector General bears the burden of proving intent to defraud Medicaid. As the SOAH ALJs acknowledge in the narrative section of their PFD, the Inspector General does not have the burden to show specific intent to defraud the Medicaid program to show that ADC has committed an unlawful act under the TMFPA. *See* PFD at 15, citing definition of "knowingly" at section 36.0011 of the TMFPA; *see also* CoL No. 6, at page 42 of the PFD (same proposition). Nevertheless, in proposed FoF No. 48, the SOAH ALJs write that the Inspector General failed to present credible, reliable, or verifiable evidence that ADC

27

001770

incorrectly scored HLD indices *"to obtain Texas Medicaid benefits for patients or to obtain Texas Medicaid payments."*

The burden on the Inspector General is only to demonstrate relevant, credible and material evidence that ADC knowingly submitted scores that overstated the child's true condition. Tex. Hum. Res. Code § 32.0291(c). Drs. Kanaan and Nazari acknowledge they applied an interpretation of ectopic eruption that did not comport with Medicaid policy. To the extent the SOAH ALJs attempt to hold the Inspector General to the additional burden of proving intent on the part of ADC to defraud the Medicaid program, proposed FoF No. 48 is erroneous.

The SOAH ALJs also erred to the extent that they relied on the *Harlingen Family Dental* decision, particularly, FoF 29, 31, and 33, for their understanding of the scope and limitations of Texas Medicaid policy. The Executive Commissioner disapproves of these findings, and expressly concludes that they were based on an incorrect interpretation and application of Texas law and Medicaid policy, and therefore, cannot be relied on. Tex. Gov't Code § 2001.058(e)(2).

Moreover, the proposed finding reflects a fundamental misunderstanding and misapplication of Texas law and Medicaid policy by the SOAH ALJs. An accurate understanding of the scope and limitations of Texas Medicaid policy is critically important to the outcome of this dispute. These allegations cannot be properly evaluated if the finder of fact does not properly interpret and apply a policy. Therefore, there is a rational connection between the correct articulation of Medicaid policy and the altered finding of fact, which accurately reflects that policy. *See, e.g., Heritage on the San Gabriel Homeowners Assoc. v. TCEQ*, 393 S.W.3d 417, 440-41 (Tex. App.—Austin 2012, pet denied); *State v. Mid-South Pavers, Inc.*, 246 S.W.3d 711, 728 (Tex. App.–Austin 2007, pet. denied); *Levy v. Tex. State Bd. of Med. Exam'rs*, 966 S.W.2d 813, 816 (Tex. App.–Austin 1998, no pet.).

49. **HHSC-OIG presented *prima facie* evidence that is credible, reliable, and verified, and that has indicia of reliability when analyzed consistently with Texas law and Medicaid policy, that ADC committed fraud or willful misrepresentations to Texas Medicaid.**

(The SOAH ALJs' proposed FoF No. 49 stated: *There is no evidence that is credible, reliable, or verifiable, or that has indicia of reliability, that ADC committed fraud or engaged in willful misrepresentation with respect to the 63 ADC patients in this case.*)

Reason for Change:

Proposed FoF No. 49 addresses a mixed question of fact and law, and is a so-called "legislative finding." Therefore, the Executive Commissioner has complete discretion to modify it. *Tex. Dep't of Licensing & Regulation v. Thompson*, 2013 WL 3791486, at *6 ("An agency enjoys *complete discretion* in modifying an

28

ALJ's findings and conclusions when those findings and conclusions reflect a lack of understanding or misapplication of the existing laws, rules, or policies.'" (quoting *Smith* v. *Montemayor*, 2003 WL 21401591, at *26-27 (emphasis added)); Tex. Gov't Code § 2001.058(e)(1).

The Executive Commissioner modifies Proposed FoF No. 49 because the SOAH ALJs misinterpreted and misapplied Texas law and Medicaid policy. First, the proposed finding misapplies Texas law governing the Inspector General's burden of proof in this case. As noted in CoL No. 12, to maintain the payment hold, the Inspector General must only make a *prima facie* showing of evidence that is credible, reliable or verifiable, or that has indicia of reliability that ADC has committed fraud or willful misrepresentations in this case.

The SOAH ALJs' determination that the Inspector General presented "no evidence" on this issue is the result of the SOAH ALJs' legally erroneous interpretation of Medicaid policy with respect to the definition of ectopic eruption. As the Inspector General noted in his Exceptions, the SOAH ALJs' determinations that the following are all errors in the interpretation and application of Texas Medicaid policy and law: (1) Texas Medicaid "defined" ectopic eruption uniquely and differently in the TMPPM than the generally accepted definition in the orthodontic profession; (2) that said definition was wholly open to subjective interpretation; and (3) that the 2012 changes to the TMPPM "definition" were substantive rather than clarifying.

Further, the SOAH ALJs also misapplied law and policy to the following evidence, which they themselves acknowledged: Dr. Kanaan scored 23 of 27 patients exactly the same way—with the same eight teeth being scored as ectopic. R-83; Vol. 3 at 43-70. This evidence of Dr. Kanaan's pattern of scoring is prima facie evidence that Dr. Kanaan acted with requisite knowledge under the TMFPA. Tex. Hum. Res. Code § 36.0011(b). The Executive Commissioner is authorized, therefore, to correct the SOAH ALJs' error. Tex. Gov't Code § 2001.058(e)(1).

The SOAH ALJs also erred to the extent that they relied on the *Harlingen Family Dental* decision, particularly, FoF 29, 31, and 33, for their understanding of the scope and limitations of Texas Medicaid policy. The Executive Commissioner disapproves of these findings, and expressly concludes that they were based on an incorrect interpretation and application of Texas law and Medicaid policy, and therefore, cannot be relied on. Tex. Gov't Code § 2001.058(e)(2).

Moreover, the proposed finding reflects a fundamental misunderstanding and misapplication of Texas law and Medicaid policy by the SOAH ALJs. An accurate understanding of the scope and limitations of Texas Medicaid policy is critically important to the outcome of this dispute. The fundamental allegation brought by the Inspector General is that ADC has submitted claims for PA and for reimbursement that are not authorized under Medicaid policy or Texas law. These allegations cannot be properly evaluated if the decision maker does not understand

29

001772

the policy. Therefore, there is a rational connection between the correct articulation of Medicaid policy and the modified finding of fact, which accurately reflects that policy. *See, e.g., Heritage on the San Gabriel Homeowners Assoc. v. TCEQ*, 393 S.W.3d at 440-41; *State v. Mid-South Pavers, Inc.*, 246 S.W.3d at 728; *Levy v. Tex. State Bd. of Med. Exam'rs*, 966 S.W.2d at 816.

50. **HHSC-OIG presented *prima facie* evidence that is credible, reliable, and verified, and that has indicia of reliability when analyzed consistently with Texas law and Medicaid policy, that ADC committed fraud or willful misrepresentations in filing requests for prior authorization with TMHP for a substantial majority of patients in the OIG audit sample.**

(The SOAH ALJs' proposed FoF No. 50 stated: *There is no evidence that is credible, reliable, or verifiable, or that has indicia of reliability, that ADC committed fraud or misrepresentation in filing requests for prior authorization with TMHP for the 63 patients at issue in this case.*)

Reason for Change:

Proposed FoF No. 50 addresses a mixed question of fact and law, and is a so-called "legislative finding." Therefore, the Executive Commissioner has complete discretion to modify it. *Tex. Dep't of Licensing & Regulation v. Thompson*, 2013 WL 3791486, at *6 ("'An agency enjoys *complete discretion* in modifying an ALJ's findings and conclusions when those findings and conclusions reflect a lack of understanding or misapplication of the existing laws, rules, or policies.'" (quoting *Smith v. Montemayor*, 2003 WL 21401591, at *26-27 (emphasis added)); Tex. Gov't Code § 2001.058(e)(1).

The Executive Commissioner modifies Proposed FoF No. 50 because the SOAH ALJs misinterpreted and misapplied Texas law and Medicaid policy. First, the proposed finding misapplies Texas law governing the Inspector General's burden of proof in this case. As noted in CoL No. 12, to maintain the payment hold, the Inspector General must only make a *prima facie* showing of evidence that is credible, reliable or verifiable, or that has indicia of reliability that ADC has committed fraud or willful misrepresentations in this case.

The SOAH ALJs' determination that the Inspector General presented "no evidence" on this issue is the result of the SOAH ALJs' legally erroneous interpretation of Medicaid policy with respect to the definition of ectopic eruption. As the Inspector General noted in his Exceptions, the SOAH ALJs' determinations that the following are all errors in the application of Texas Medicaid policy and law: (1) Texas Medicaid "defined" ectopic eruption uniquely and differently in the TMPPM than the generally accepted definition in the orthodontic profession; (2) that said definition was wholly open to subjective interpretation; and (3) that the 2012 changes to the TMPPM "definition" were substantive rather than clarifying.

30

001773

Further, Dr. Kanaan scored 23 of 27 patients exactly the same way—with the same eight teeth being scored as ectopic. R-83; Vol. 3 at 43-70. The SOAH ALJs acknowledged this undisputed evidence. PFD, at 25. This evidence of Dr. Kanaan's pattern of scoring is prima facie evidence that Dr. Kanaan acted with requisite knowledge under the TMFPA. Tex. Hum. Res. Code § 36.0011(b). The Executive Commissioner is authorized, therefore, to correct the SOAH ALJs' error. Tex. Gov't Code § 2001.058(e)(1).

The SOAH ALJs also erred to the extent that they relied on the *Harlingen Family Dental* decision, particularly, FoF 29, 31, and 33, for their understanding of the scope and limitations of Texas Medicaid policy. The Executive Commissioner disapproves of these findings, and expressly concludes that they were based on an incorrect interpretation and application of Texas law and Medicaid policy, and therefore, cannot be relied on. Tex. Gov't Code § 2001.058(e)(2).

Moreover, the proposed finding reflects a fundamental misunderstanding and misapplication of Texas law and Medicaid policy by the SOAH ALJs. An accurate understanding of the scope and limitations of Texas Medicaid policy is critically important to the outcome of this dispute. The fundamental allegation brought by the Inspector General is that ADC has submitted claims for PA and for reimbursement that are not authorized under Medicaid policy or Texas law. These allegations cannot be properly evaluated if the fact finder does not understand the policy. Therefore, there is a rational connection between the correct articulation of Medicaid policy and the modified finding of fact, which accurately reflects that policy. *See, e.g., Heritage on the San Gabriel Homeowners Assoc. v. TCEQ*, 393 S.W.3d at 440-41; *State v. Mid-South Pavers, Inc.,* 246 S.W.3d at 728; *Levy v. Tex. State Bd. of Med. Exam'rs*, 966 S.W.2d at 816.

51. When HHSC-OIG arrived at ADC in November 11, 2012, and asked for 63 case files, prima facie evidence exists that ADC could not locate eight dental models, four HLD score sheets, and two pre-treatment x-rays.

52. ADC forwarded the HLD score sheets and supporting documentation to TMHP when ADC filed its requests for prior authorization.

53. HHSC-OIG presented prima facie evidence that ADC failed to retain these records and models for the required five years.

54. **HHSC-OIG presented *prima facie* evidence that is credible, reliable, and verified, and that has indicia of reliability when analyzed consistently with Texas law and Medicaid policy, that ADC billed or caused claims to be submitted to Texas Medicaid for services or items that are not reimbursable by the Texas Medicaid program.**

(The SOAH ALJs' proposed FoF No. 54 stated: *HHSC-OIG failed to present prima facie evidence that ADC billed or caused claims to be submitted to Texas*

31

001774

*Medicaid for services or items that are not reimbursable by the Texas Medicaid program.*)

Reason for Change:

Proposed FoF No. 54 addresses a mixed question of fact and law, and is a so-called "legislative finding." Therefore, the Executive Commissioner has complete discretion to modify it. *Tex. Dep't of Licensing & Regulation* v. *Thompson*, 2013 WL 3791486, at *6 ("'An agency enjoys *complete discretion* in modifying an ALJ's findings and conclusions when those findings and conclusions reflect a lack of understanding or misapplication of the existing laws, rules, or policies.'" (quoting *Smith* v. *Montemayor*, 2003 WL 21401591, at *26-27 (emphasis added)); Tex. Gov't Code § 2001.058(e)(1).

The Executive Commissioner modifies Proposed FoF No. 54 because it misapplies Texas law and Medicaid policy. If the SOAH ALJs had applied the proper standard for ectopic eruption, consistent with the TMPPM provision requiring providers to be "conservative" in scoring, to the facts of this case, then the SOAH ALJs would have concluded that HHSC-OIG presented prima facie evidence that in at least 58 of the 63 cases in the sample ADC submitted PA requests for patients who were not qualified for full orthodontia.

The SOAH ALJs also erred to the extent that they relied on the *Harlingen Family Dental* decision, particularly, FoF 29, 31, and 33, for their understanding of the scope and limitations of Texas Medicaid policy. The Executive Commissioner disapproves of these findings, and expressly concludes that they were based on an incorrect interpretation and application of Texas law and Medicaid policy, and therefore, cannot be relied on. Tex. Gov't Code § 2001.058(e)(2).

Moreover, the proposed finding reflects a fundamental misunderstanding and misapplication of Texas law and Medicaid policy by the SOAH ALJs. An accurate understanding of the scope and limitations of Texas Medicaid policy is critically important to the outcome of this dispute. The fundamental allegation brought by the Inspector General is that ADC has submitted claims for PA and for reimbursement that are not authorized under Medicaid policy or Texas law. These allegations cannot be properly evaluated if the decision maker does not understand the policy. Therefore, there is a rational connection between the correct articulation of Medicaid policy and the modified finding of fact, which accurately reflects that policy. *See, e.g., Heritage on the San Gabriel Homeowners Assoc. v. TCEQ*, 393 S.W.3d at 440-41; *State v. Mid-South Pavers, Inc.*, 246 S.W.3d at 728; *Levy v. Tex. State Bd. of Med. Exam'rs*, 966 S.W.2d at 816.

55. **ADC committed program violations when it submitted prior authorization requests and HLD forms for D8080 comprehensive orthodontic treatment, of Patients 15, 56, and 60 when these patients did not qualify for comprehensive orthodontics.**

32

001775

(The SOAH ALJs' proposed FoF No. 55 stated: *Patient 15, 56, and 60, were eligible for interceptive treatment under Texas Medicaid.*)

Reason for Change:

Proposed FoF No. 55 addresses a mixed question of fact and law, and is a so-called "legislative finding." Therefore, the Executive Commissioner has complete discretion to modify it. *Tex. Dep't of Licensing & Regulation v. Thompson*, 2013 WL 3791486, at *6 ("'An agency enjoys *complete discretion* in modifying an ALJ's findings and conclusions when those findings and conclusions reflect a lack of understanding or misapplication of the existing laws, rules, or policies.'" (quoting *Smith v. Montemayor*, 2003 WL 21401591, at *26-27 (emphasis added)); Tex. Gov't Code § 2001.058(e)(1).

The Executive Commissioner modifies Proposed FoF No. 55 because it misapplies Texas law and Medicaid policy. To the extent the SOAH ALJs use "interceptive" treatment to mean something less than comprehensive orthodontics [D8080] (and therefore outside the requirement that patients be 12 or older or have no baby teeth), the SOAH ALJs misstate the evidence. ADC billed the code D8080 for these patients, meaning they falsely represented to the state that these patients were 12 or older or had lost all baby teeth. To the extent the SOAH ALJs use "interceptive" to include code D8080, *see* Ex R-15 at § 19.18.7, they are again in error: D8080 is explicitly not applicable to patients like these who have baby teeth and are under 12 years old.

These patients may well have been eligible for interceptive treatment – that is, something less than comprehensive orthodontics – but the evidence in this case is clear: ADC billed Medicaid for – and represented to the State that these patients qualified for – D8080, or comprehensive orthodontics. For example, with regard to Patient 15, the PFD states that ADC requested "prior authorization for interceptive treatment." PFD at 33. ADC requested D8080, comprehensive orthodontics, for this patient, even though the patient was 9 years old and had baby teeth. Ex. P-15 at P15-0019 (ADC Prior Authorization Request Form for Patient 15 requesting "D8080".) This is a program violation. 1 Tex. Admin. Code § 371.1617(1)(K) and (5)(G).

With regard to Patient 56, ADC requested D8080 comprehensive orthodontics for this patient, even though the patient was 9 years old and had baby teeth. Ex. P-56 at P56-0015 (ADC Prior Authorization Request Form for Patient 56 requesting "D8080" for a charge of $775.00.) This is a program violation. 1 Tex. Admin. Code § 371.1617(1)(K) and (5)(G).

Finally, for Patient 60, ADC requested D8080 comprehensive orthodontics, even though this patient was under 12 and had baby teeth. Ex. P-60 at P60-0004(ADC Prior Authorization Request Form for Patient 60 requesting "D8080" for a charge

33

001776

of $775.00.). This is a program violation. 1 Tex. Admin. Code § 371.1617(1)(K) and (5)(G).

The fact that ADC billed for comprehensive orthodontics when their patients did not qualify for that treatment is a program violation, and warrants a payment hold.

The SOAH ALJs also erred to the extent that they relied on the *Harlingen Family Dental* decision, particularly, FoF 29, 31, and 33, for their understanding of the scope and limitations of Texas Medicaid policy. The Executive Commissioner disapproves of these findings, and expressly concludes that they were based on an incorrect interpretation and application of Texas law and Medicaid policy, and therefore, cannot be relied on. Tex. Gov't Code § 2001.058(e)(2).

An accurate understanding of the scope and limitations of Texas Medicaid policy is critically important to the outcome of any dispute. Allegations cannot be properly evaluated if the decision maker does not properly interpret and apply a policy. Therefore, there is a rational connection between the correct articulation of Medicaid policy and the altered finding of fact, which accurately reflects that policy. *See, e.g., Heritage on the San Gabriel Homeowners Assoc. v. TCEQ*, 393 S.W.3d 417, 440-41 (Tex. App.—Austin 2012, pet denied); *State v. Mid-South Pavers, Inc.*, 246 S.W.3d 711, 728 (Tex. App.–Austin 2007, pet. denied); *Levy v. Tex. State Bd. of Med. Exam'rs*, 966 S.W.2d 813, 816 (Tex. App.–Austin 1998, no pet.).

56.  Program violations range from "very innocuous" to "very important."

57.  **ADC's record keeping violations, together with the *prima facie* evidence presented by HHSC-OIG of ADC's fraud and willful misrepresentations, when analyzed consistently with Texas law and Medicaid policy, justify maintaining the payment hold.**

(The SOAH ALJs' proposed FoF No. 57 stated: *ADC's violation is a technical violation and based upon this record does not rise to a level of substantive concern.*)

Reason for Change:

Proposed FoF No. 57 addresses a mixed question of fact and law, and is a so-called "legislative finding." Therefore, the Executive Commissioner has complete discretion to modify it. *Tex. Dep't of Licensing & Regulation v. Thompson*, 2013 WL 3791486, at *6 ("'An agency enjoys *complete discretion* in modifying an ALJ's findings and conclusions when those findings and conclusions reflect a lack of understanding or misapplication of the existing laws, rules, or policies.'" (quoting *Smith v. Montemayor*, 2003 WL 21401591, at *26-27 (emphasis added)); Tex. Gov't Code § 2001.058(e)(1).

Proposed FoF No. 57 is erroneous because it misapplies Texas law and Medicaid policy, including to the extent this finding rests on the false premise that ADC's

34

001777

record keeping violations are the only actionable violations found by the Inspector General. The SOAH ALJs appear to reason that ADC's program violations, by themselves, do not justify continuation of the payment hold. The underlying premise, in turn, is based the SOAH ALJs misapplication of Texas Medicaid policy regarding ectopic eruption. This finding is also erroneous because it is within the sound discretion of the Executive Commissioner, and not the SOAH ALJs, to determine whether or not ADC's record keeping violations are cause for concern.

The Inspector General based his payment hold, in part, on ADC's failure to provide records pursuant to the Inspector General's request. In some cases, ADC had these records, and entered them into evidence in this case *over a year after the Inspector General requested them.* ADC's failure to provide these records *immediately* is a program violation and may result in a payment hold. 1 Tex. Admin. Code § 371.1617(2)(A); R-14 at 1-8 ("Failure to supply the requested documents and other items, within the time frame specified, may result in a payment hold . . . or exclusion from Medicaid.").

Proposed FoF No. 57 is erroneous in characterizing these program violations as "technical violation[s]" that are not "of substantive concern," particularly in light of the fact that the Inspector General is obligated to investigate Medicaid fraud, waste, and abuse, and, in the course of investigating, is entitled to request documents of providers. Ex. R-14 (2008 TMPPM) § 1.2.3. Furthermore, the Inspector General is entitled to base payment hold determinations on the records that Medicaid providers provide in response to a proper request on the part of the Inspector General. Medicaid providers' failure to provide documents to the Inspector General pursuant to a written request for them is a "substantive concern," particularly in cases, like this one, where the provider later attacks the validity of the payment hold based on the existence of documents it failed to provide to the Inspector General. The existence and provision of documents necessary to fully document and evaluate the necessity and delivery of medical services is paramount to the integrity of the Medicaid system. *See Pierce v. Tex. Racing Comm'n,* 212 S.W.3d 745, 754 (Tex. App.—Austin 2006, pet. denied) (agency determines appropriate penalty to further agency's goals of compliance with state law) (citing *Firemen's & Policemen's Civil Serv. Comm'n v. Brinkmeyer,* 662 S.W.2d 953, 956 (Tex.1984)); *see also Tex. State Bd. of Dental Exam'rs v. Brown,* 281 S.W.3d 692, 697 (Tex. App.—Corpus Christi 2009, pet. denied) (agency, not ALJ, determines appropriate sanction).

The SOAH ALJs also erred to the extent that they relied on the *Harlingen Family Dental* decision, particularly, FoF 29, 31, and 33, for their understanding of the scope and limitations of Texas Medicaid policy. The Executive Commissioner disapproves of these findings, and expressly concludes that they were based on an

35

001778

incorrect interpretation and application of Texas law and Medicaid policy, and therefore, cannot be relied on. Tex. Gov't Code § 2001.058(e)(2).

Moreover, the proposed finding reflects a fundamental misunderstanding and misapplication of Texas law and Medicaid policy by the SOAH ALJs. An accurate understanding of the scope and limitations of Texas Medicaid policy is critically important to the outcome of this dispute. The fundamental allegation brought by the Inspector General is that ADC has submitted claims for PA and for reimbursement that are not authorized under Medicaid policy or Texas law. These allegations cannot be properly evaluated if the fact finder does not understand the policy. Therefore, there is a rational connection between the correct articulation of Medicaid policy and the modified finding of fact, which accurately reflects that policy. *See, e.g., Heritage on the San Gabriel Homeowners Assoc. v. TCEQ*, 393 S.W.3d at 440-41; *State v. Mid-South Pavers, Inc.*, 246 S.W.3d at 728; *Levy v. Tex. State Bd. of Med. Exam'rs*, 966 S.W.2d at 816.

## CONCLUSIONS OF LAW

1.  HHSC-OIG has jurisdiction over this case. Tex. Gov't Code ch. 531; Tex. Hum. Res. Code ch. 32.

2.  SOAH has jurisdiction over the hearing process and the preparation and issuance of a proposal for decision, with findings of fact and conclusions of law. Tex. Gov't Code ch. 2003.

3.  Notice of the hearing was properly provided. Tex. Gov't Code ch. 2001.

4.  **The Inspector General's burden to maintain the payment hold under section 531.102(g)(2) of the Government Code or section 32.0291(c) of the Human Resources Code, is to show by reliable or *prima facie* evidence that ADC has committed fraud or made willful misrepresentations.**

    (The SOAH ALJs' proposed CoL No. 4 stated: *HHSC-OIG had the burden of proof.*)

    Reason for Change:

    The Executive Commissioner modifies Proposed CoL No. 4. Proposed CoL No. 4 is erroneous because it is a misstatement of the law. *See* Tex. Gov't Code § 2001.058(e)(1). The Inspector General is required by law to impose a payment hold "on receipt of reliable evidence that the circumstances giving rise to the hold on payment involve fraud or willful misrepresentation under the state Medicaid program in accordance with 42 C.F.R. Section 455.23." Tex. Gov't Code § 531.102(g)(2). Additionally, "[t]he department shall discontinue the hold unless the department makes a *prima facie* showing at the hearing that the evidence relied on by the department in imposing the hold is relevant, credible and material to the issue of fraud or willful misrepresentation." Tex. Hum. Res. Code § 32.0291(c)

36

001779

(emphasis added). Because the SOAH ALJs' proposed conclusion of law misstated the applicable law, the Executive Commissioner has discretion to modify it. *Thompson*, 2013 WL 3791486, at *6; Tex. Gov't Code § 2001.058(e)(1).

The SOAH ALJs also erred to the extent that they relied on the *Harlingen Family Dental* decision, particularly, FoF 29, 31, and 33, for their understanding of the scope and limitations of Texas Medicaid policy. The Executive Commissioner disapproves of these findings, and expressly concludes that they were based on an incorrect interpretation and application of Texas law and Medicaid policy, and therefore, cannot be relied on. Tex. Gov't Code § 2001.058(e)(2).

Moreover, the proposed conclusion reflects a fundamental misunderstanding and misapplication of Texas law by the SOAH ALJs. Therefore, there is a rational connection between Texas law and Medicaid policy and the modified conclusion of law. *See, e.g., Heritage on the San Gabriel Homeowners Assoc. v. TCEQ*, 393 S.W.3d at 440-41; *State v. Mid-South Pavers, Inc.*, 246 S.W.3d at 728; *Levy v. Tex. State Bd. of Med. Exam'rs*, 966 S.W.2d at 816.

5.    It is an unlawful act to knowingly make or cause to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized. Tex. Hum. Res. Code § 36.002(1) (2003).

6.    The term "knowingly" means that the person has knowledge of the information, acts with conscious indifference to the truth or falsity of the information, or acts in reckless disregard of the truth or falsity of the information. Proof of the person's specific intent to commit an unlawful act under § 36.002 is not required to show that a person acted "knowingly." Tex. Hum. Res. Code § 36.0011 (2003).

7.    "Fraud" is an intentional deception or misrepresentation made by a person with the knowledge that the deception could result in some unauthorized benefit to that person or some other person, including any act that constitutes fraud under applicable federal or state law. Tex. Gov't Code § 531.1011(1) (2011).

8.    HHSC-OIG must impose a hold on payment of claims for reimbursement submitted by a provider on receipt of reliable evidence that the circumstances giving rise to the hold on payment involve fraud or willful misrepresentation under the state Medicaid program. Texas Gov't Code § 531.102(g)(2) (2011).

9.    All Medicaid payments to a provider must be suspended after the state Medicaid agency determines that there is a credible allegation of fraud for which an investigation is pending, unless the agency has good cause not to suspend payments (or to suspend payments only in part). If the state's Medicaid fraud control unit accepts a referral for investigation of the provider, the payment

37

001780

suspension may be continued until such time as the investigation and any associated enforcement proceedings are completed. 42 C.F.R. § 455.23 (2011).

10.  **A "Credible allegation of fraud" may be "an allegation, which has been verified by the State, from any source" including, but not limited to, 'fraud hotline complaints, claims data mining, and patterns identified through provider audits, and law enforcement investigations. Allegations are considered credible when they have indicia of reliability and the State Medicaid agency has reviewed all allegations, facts, and evidence carefully and acts judiciously on a case-by-case basis." 42 C.F.R. § 455.2.**

(The SOAH ALJs' proposed CoL No. 10 stated: *"Credible allegation of fraud" is "an allegation, which has been verified by the State, from any source," including, for example, fraud hotline complaints, claims data mining, and provider audits. Allegations are considered credible when they have indicia of reliability and the State Medicaid agency has reviewed all allegations, facts, and evidence carefully and acts judiciously on a case-by-case basis. 42 C.F.R. § 455.2 (2011)."*.)

Reason for Change:

The Executive Commissioner modifies Proposed CoL No. 10. Proposed CoL No. 10 omits words and phrases from the statute, all essential to the meaning of the statute: "'patterns identified through' provider audits"; the SOAH ALJs also deleted the phrase "and law enforcement investigations" and substituted the word "is" for "may be" and "for example" for "but not limited to."

Because Proposed CoL No. 10 incorrectly states the law, the Executive Commissioner has complete discretion to modify CoL No. 10 to correctly state the law, add the essential phrases and words of "patterns identified through" and "and law enforcement investigations" and substitute the words "can be" for "is" and "but not limited to" for "for example." *See Thompson*, 2013 WL 3791486, at *6; Tex. Gov't Code § 2001.058(e)(1).

The SOAH ALJs also erred to the extent that they relied on the *Harlingen Family Dental* decision, particularly, FoF 29, 31, and 33, for their understanding of the scope and limitations of Texas Medicaid policy. The Executive Commissioner disapproves of these findings, and expressly concludes that they were based on an incorrect interpretation and application of Texas law and Medicaid policy, and therefore, cannot be relied on. Tex. Gov't Code § 2001.058(e)(2).

Moreover, because the proposed conclusion reflects a fundamental misunderstanding and misapplication of law by the SOAH ALJs, there is a rational connection between Texas law and Medicaid policy and the modified conclusion of law. *See, e.g., Heritage on the San Gabriel Homeowners Assoc. v. TCEQ*, 393 S.W.3d at 440-41; *State v. Mid-South Pavers, Inc.*, 246 S.W.3d at 728; *Levy v. Tex. State Bd. of Med. Exam'rs*, 966 S.W.2d at 816.

38

001781

11.  HHSC-OIG may impose a payment hold on future claims submitted by a provider if there is reliable evidence that the provider has committed fraud or willful misrepresentation regarding a claim for reimbursement under the medical assistance program. Tex. Hum. Res. Code § 32.0291(b) (2003).

12.  In a SOAH hearing on a payment hold, HHSC-OIG must make a prima facie showing that the evidence relied upon in imposing the payment hold is relevant, credible, and material to the issue of fraud or willful misrepresentation. Tex. Hum. Res. Code § 32.0291(c) (2003).

13.  **HHSC-OIG should maintain the payment hold against ADC for alleged fraud or willful misrepresentation, and program violations.  Tex. Gov't Code § 531.102(g) (2011); 42 CFR § 455.23 (2011); Tex. Hum. Res. Code § 32.091(c) (2003); 1 Tex. Admin. Code §§ 371.1703(b)(3), and (b)(5), 371.1617(a)(1)(A)-(C), (I), (K), (2)(A), (5)(A), (5)(G) (2005).**

(The SOAH ALJs' proposed CoL No. 13 stated: *HHSC-OIG lacks authority to maintain the payment hold against ADC for alleged fraud or misrepresentation. Tex. Gov't Code § 531.102(g) (2011); 42 CFR § 455.23 (2011); Tex. Hum. Res. Code § 32.091(c) (2003); 1 Tex. Admin. Code §§ 371.1703(b)(3), 371.1617(a)(1)(A)-(C) (2005).*)

Reason for Change:

The Executive Commissioner modifies Proposed CoL No. 13. Proposed CoL No. 13 is erroneous because it misapplies Texas law and Medicaid policy to the facts of this case. This conclusion rests on the SOAH ALJs' misinterpretation and misapplication of Medicaid's limited orthodontic benefit and their misconstruction of ectopic eruption.  Further, this conclusion reflects the SOAH ALJs' failure to apply the proper evidentiary burden in this case.

Because CoL No. 13 rests on faulty applications of law as well as erroneous interpretations of Medicaid policy the Executive Commissioner enjoys complete discretion to correct it. *Thompson*, 2013 WL 3791486, at *6; Tex. Gov't Code § 2001.058(e)(1).  Further, the Executive Commissioner, and not the SOAH ALJs, determines the appropriate sanction if the law has been violated. *See Pierce v. Tex. Racing Comm'n*, 212 S.W.3d 745, 754 (Tex. App.—Austin 2006, pet. denied) (agency determines appropriate penalty to further agency's goals of compliance with state law (citing *Firemen's & Policemen's Civil Serv. Comm'n v. Brinkmeyer*, 662 S.W.2d 953, 956 (Tex.1984)); *see also Tex. State Bd. of Dental Exam'rs v. Brown*, 281 S.W.3d 692, 697 (Tex. App.—Corpus Christi 2009, pet. denied) (agency, not ALJ, determines appropriate sanction).

The SOAH ALJs also erred to the extent that they relied on the *Harlingen Family Dental* decision, particularly, FoF 29, 31, and 33, for their understanding of the scope and limitations of Texas Medicaid policy.  The Executive Commissioner disapproves of these findings, and expressly concludes that they were based on an

001782

incorrect interpretation and application of Texas law and Medicaid policy, and therefore, cannot be relied on. Tex. Gov't Code § 2001.058(e)(2).

Moreover, the proposed conclusion reflects a fundamental misunderstanding and misapplication of Texas law by the SOAH ALJs. Therefore, there is a rational connection between Texas law and Medicaid policy and the modified conclusion of law. *See, e.g., Heritage on the San Gabriel Homeowners Assoc. v. TCEQ*, 393 S.W.3d at 440-41; *State v. Mid-South Pavers, Inc.*, 246 S.W.3d at 728; *Levy v. Tex. State Bd. of Med. Exam'rs*, 966 S.W.2d at 816.

14. **The Texas Government Code mandates a payment hold when reliable evidence has been presented of fraud or willful misrepresentation. Tex. Gov't Code § 531.102(g)(2). The Executive Commissioner shall discontinue the hold unless the department makes a *prima facie* showing at the hearing that the evidence relied on by the department in imposing the hold is relevant, credible and material to the issue of fraud or willful misrepresentation. Tex. Hum. Res. Code § 32.0291(c).**

(The SOAH ALJs' proposed CoL No. 14 stated: *A payment hold should be reasonably related to the magnitude of the violation.*)

Reason for Change:

The Executive Commissioner modifies Proposed CoL No. 14. Proposed CoL No. 14 is erroneous because it misstates the law. *See* Tex. Gov't Code § 2001.058(e)(1). The Texas Government Code mandates a payment hold when reliable evidence was been presented of fraud or willful misrepresentation. Tex. Gov't Code § 531.102(g)(2). Additionally, "[t]he department shall discontinue the hold unless the department makes a *prima facie* showing at the hearing that the evidence relied on by the department in imposing the hold is relevant, credible and material to the issue of fraud or willful misrepresentation." Tex. Hum. Res. Code § 32.0291(c) (emphasis added).

Because the SOAH ALJs' proposed conclusion of law misstated the applicable law, the HHSC-ALJ had complete discretion to modify it. *Thompson*, 2013 WL 3791486, at *6; Tex. Gov't Code § 2001.058(e)(1).

The SOAH ALJs also erred to the extent that they relied on the *Harlingen Family Dental* decision, particularly, FoF 29, 31, and 33, for their understanding of the scope and limitations of Texas Medicaid policy. The Executive Commissioner disapproves of these findings, and expressly concludes that they were based on an incorrect interpretation and application of Texas law and Medicaid policy, and therefore, cannot be relied on. Tex. Gov't Code § 2001.058(e)(2).

Moreover, the proposed conclusion reflects a fundamental misunderstanding and misapplication of Texas law by the SOAH ALJs. Therefore, there is a rational connection between Texas law and Medicaid policy and the modified conclusion

40

001783

of law. *See, e.g., Heritage on the San Gabriel Homeowners Assoc. v. TCEQ*, 393 S.W.3d at 440-41; *State v. Mid-South Pavers, Inc.*, 246 S.W.3d at 728; *Levy v. Tex. State Bd. of Med. Exam'rs*, 966 S.W.2d at 816.

15. The prima facie evidence established that ADC committed program violations by failing to maintain certain patient records for the required five years. 1 Tex. Admin. Code §§ 371.1703(b)(5),(6); 371.1617(2)(A), (5)(A) and (G) (2005).

16. **ADC's failure to immediately provide HHSC-OIG with the documents and other items requested in writing, along with the extensive and overwhelming pattern of willful misrepresentations or fraud in ADC's HLD scoresheets, and ADC's billing for non-reimbursable services, should result in a continuing payment hold. Tex. Gov't Code § 531.102(g) (2011); Tex. Hum. Res. Code § 32.0291(c); 1 Tex. Code § 371.1617(2)(A) (2005); 2008 TMPPM at 1.2.3.**

(The SOAH ALJs' proposed CoL No. 16 stated: *These technical violations are very limited in number and are innocuous; therefore, they do not warrant a payment hold in this case.*)

Reason for Change:

The Executive Commissioner modifies Proposed CoL No. 16. Proposed CoL No. 16 is erroneous because (1) failure to provide records to HHSC-OIG is also a program violation; and (2) failure to provide records to HHSC-OIG is neither a technical violation nor innocuous, as HHSC-OIG decided to impose a payment hold on ADC based on the patient records it provided in response to HHSC-OIG's written request, and based on the fact that ADC failed to provide certain records at that time.

Because CoL No. 16 rests on faulty applications of law as well as erroneous interpretations of Medicaid policy the Executive Commissioner enjoys complete discretion to correct it. *Thompson*, 2013 WL 3791486, at *6; Tex. Gov't Code § 2001.058(e)(1). Further, the Executive Commissioner, and not the SOAH ALJs, determines the appropriate sanction if the law has been violated. *See Pierce v. Tex. Racing Comm'n*, 212 S.W.3d 745, 754 (Tex. App.—Austin 2006, pet. denied) (agency determines appropriate penalty to further agency's goals of compliance with state law (citing *Firemen's & Policemen's Civil Serv. Comm'n v. Brinkmeyer*, 662 S.W.2d 953, 956 (Tex.1984)); *see also Tex. State Bd. of Dental Exam'rs v. Brown*, 281 S.W.3d 692, 697 (Tex. App.—Corpus Christi 2009, pet. denied) (agency, not ALJ, determines appropriate sanction).

The SOAH ALJs also erred to the extent that they relied on the *Harlingen Family Dental* decision, particularly, FoF 29, 31, and 33, for their understanding of the scope and limitations of Texas Medicaid policy. The Executive Commissioner disapproves of these findings, and expressly concludes that they were based on an incorrect interpretation and application of Texas law and Medicaid policy, and therefore, cannot be relied on. Tex. Gov't Code § 2001.058(e)(2).

41

001784

Moreover, the proposed conclusion reflects a fundamental misinterpretation and misapplication of Texas law by the SOAH ALJs. Therefore, there is a rational connection between Texas law and Medicaid policy and the modified conclusion of law. *See, e.g., Heritage on the San Gabriel Homeowners Assoc. v. TCEQ*, 393 S.W.3d at 440-41; *State v. Mid-South Pavers, Inc.*, 246 S.W.3d at 728; *Levy v. Tex. State Bd. of Med. Exam'rs*, 966 S.W.2d at 816.

It is further ORDERED that the 100% payment hold instituted on April 4, 2012 shall remain in place until further order of the Executive Commissioner.

Signed this 2 day of May , 201_.

Kyle L. Janek, M.D.
Executive Commissioner

42

001785

# Appendix B

 **(/index.html)**
Keeping America Healthy

Return to previous page

lome (/index.html) > Medicaid (/medicaid-chip-program-information/medicaid-and-chip-program-information.html) > By State

# Texas

 State of Texas Website  **All States** ▶ (/medicaid-chip-program-information/by-state/by-state.html)
(http://www.hhsc.state.tx.us/)

## Medicaid-Marketplace Overview

The Federally-facilitated Marketplace (FFM) is offering health coverage in Texas in 2015. The FFM will make assessments of Medicaid/CHIP eligibility and then transfer the applicant's account to the state agency for a final eligibility determination. Texas has not expanded Medicaid coverage to low-income adults.

## Medicaid and CHIP Eligibility Levels

To view the modified adjusted gross income (MAGI) (/medicaid-chip-program-information/program-information/downloads/modified-adjusted-gross-income-and-medicaid-chip.pdf)     -based eligibility levels, expressed as a percentage of the federal poverty level (FPL) and by monthly dollar amount and family size for Medicaid and CHIP, visit the National Medicaid and CHIP Eligibility Levels page (/medicaid-chip-program-information/program-information/medicaid-and-chip-eligibility-levels/medicaid-chip-eligibility-levels.html) for more information.

| State | Medicaid Expansion | Children - Medicaid | | | Separate CHIP | Pregnant Women | | Parents[3] | Other Adults |
|---|---|---|---|---|---|---|---|---|---|
| | | Ages 0-1[1] | Ages 1-5[2] | Ages 6-18[2] | | Medicaid | CHIP | | |
| Texas | N | 198% | 144% | 133% | 201% | 198% | N/A | 15% | 0% |

*1. These eligibility standards include CHIP-funded Medicaid expansions.*

*2. Children in separate CHIP programs are typically charged premiums. This table does not include notations of states that have elected to provide CHIP coverage from conception to birth.*

*3. In states that use dollar amounts rather than percentages of the federal poverty level (FPL) for 2013 to determine eligibility for parents, we converted those amounts to a percent of the FPL and selected the highest percentage to reflect eligibility level for the group. In addition, in states that are adopting the Medicaid expansion, we have indicated the upper income limit for parents to also be 133% of the FPL, since parents can be eligible for coverage under the new adult group. The actual dollar standards that states will use to determine eligibility are quoted in the monthly income tables.*

## Monthly Medicaid and CHIP Enrollment Data

Each month, CMS releases state-reported data on State Medicaid and CHIP program Enrollment. The enrollment data for each month is a point-in-time count of total Medicaid and CHIP enrollment on the last day of the month, and is not solely a count of those newly enrolled during the reporting period.   Below, this data is compared to average enrollment from July-September 2013, the period before the initial open enrollment period of the Health Insurance Marketplaces. Additional information and enrollment data is available on the Medicaid and CHIP Application, Eligibility Determination, and Enrollment Data page (/medicaid-chip-program-information/program-information/medicaid-and-chip-enrollment-data/medicaid-and-chip-application-eligibility-determination-and-enrollment-data.html).

| State | State Medicaid & CHIP Enrollment | | | National | | |
|---|---|---|---|---|---|---|
| | Total Medicaid & CHIP Enrollment (February 2015) (Preliminary) | Comparison of February 2015 data to July-September 2013 Average Enrollment | | Total Medicaid & CHIP Enrollment, all States (February 2015) (Preliminary) | Comparison of February 2015 data to July-September 2013 Average Enrollment | |
| | | Net Change | % Change | | Net Change | % Change |
| Texas | 4,655,609 | 214,004 | 4.82% | 70,515,716 | 11,718,178 | 20.28% |

## Medicaid and CHIP Applications

The Affordable Care Act established a streamlined enrollment process through which individuals can gain access to affordable insurance coverage for which they are eligible. The law directed the Secretary of Health and Human Services (HHS) to develop a model application that will be used to apply for coverage through the Marketplace, Medicaid and CHIP (http://www.healthcare.gov/get-coverage/). States have the option to adopt the Secretary of HHS's model application form for affordable insurance programs or to adopt an alternative application that meets federal requirements.

- Texas Medicaid/CHIP Application (http://www.yourtexasbenefits.com)

In response to CMS Guidance provided on May 17, 2013 (/federal-policy-guidance/downloads/sho-13-003.pdf) , many states have adopted one or more "targeted enrollment strategies" designed to facilitate enrollment and retain coverage for eligible individuals in Medicaid/CHIP. The states that have adopted one or more targeted enrollment strategies are listed on the Targeted Enrollment Strategies (/medicaid-chip-program-information/program-information/targeted-enrollment-strategies/targeted-enrollment-strategies.html) page.

## Medicaid and CHIP State Plan Amendments

The state Medicaid and CHIP plans spell out how each state has chosen to design its program within the broad requirements for federal funding. As always, states amend their Medicaid and CHIP state plans in order to inform CMS of programmatic and financing changes and to secure legal authority for those changes. The Affordable Care Act included many new opportunities for states to augment and improve their Medicaid and CHIP programs. As a result there has been a great deal of state plan amendment activity over the past several years in the areas of eligibility, benefits design and financing, as well as new approaches to providing health homes, long-term services and supports, and enrollment strategies like hospital presumptive eligibility. See below for a state-specific list of approved Medicaid and CHIP SPAs.

- Texas Medicaid SPAs (http://www.medicaid.gov/State-Resource-Center/Medicaid-State-Plan-Amendments/Medicaid-State-Plan-Amendments.html?filterBy=Texas)

- Texas CHIP SPAs (http://www.medicaid.gov/chip/state-program-information/chip-state-program-information.html?filterBy=Texas)

## Demonstrations and Waivers

Demonstration and waivers are vehicles states can use to test new or existing ways to deliver and pay for health care services in Medicaid and CHIP. The primary types of waivers and demonstration projects include section 1115 demonstrations, section 1915(b) managed care waivers, and section 1915(c) home and community-based services waivers. More information about waivers is available on the Waivers (/medicaid-chip-program-information/by-topics/waivers/waivers.html) page.

- State of Texas Approved Waivers (http://medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/Waivers_faceted.html?filterBy=Texas)

## Medicaid Delivery System

States have choices in their approach to delivery system design under the Medicaid and CHIP programs. States are increasingly moving to the use of managed care (/medicaid-chip-program-information/by-topics/delivery-systems/managed-care/managed-care-site.html) and other integrated care models (/medicaid-chip-program-information/by-topics/long-term-services-and-supports/integrating-care/integrating-care.html) in serving their Medicaid beneficiaries. On average, more than 70 percent of the Medicaid population is enrolled in some form of managed care.

## CHIP Program Information

The Children's Health Insurance Program (/chip/chip-program-information.html) was established in 1997 to provide new coverage opportunities for children in families with incomes too high to qualify for Medicaid, but who cannot afford private coverage. Like Medicaid, CHIP is administered by the states, but is jointly funded by the federal government and states. States had the opportunity to design their CHIP programs (/chip/downloads/chip-map.pdf) as an expansion of Medicaid, as a stand-alone program or through a combined approach.

## Medicaid/CHIP Participation Rates

The participation rate is the percentage of eligible children enrolled in Medicaid and CHIP in the state. Data from 2013 show 88.3 percent of the eligible children in the United States are enrolled in Medicaid and CHIP programs. More information about the participation rate among children in Texas is available on InsureKidsNow.gov (http://www.insurekidsnow.gov/professionals/reports/index.html).

| State | Participation |
|-------|---------------|
| Texas | 83.7% |

## Medicaid/CHIP Eligibility Verification Plans

Medicaid and CHIP agencies now rely primarily on information available through data sources (e.g., the Social Security Administration, the Departments of Homeland Security and Labor) rather than paper documentation from families for purposes of verifying eligibility for Medicaid and CHIP.

- Texas's Medicaid and CHIP Verification Plan (/medicaid-chip-program-information/program-information/eligibility-verification-policies/downloads/texas-verification-plan-template-final.pdf)

## MAGI Conversion Plans

CMS provided states with a template for completing their "MAGI Conversion Plans" that are designed to reflect the MAGI-based eligibility standards that are used to determine Medicaid and CHIP eligibility. The MAGI-conversion process involved a translation of pre-2014 net income eligibility standards into MAGI-based eligibility standards. Moving to MAGI replaced income disregards with simpler, more universal income eligibility rules that are generally aligned with the rules that are used to determine eligibility for the premium tax credits in the Marketplace. To complete the transformation to MAGI, states needed to "convert" their net-income based eligibility standards to MAGI-based standards.

- Texas's MAGI Conversion Plan is currently in progress

- Texas SIPP-Based MAGI Conversion Results (/medicaid-chip-program-information/program-information/medicaid-and-chip-and-the-marketplace/downloads/tx-converted-thresholds-26apr2013.pdf)

# Appendix C

# Texas Medicaid
# and CHIP
# in Perspective

*Tenth Edition*

*Texas Health and Human Services Commission*
*February 2015*

# Chapter 1: Texas Medicaid in Perspective

*What is Medicaid? What is Medicaid managed care? How is Texas Medicaid changing?*

## What Is Medicaid?

Medicaid is a jointly funded state-federal health care program, established in Texas in 1967 and administered by the Health and Human Services Commission (HHSC). In order to participate in Medicaid, federal law requires states to cover certain population groups (mandatory eligibility groups) and gives them the flexibility to cover other population groups (optional eligibility groups). Each state chooses its own eligibility criteria within federal minimum standards. States can apply to the Centers for Medicare & Medicaid Services (CMS) for a waiver of federal law to expand health coverage beyond these groups. Medicaid is an entitlement program, which means the federal government does not, and a state cannot, limit the number of eligible people who can enroll, and Medicaid must pay for any services covered under the program. In July 2013, about one in seven Texans (3.7 million of the 26.4 million) relied on Medicaid for health coverage or long-term services and supports.

Medicaid pays for acute health care (physician, inpatient, outpatient, pharmacy, lab, and x-ray services), and long-term services and supports (home and community-based services, nursing facility services, and services provided in Intermediate Care Facilities for Individuals with an Intellectual Disability or Related Conditions (ICFs/IID)) for people age 65 and older and those with disabilities. In state fiscal year (SFY) 2013, total expenditures (i.e. state and federal) for Medicaid were estimated to represent 26.2 percent (about $25.6 billion) of Texas' budget[i]. The federal share of the jointly financed program is determined annually based on the average state per capita income compared to the U.S. average. The federal share is known as the federal medical

---

[i] All funds, excluding disproportionate share hospital (DSH), uncompensated care (UC), and Delivery System Improvement Program (DSRIP). Sources: Texas Medicaid History Report, August 2014, and Fiscal Size-Up(s)..

# Appendix D



# TEXAS MEDICAID
## PROVIDER PROCEDURES MANUAL

**Volumes
1 & 2**

This manual is available for download at www.tmhp.com, and is also available on CD. There are many benefits to using the electronic manual, including easy navigation with bookmarks and hyperlinked cross-references, the ability to quickly search for specific terms or codes, and form printing on demand.

The Texas Medicaid & Healthcare Partnership (TMHP) is the claims administrator for Texas Medicaid under contract with the Texas Health and Human Services Commission.

## 4.2.23 Hospitalization and ASC/HASC

Dental services performed in an ASC, HASC, or a hospital (either as an inpatient or an outpatient) may be benefits of THSteps based on the medical or behavioral justification provided, or if one of the following conditions exist:

- The procedures cannot be performed in the dental office.
- The client is severely disabled.

To satisfy the preadmission history and physical examination requirements of the hospital, ASC, or HASC, a THSteps medical checkup for dental rehabilitation or restoration may be performed by the child's primary care provider. Physicians who are not enrolled as THSteps medical providers must submit claims for the examination of a client before the procedure with the appropriate evaluation and management procedure code from the following table:

| Procedure Code | Place of Service (POS) |
|---|---|
| 99202 | POS 1 (office) |
| 99222 | POS 3 (inpatient hospital) |
| 99282 | POS 5 (outpatient hospital) |

> *Refer to:* Subsection 5.3.1.6, "Exception-to-Periodicity Checkups" in this handbook.

> *Note:* *The dental provider must submit claims to TMHP using the ADA Dental Claim Form to be considered for reimbursement through THSteps Dental Services.*

The dental provider is responsible for obtaining prior authorization for the services performed under general anesthesia. Hospitals, ASC's, and anesthesiologists must obtain the prior authorization number from the dental provider.

Contact the individual HMO for precertification requirements related to the hospital procedure. If services are precertified, the provider receives a precertification number effective for 90 days.

In those areas of the state with Medicaid managed care, the provider should contact the managed care plan for specific requirements or limitations. It is the dental provider's responsibility to obtain precertification from the client's HMO or managed care plan for facility and general anesthesia services if precertification is required.

To be reimbursed by the HMO, the provider must use the HMO's contracted facility and anesthesia provider. These services are included in the capitation rates paid to HMOs, and the facility or anesthesiologist risk nonpayment from the HMO without such approval. Coordination of all specialty care is the responsibility of the client's primary care provider. The primary care provider must be notified by the dentist or the HMO of the planned services.

Dentists providing sedation or anesthesia services must have the appropriate current permit from the TSBDE for the level of sedation or anesthesia provided.

The dental provider must be in compliance with the guidelines detailed in General Information.

> *Note:* *Post-treatment authorization will not be approved for codes that require mandatory prior authorization.*

## 4.2.24 Orthodontic Services (THSteps)

Orthodontic services for cosmetic purposes only are not a benefit of Texas Medicaid. Orthodontic services are limited to the treatment of children who are 12 years of age and older with severe handicapping malocclusion, children who are birth through 20 years of age with cleft palate, or other special medically necessary circumstances as outlined in Benefits and Limitations, which follows.

CPT ONLY - COPYRIGHT 2010 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

### 4.2.24.1 Benefits and Limitations

Orthodontic services include the following:

- Correction of severe handicapping malocclusion as measured on the Handicapping Labiolingual Deviation (HLD) Index. A minimum score of 26 points is required for full banding approval (only permanent dentition cases are considered).

  *Refer to:* Subsection 4.2.26, "Handicapping Labio-lingual Deviation (HLD) Index" in this handbook.

  *Exception:* *Retained deciduous teeth and cleft palates with gross malocclusion that will benefit from early treatment. Cleft palate cases do not have to meet the HLD 26-point scoring requirement. However, it is necessary to submit a sufficient narrative or outline of the proposed treatment plan when requesting authorization for orthodontic services on cleft palate cases.*

- Crossbite therapy.

- Head injury involving severe traumatic deviation.

The following limitations apply for orthodontic services:

- Orthodontic services for cosmetic purposes only are not a benefit of Texas Medicaid or THSteps.

- Orthognathic surgery, to include extractions, required or provided in conjunction with the application of braces must be completed while the client is Medicaid-eligible in order for reimbursement to be considered.

- Except for procedure code D8660, all orthodontic procedures require prior authorization for consideration of reimbursement.

- The THSteps client must be Medicaid THSteps-eligible when authorization is requested and the orthodontic treatment plan is initiated. It is the provider's responsibility to verify that the client has a current Medicaid Identification Form (Form H3087) or Medicaid Eligibility Verification Form (Forms H1027 and H1027-A-C); that the date of birth on the form indicates the client is 20 years of age or younger; and that no limitations are indicated.

- Prior authorization is issued to the requesting provider only and is not transferable to another provider. If the client changes providers or if the provider ceases to be a Medicaid provider for any reason, a new prior authorization must be requested by the new provider.

  *Refer to:* Subsection 4.2.24.4, "Transfer of Orthodontic Services" in this handbook.

The following procedure codes, policies, and limitations are applied to the processing and payment of orthodontic services under THSteps dental services:

- Procedure code D8660 is allowed when:

  - The client is referred to a dental provider to determine whether orthodontic services are indicated and to determine the appropriate time to initiate such services.

  - The client is referred to a dental provider and elects to receive services from another orthodontic provider for justifiable reasons.

  - Repeat visits at different age levels are required to determine the appropriate time to initiate orthodontic treatment.

- If procedure code D8660 is submitted within six months of procedure code D8080, procedure code D8080 will be reduced by the amount that was paid for procedure code D8660.

- Procedure code D8680 is payable for one retainer per arch, per lifetime, and each retainer may be replaced once because of loss or breakage (prior authorization is required).

CPT ONLY - COPYRIGHT 2010 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

- Procedure code D8670 must be submitted only when an adjustment to the appliances is provided and may not be submitted before the date on which the orthodontic adjustment was performed. The number of visits for monthly adjustments to the appliances is restricted to the number that was authorized in the treatment plan. However, the number of monthly visits may be amended with appropriate documentation of medical necessity while the client is Medicaid eligible.

- Procedure code D8670 is paid only in conjunction with a history of braces (code D8080), unless special circumstances exist.

- All orthodontic procedure codes and appliances are global fees.

- Separate fees for adjustments to retainers are not payable.

- The appropriate procedure code must be submitted for those appliances required as part of the treatment of cleft palate cases.

Special orthodontic appliances may also be used with full banding and crossbite therapy with approval by the TMHP Dental Director.

- Procedure codes D5951, D5952, D5953, D5954, D5955, D5958, D5959, and D5960 are to be used as applicable with documentation of medical necessity. Otherwise, use the appropriate special orthodontic appliance code.

- Full banding is allowed on permanent dentition only, and treatment should be accomplished in one stage and is allowed once per lifetime.

**Exception:** *Cases of mixed dentition when the treatment plan includes extractions of remaining primary teeth or cleft palate.*

- Crossbite therapy is allowed for primary, mixed, or permanent dentition.

- Providers must not request crossbite correction (limited orthodontics) for a mixed dentition client when there is a need for full banding in the adult teeth. Crossbite therapy is an inclusive charge for treating the crossbite to completion, and additional reimbursement is not provided for adjustments or maintenance.

- If a case is not approved, the dentist may file a claim for payment of the diagnostic workup for procedure codes used that were necessary to request the prior authorization (procedure codes D0330, D0340, D0350, and D0470). The dentist may receive payment under these procedure codes for no more than two cases out of every ten cases denied. The dentist should determine if the client's condition meets orthodontic benefit criteria before performing a diagnostic workup.

- Procedure codes D8080, D8050, and D8060, are limited to one per lifetime.

- Comprehensive orthodontic services (procedure code D8080) are restricted to clients who are 12 years of age and older or clients who have exfoliated all primary dentition. Crossbite therapy includes diagnostic cast services.

### 4.2.24.2 Completion of Treatment Plan

If a client reaches 21 years of age or loses Medicaid eligibility before the authorized orthodontic treatment is completed, reimbursement is provided to complete the orthodontic treatment that was authorized and initiated while the client was 20 years of age or younger, eligible for Medicaid THSteps, and completed within 36 months. Any orthodontic-related service requested in the prior authorization request (e.g., extractions or surgeries) must be completed before the loss of client eligibility. Services cannot be added or approved after Medicaid THSteps eligibility has expired.

**Exception:** *Medicaid will not reimburse for any orthodontic services during a period of time when a THSteps client is incarcerated. During a period of incarceration, the facility is responsible for any and all dental services, including orthodontic services.*

CPT ONLY - COPYRIGHT 2010 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

### 4.2.24.3 Premature Removal of Appliances

The overall fee for orthodontic treatment (D8080) includes the removal of orthodontic brackets and treatment appliances. Procedure code D7997 may be used only when the appliances were placed by a different provider with an unaffiliated practice (not a partner or office-sharing arrangement) and one of the following conditions exist:

- There is documentation of a lack of cooperation from the client.
- The client requests premature removal and a release of liability form has been signed by the parent, guardian, or client if he is at least 18 years of age.

Providers must keep a copy of the release of liability form on file and are responsible for this documentation during a review process.

### 4.2.24.4 Transfer of Orthodontic Services

Prior authorization that has been issued to a dental provider for orthodontic services is not transferable to another dental provider. The new provider must submit to TMHP a new prior authorization request to get approval to complete the orthodontic treatment that was initiated by the original provider.

To complete the treatment plan, the client must be eligible for Medicaid with a current client Medicaid Identification Form (Form H3087) or Medicaid Eligibility Verification Form (Form H1027).

If the client does not return for the completion of services and there is documented failure to keep appointments by the client, the dental provider who initiated the services may submit a claim for reimbursement. The claim must be received by TMHP within the 95-day filing deadline from the last DOS.

The following supporting documentation must accompany the new request for orthodontia services and must include the DOS the orthodontic diagnostic tools were completed and include:

- All of the documentation as required for the original provider.
- The reason the client left the previous provider, if known.
- An explanation of the treatment status.
- A complete treatment plan addressing all procedures for which authorization is being requested (such as the number of monthly adjustments or retainers required to complete the case).
- A full diagnostic workup (procedure code D8080) with an HLD Index. The score of 26 points will be modified according to any progress achieved.

*Exception:* *The prior authorization requests for clients who initiate orthodontic services before becoming eligible for Medicaid do not require models or the HLD score sheet, nor does the client have to meet the HLD Index of 26 points. However, a complete plan of treatment is required.*

*Note:* *If Medicaid clients initiate orthodontic services outside of Medicaid because they do not score 26 points on the HLD, they are not eligible to have their orthodontic services transferred to or reimbursed by Medicaid.*

Providers who want to request prior authorization to complete orthodontic treatment that was initiated by another provider must complete a THSteps Dental Mandatory Prior Authorization Request Form and send it with the complete plan of treatment, and the appropriate documentation for orthodontic services or crossbite therapy to the TMHP Dental Director at the following address:

Texas Medicaid & Healthcare Partnership
THSteps Dental Prior Authorization Unit
PO Box 202917
Austin, TX 78720-2917

CPT ONLY - COPYRIGHT 2010 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

### 4.2.24.5 Comprehensive Orthodontic Treatment

Comprehensive orthodontic services (procedure code D8080) are restricted to clients who are 12 years of age and older or clients who have exfoliated all primary dentition. Crossbite therapy includes diagnostic cast services.

National procedure codes do not allow for any work-in-progress or partial submission of a claim by separating the three orthodontic components: diagnostic workup, orthodontic appliance (upper), or orthodontic appliance (lower).

When submitting claims for comprehensive orthodontic treatment, procedure code D8080, three local codes must be submitted as remarks codes along with procedure code D8080. Local codes (procedure codes Z2009, Diagnostic workup approved; Z2011, Orthodontic appliance, upper; or Z2012, Orthodontic appliance, lower) must be placed in the Remarks Code field on electronic claims or Block 35 on paper claims.

> **Note:** *If the remarks code and procedure code D8080 are not submitted, the claim will be denied.*

Each remarks code pays the correct reimbursement rate which, when combined, totals the maximum payment of $775. Procedure code D8080 must be submitted on three separate details, with the appropriate remarks code, even if the claim submission is for the workup and full banding. Submission of only one detail for a total of $775 will not be accepted.

**Example 1:** A client is approved for full banding, but after the initial workup, the client discontinues treatment. This provider would submit the national procedure code D8080 and place the local code Z2009, Diagnostic workup approved, in the Remarks/comment field. The claim would pay $175.

**Example 2:** A client is approved for full banding. The provider continues treatment and places the maxillary bands. The provider would submit the national procedure code D8080 and place the local procedure code Z2009, Diagnostic workup approved, and Z2011, Maxillary bands, in the Remarks/comment field. The claim would pay $475.

All electronic claims for procedure code D8080 must have the appropriate remarks code associated with the procedure code.

Providers must adhere to the following guidelines for electronic claim submission so TMHP can accurately apply the correct remarks code to the appropriate claim detail.

A Diagnostic Procedure Code (DPC) remarks code must be submitted, only once, in the first three bytes of the NTE02 at the 2400 loop.

**Example 1:** For a claim with one detail, submitted with procedure code D8080 and remarks code Z2009, enter the information as follows: DPCZ2009. The total submitted would be $175.

**Example 2:** For a claim with two details, where details one and two are procedure code D8080 and the remarks codes are Z2009 and Z2011, enter the information as follows: DPCZ2009Z2011. The total submitted would be $475.

**Example 3:** For a claim with three details, where all three details are submitted separately with procedure code D8080, enter the remarks code based on the order of the claim detail as follows: DPCZ2009Z2011Z2012. The total submitted would be $775.

This method ensures accurate and appropriate payment for services rendered and addresses the need for submission of a partial claim.

CPT ONLY - COPYRIGHT 2010 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

# Appendix E

## Welcome: 2010 Texas Medicaid Provider Procedures Manual

This manual is a comprehensive guide for Texas Medicaid providers. It contains information about Texas Medicaid benefits, policies, and procedures. It also includes information about Texas Health Steps (THSteps), the Children's Services Program and managed care programs, including Primary Care Case Management (PCCM).

Texas Medicaid policy published in this manual was implemented on or before January 1, 2010. Policy updates effective after January 2, 2010, are published bimonthly in the Texas Medicaid Bulletin.

All Texas Medicaid policy updates, which are published bimonthly in the Texas Medicaid Bulletin, supplement this manual and update the policy it contains.

This manual is also available on the TMHP website at www.tmhp.com.

### New Format for 2010

This year's manual features a new format that makes it easier to access the information providers need. The following outlines the new format:

### *Volume I: General Information*

Volume 1 applies to all health-care providers who are enrolled in Texas Medicaid and provide services to Texas Medicaid clients. The sections in Volume 1 include general information for enrolling in the program, receiving appropriate reimbursement, and claim submissions and appeals for services rendered.

- Contents
- Introduction
- TMHP Telephone and Address Guide
- Section 1. Provider Enrollment and Responsibilities
- Section 2. Texas Medicaid Reimbursement
- Section 3. TMHP Electronic Data Interchange (EDI)
- Section 4. Client Eligibility
- Section 5. Prior Authorization
- Section 6. Claims Filing
- Section 7. Appeals
- Section 8. Managed Care
- Appendix A: State and Federal Offices Communications Guide
- Appendix B: Vendor Drug Program
- Appendix C: HIV/AIDS
- Appendix D: Medical Transportation
- Appendix E: Acronym Dictionary
- Index (for Volume 1 and all handbooks)

CPT ONLY - COPYRIGHT 2009 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

## 5.3.23 Hospitalization and ASC/HASC

Dental services performed in an ASC, HASC, or a hospital (either as an inpatient or an outpatient) may be benefits of THSteps based on the medical or behavioral justification provided, or if one of the following conditions exist:

- The procedures cannot be performed in the dental office.
- The client is severely disabled.

To satisfy the preadmission history and physical examination requirements of the hospital, ASC, or HASC, a THSteps medical checkup for dental rehabilitation or restoration may be performed by the child's primary care provider. Physicians who are not enrolled as THSteps medical providers should bill for the examination of a client before the procedure with the appropriate evaluation and management procedure code from the following table:

| Procedure Code | Place of Service (POS) |
|---|---|
| 99202 | POS 1 (office) |
| 99222 | POS 3 (inpatient hospital) |
| 99282 | POS 5 (outpatient hospital) |

Providers enrolled in THSteps Medical should refer to subsection 6.3.1.6, "Exception-to-Periodicity Checkups" in this handbook.

> **Note:** *The dental provider should bill TMHP using the ADA Dental Claim Form to be considered for reimbursement through THSteps Dental Services.*

Contact the individual HMO for precertification requirements related to the hospital procedure. If services are precertified, the provider receives a precertification number effective for 90 days.

In those areas of the state with Medicaid managed care, the provider should contact the managed care plan for specific requirements or limitations. It is the dental provider's responsibility to obtain precertification from the client's HMO or managed care plan for facility and general anesthesia services if precertification is required.

To be reimbursed by the HMO, the provider must use the HMO's contracted facility and anesthesia provider. These services are included in the capitation rates paid to HMOs, and the facility or anesthesiologist risk nonpayment from the HMO without such approval. Coordination of all specialty care is the responsibility of the client's primary care provider. The primary care provider must be notified by the dentist or the HMO of the planned services.

Dentists providing sedation or anesthesia services must have the appropriate current permit from the TSBDE for the level of sedation or anesthesia provided.

The dental provider must be in compliance with the guidelines detailed in General Information.

> **Note:** *Post-treatment authorization will not be approved for codes that require mandatory prior authorization.*

## 5.3.24 Orthodontic Services (THSteps)

Orthodontic services for cosmetic purposes only are not a benefit of Texas Medicaid. Orthodontic services are limited to the treatment of children 12 years of age or older with severe handicapping malocclusion, children birth through 20 years of age with cleft palate, or other special medically necessary circumstances as outlined in Benefits and Limitations, which follows.

CPT ONLY - COPYRIGHT 2009 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

### 5.3.24.1 Benefits and Limitations

Orthodontic services include the following:

- Correction of severe handicapping malocclusion as measured on the Handicapping Labiolingual Deviation (HLD) Index. Refer to subsection 5.3.26, "How to Score the Handicapping Labio-lingual Deviation (HLD) Index" in this handbook for information on how to score the HLD. A minimum score of 26 points is required for full banding approval (only permanent dentition cases are considered).

  *Exception:* *Retained deciduous teeth and cleft palates with gross malocclusion that will benefit from early treatment. Cleft palate cases do not have to meet the HLD 26-point scoring requirement. However, it is necessary to submit a sufficient narrative and/or outline of the proposed treatment plan when requesting authorization for orthodontic services on cleft palate cases.*

- Crossbite therapy.

- Head injury involving severe traumatic deviation.

The following limitations apply for orthodontic services:

- Orthodontic services for cosmetic purposes only are not a benefit of Texas Medicaid or THSteps.

- Orthognathic surgery, to include extractions, required or provided in conjunction with the application of braces must be completed while the client is Medicaid-eligible in order for reimbursement to be considered.

- Except for procedure code D8660, all orthodontic procedures require prior authorization for consideration of reimbursement.

- The THSteps client must be Medicaid THSteps-eligible when authorization is requested and the orthodontic treatment plan is initiated. It is the provider's responsibility to verify that the client has a current Medicaid Identification Form (Form H3087) or Medicaid Eligibility Verification Form (Forms H1027 and H1027-A-C); that the date of birth on the form indicates the client is 20 years of age or younger; and that no limitations are indicated.

- Prior authorization is issued to the requesting provider only and is not transferable to another provider. If the client changes providers or if the provider ceases to be a Medicaid provider for any reason, a new prior authorization must be requested by the new provider.

  *Refer to:* Subsection 5.3.24.4, "Transfer of Orthodontic Services" in this handbook.

The following procedure codes, policies, and limitations are applied to the processing and payment of orthodontic services under THSteps dental services:

- Procedure code D8660 is allowed when:

  - The client is referred to a dental provider to determine whether orthodontic services are indicated and to determine the appropriate time to initiate such services.

  - The client is referred to a dental provider and elects to receive services from another orthodontic provider for justifiable reasons.

  - Repeat visits at different age levels are required to determine the appropriate time to initiate orthodontic treatment.

- If procedure code D8660 is billed within six months of procedure code D8080, procedure code D8080 will be reduced by the amount that was paid for procedure code D8660.

- Procedure code D8680 is payable for one retainer per arch, per lifetime, and each retainer may be replaced once because of loss or breakage (prior authorization is required).

CPT ONLY - COPYRIGHT 2009 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

- Procedure code D8670 should be billed only when an adjustment to the appliances is provided and may not be billed before the date on which the orthodontic adjustment was performed. The number of visits for monthly adjustments to the appliances is restricted to the number that was authorized in the treatment plan. However, the number of monthly visits may be amended with appropriate documentation of medical necessity while the client is Medicaid eligible.

- Procedure code D8670 is paid only in conjunction with a history of braces (code D8080), unless special circumstances exist.

- All orthodontic procedure codes and appliances are global fees.

- Separate fees for adjustments to retainers are not payable.

- The appropriate procedure code should be billed for those appliances required as part of the treatment of cleft palate cases.

Special orthodontic appliances may also be used with full banding and crossbite therapy with approval by the TMHP Dental Director.

- Procedure codes D5951, D5952, D5953, D5954, D5955, D5958, D5959, and D5960 are to be used as applicable with documentation of medical necessity. Otherwise, use the appropriate special orthodontic appliance code.

- Full banding is allowed on permanent dentition only, and treatment should be accomplished in one stage and is allowed once per lifetime.

*Exception:* *Cases of mixed dentition when the treatment plan includes extractions of remaining primary teeth or cleft palate.*

- Crossbite therapy is allowed for primary, mixed, or permanent dentition.

- Providers must not request crossbite correction (limited orthodontics) for a mixed dentition client when there is a need for full banding in the adult teeth. Crossbite therapy is an inclusive charge for treating the crossbite to completion, and additional reimbursement is not provided for adjustments or maintenance.

- If a case is not approved, the dentist may file a claim for payment of the diagnostic workup for procedure codes used that were necessary to request the prior authorization (procedure codes D0330, D0340, D0350, and D0470). The dentist may receive payment under these procedure codes for no more than two cases out of every ten cases denied. The dentist should determine if the client's condition meets orthodontic benefit criteria before performing a diagnostic workup.

- Procedure codes D8080, D8050, and D8060, are limited to one per lifetime.

- Comprehensive orthodontic services (procedure code D8080) are restricted to clients who are 12 years of age or older or clients who have exfoliated all primary dentition. Crossbite therapy includes diagnostic cast services.

### 5.3.24.2 Completion of Treatment Plan

If a client reaches 21 years of age or loses Medicaid eligibility before the authorized orthodontic treatment is completed, reimbursement is provided to complete the orthodontic treatment that was authorized and initiated while the client was 20 years of age or younger, eligible for Medicaid THSteps, and completed within 36 months. Any orthodontic-related service requested in the prior authorization request (e.g., extractions or surgeries) must be completed before the loss of client eligibility. Services cannot be added or approved after Medicaid THSteps eligibility has expired.

*Exception:* *Medicaid will not reimburse for any orthodontic services during a period of time when a THSteps client is incarcerated. During a period of incarceration, the facility is responsible for any and all dental services, including orthodontic services.*

CPT ONLY - COPYRIGHT 2009 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

### 5.3.24.3 Premature Removal of Appliances

The overall fee for orthodontic treatment (D8080) includes the removal of orthodontic brackets and treatment appliances. Procedure code D7997 may be used only when the appliances were placed by a different provider with an unaffiliated practice (not a partner or office-sharing arrangement) and one of the following conditions exist:

- There is documentation of a lack of cooperation from the client.
- The client requests premature removal and a release of liability form has been signed by the parent, guardian, or client if he is at least 18 years of age.

Providers must keep a copy of the release of liability form on file and are responsible for this documentation during a review process.

### 5.3.24.4 Transfer of Orthodontic Services

Prior authorization that has been issued to a dental provider for orthodontic services is not transferable to another dental provider. The new provider must submit to TMHP a new prior authorization request to get approval to complete the orthodontic treatment that was initiated by the original provider.

To complete the treatment plan, the client must be eligible for Medicaid with a current client Medicaid Identification Form (Form H3087) or Medicaid Eligibility Verification Form (Form H1027).

If the client does not return for the completion of services and there is documented failure to keep appointments by the client, the dental provider who initiated the services may submit a claim for reimbursement. The claim must be received by TMHP within the 95-day filing deadline from the last DOS.

The following supporting documentation must accompany the new request for orthodontia services and must include the DOS the orthodontic diagnostic tools were completed and include:

- All of the documentation as required for the original provider.
- The reason the client left the previous provider, if known.
- An explanation of the treatment status.
- A complete treatment plan addressing all procedures for which authorization is being requested (such as the number of monthly adjustments or retainers required to complete the case).
- A full diagnostic workup (procedure code D8080) with an HLD Index. The score of 26 points will be modified according to any progress achieved.

**Exception:** *The prior authorization requests for clients who initiate orthodontic services before becoming eligible for Medicaid do not require models or the HLD score sheet, nor does the client have to meet the HLD Index of 26 points. However, a complete plan of treatment is required.*

**Note:** *If Medicaid clients initiate orthodontic services outside of Medicaid because they do not score 26 points on the HLD, they are not eligible to have their orthodontic services transferred to or reimbursed by Medicaid.*

Providers who want to request prior authorization to complete orthodontic treatment that was initiated by another provider must complete a THSteps Dental Mandatory Prior Authorization Request Form and send it, the complete plan of treatment, and the appropriate documentation for orthodontic services or crossbite therapy to the TMHP Dental Director at the following address:

Texas Medicaid & Healthcare Partnership
THSteps Dental Prior Authorization Unit
PO Box 202917
Austin, TX 78720-2917

CPT ONLY - COPYRIGHT 2009 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

### 5.3.24.5 Comprehensive Orthodontic Treatment

Comprehensive orthodontic services (procedure code D8080) are restricted to clients who are 12 years of age or older or clients who have exfoliated all primary dentition.

National procedure codes do not allow for any work-in-progress or partial billing by separating the three orthodontic components: diagnostic workup, orthodontic appliance (upper), or orthodontic appliance (lower).

When billing for comprehensive orthodontic treatment, procedure code D8080, three local codes must be submitted as remarks codes along with procedure code D8080. Local codes (procedure codes Z2009, Diagnostic workup approved; Z2011, Orthodontic appliance, upper; or Z2012, Orthodontic appliance, lower) must be placed in the Remarks Code field on electronic claims or Block 35 on paper claims.

> **Note:** *If the remarks code and procedure code D8080 are not submitted, the claim will be denied.*

Each remarks code pays the correct reimbursement rate which, when combined, totals the maximum payment of $775. Procedure code D8080 must be billed on three separate details, with the appropriate remarks code, even if billing for the workup and full banding. Billing only one detail for a total of $775 will not be accepted.

**Example 1:** A client is approved for full banding, but after the initial workup, the client discontinues treatment. This provider would bill the national procedure code D8080 and place the local code Z2009, Diagnostic workup approved, in the Remarks/comment field. The claim would pay $175.

**Example 2:** A client is approved for full banding. The provider continues treatment and places the maxillary bands. The provider would bill the national procedure code D8080 and place the local procedure code Z2009, Diagnostic workup approved, and Z2011, Maxillary bands, in the Remarks/comment field. The claim would pay $475.

All electronic claims for procedure code D8080 must have the appropriate remarks code associated with the procedure code.

Providers should adhere to the following guidelines for electronic claim submission so that TMHP can accurately apply the correct remarks code to the appropriate claim detail.

A Diagnostic Procedure Code (DPC) remarks code must be submitted, only once, in the first three bytes of the NTE02 at the 2400 loop.

**Example 1:** For a claim with one detail, submitted with procedure code D8080 and remarks code Z2009, enter the information as follows: DPCZ2009. The total billed would be $175.

**Example 2:** For a claim with two details, where details one and two are procedure code D8080 and the remarks codes are Z2009 and Z2011, enter the information as follows: DPCZ2009Z2011. The total billed would be $475.

**Example 3:** For a claim with three details, where all three details are submitted separately with procedure code D8080, enter the remarks code based on the order of the claim detail as follows: DPCZ2009Z2011Z2012. The total billed would be $775.

This method ensures accurate and appropriate payment for services rendered and addresses the need for partial billing.

CPT ONLY - COPYRIGHT 2009 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

### 5.3.24.6 Orthodontic Procedure Codes and Fee Schedule

When submitting claims for orthodontic procedures, use the following procedure codes:

| Procedure Code | Limitations | Maximum Fee |
|---|---|---|
| **Orthodontic Services** | | |
| D0330*, D0340*, D0350*, and D0470* | When requested orthodontic cases are submitted for authorization and denied, two out of ten denials will be paid. These four procedure codes, when billed together for denied cases, replace local procedure code Z2010. | $100.00 |
| D7280 | A 1-20 | $62.50 |
| D7997* | Replaces Z2016. Not payable to the dentist who placed the appliance. Includes removal of arch bar and premature removal of braces. A 1-20 | $50.00 |
| **Interceptive Orthodontic Treatment** | | |
| D8050* | Replaces Z2018 and 8110D. Limited to one per lifetime. | $340.00 |
| D8060* | Replaces Z2018 and 8120D. Limited to one per lifetime. | $340.00 |
| **Comprehensive Orthodontic Treatment** | | |
| D8080* | Replaces Z2009, Z2011, and Z2012. Limited to one per lifetime. | $775.00 |
| **Minor Treatment to Control Harmful Habits** | | |
| D8210* | Refer to Subsection 5.3.25, "Special Orthodontic Appliances" below for associated remarks field code. | See separate table |
| D8220* | Refer to Subsection 5.3.25, "Special Orthodontic Appliances" below for associated remarks field code. | See separate table |
| **Other Orthodontic Services** | | |
| D8660* | Replaces Z2008. Denied when billed on the same DOS as D0120, D0145, or D0150. | $15.00 |
| D8670* | Replaces Z2013. | $68.10 |
| D8680* | Replaces Z2014 and Z2015; one retainer per arch per lifetime; may be replaced once because of loss or breakage (prior authorization is required). | $100.00 |
| D8690* | Bracket replacement. | $20.00 |
| D8691 | Not considered medically necessary. | NC |
| D8692 | Although procedure code D8692 is not a benefit of Texas Medicaid, providers can use procedure code D8680 to bill for retainer(s). Providers should include local code Z2014 or Z2015 on the claim form to indicate upper or lower, as appropriate. | NC |
| D8693 | | $50.00 |
| D8999 | | Manually priced |
| * = Services payable to an FQHC for a client encounter. | | |

## 5.3.25 Special Orthodontic Appliances

All removable or fixed special orthodontic appliances must be prior authorized. The prior authorization request must include both the national code and remarks code. However, prior authorization requests may omit the DPC prefix to the eight-digit remarks code.

CPT ONLY - COPYRIGHT 2009 AMERICAN MEDICAL ASSOCIATION. ALL RIGHTS RESERVED.

# Appendix F

## Dear Manual User:

Welcome to the 2009 *Texas Medicaid Provider Procedures Manual*. To enhance usability, this manual is available on a searchable CD-ROM and on the TMHP website at www.tmhp.com.

**Note:** *All users who access www.tmhp.com are required to accept the American Medical Association (AMA) End-user Agreement on the use of Current Procedural Terminology (CPT). For each computer that accesses the TMHP website, the agreement must be accepted every 30 days from the last date on which the agreement was accepted by the user. If the end-user agreement is not accepted on a particular computer every 30 days, no user will be able to enter the website from that computer. For additional information about the AMA and CPT, refer to www.ama-assn.org/ama/pub/category /3113.html.*

A *Claims Filing Resources* table is located at the end of each service section with page references to all claim instructions, appendices, Medicaid forms, and claim form examples associated with the service.

This manual contains both the Primary Care Case Management (PCCM) and Texas Health Steps (THSteps) manuals. PCCM information can be found primarily in Section 7, though relevant information can be found in other sections. THSteps information is contained in Section 43 and throughout the manual.

Texas Medicaid policy published in this manual represents policy implemented on or before October 31, 2008. Policy updates effective after October 31, 2008, are published bimonthly in the *Texas Medicaid Bulletin.*

The November/December 2008 *Texas Medicaid Bulletin* and all *Texas Medicaid Bulletins* through and including the September/October 2009 *Texas Medicaid Bulletin* supplement the 2009 *Texas Medicaid Provider Procedures Manual* and update the policy contained herein.

The *Texas Medicaid Provider Procedures Manual* serves as a comprehensive guide for Texas Medicaid providers, and contains information about Texas Medicaid benefits, policies, and procedures. The manual also includes an overview of the State of Texas Medicaid Managed Care programs to include the State of Texas Access Reform (STAR), STAR+PLUS, PCCM, and NorthSTAR. The information regarding the State of Texas Medicaid Managed Care programs, including Section 7, is not an exhaustive policies and procedures guide. For specific managed care information, contact the individual health plans participating in STAR, STAR+PLUS, and NorthSTAR. For PCCM, refer to the TMHP Telephone and Address Guide included in this manual.

## Provider Manual Overview

The 2008 *Texas Medicaid Provider Procedures Manual* is divided into three parts, including:

### Part I: Provider Information

The information in Part I is for all health-care providers who are enrolled in Texas Medicaid and provide services to Texas Medicaid clients. In Part I, providers find instructions for providing allowable services and receiving appropriate reimbursement for services. The following sections are included in Part I:

- Introduction
- TMHP Telephone and Address Guide
- *Section 1.* Provider Enrollment and Responsibilities
- *Section 2.* Texas Medicaid Reimbursement
- *Section 3.* TMHP Electronic Data Interchange (EDI)
- *Section 4.* Client Eligibility
- *Section 5.* Claims Filing
- *Section 6.* Appeals
- *Section 7.* Managed Care

### Part II: Texas Medicaid Services

Part II contains a section for each Texas Medicaid service with information on health-care policy, procedures, and claims filing pertaining to each provider type.

CPT only copyright 2008 American Medical Association. All rights reserved.

should allow longer than "at the time of the request" to produce the records, the provider will be required to produce all records completed, at the time of the completion or at the end of each day of production, as directed by the requestor who will take custody of the requested items.

If the provider places the required information in another legal entity's records, such as a hospital, the provider is responsible for obtaining a copy of these requested records for use by the requesting state and federal agencies.

These documents and claims must be retained for a minimum period of five years from the date of service or until all audit questions, appeal hearings, investigations, or court cases are resolved. Freestanding RHCs must retain their records for a minimum of six years, and hospital-based RHCs must retain their records for a minimum of ten years. These records must be made available immediately at the time of the request to employees, agents, or contractors of HHSC Office of Inspector General (OIG), the Texas Attorney General's Medicaid Fraud Control Unit (MFCU) or Antitrust and Civil Medicaid Fraud Section, TMHP, DFPS, the Department of Aging and Disability Services (DADS), Department of State Health Services (DSHS), Department of Assistive and Rehabilitative Services (DARS), U.S. Department of Health and Human Services (HHS) representative, any state or federal agency authorized to conduct compliance, regulatory, or program integrity functions on the provider, person, or the services rendered by the provider or person, or any agent, contractor, or consultant of any agency or division delineated above. In addition, the provider must meet all requirements of 1 TAC, Part 15, §371.1643(f).

The records must be available as requested by each of these entities, during any investigation or study of the appropriateness of the Medicaid claims submitted by the provider.

### 1.4.3.1 Payment Error Rate Measurement (PERM) Process

CMS assesses Texas Medicaid using the PERM process to measure improper payments in Texas Medicaid. Providers will be required to provide medical record documentation to support the medical reviews that the federal review contractor will conduct for Texas Medicaid fee-for-service and PCCM Medicaid and State Children's Health Insurance Program (SCHIP) claims.

Under the PERM process, if a claim is selected in a sample for a service that a provider rendered to a Medicaid client, the provider will be contacted to submit a copy of the medical records that support the medical review of the claim. All providers should check the TMHP system to ensure their current telephone number and addresses are correct in the system. If the information is incorrect or incomplete, providers must request a change immediately to ensure the PERM medical record request can be delivered. Client authorization for release of this information is not required.

Once a provider receives the request for medical records, the provider must submit the information electronically or in hard copy within 60-calendar days. It is important that providers cooperate by submitting all requested documentation in a timely manner because no response or insufficient documentation will count against the state as an error. This can ultimately negatively impact the amount of federal funding received by Texas for Medicaid.

### 1.4.4 Release of Confidential Information

Information about the diagnosis, evaluation, or treatment of a client with Texas Medicaid coverage by a person licensed or certified to perform the diagnosis, evaluation, or treatment of any medical, mental, or emotional disorder, or drug abuse, is confidential information that the provider may disclose only to authorized people. Family planning information is sensitive, and confidentiality must be ensured for all clients, especially minors.

Only the client may give written permission for release of any pertinent information before client information can be released, and confidentiality must be maintained in all other respects. If a client's medical records are requested by a licensed Texas health-care provider or a physician licensed by any state, territory, or insular possession of the United States or any State or province of Canada, for purposes of emergency or acute medical care, a provider must furnish such records at no cost to the requesting provider. This includes records received from another physician or health-care provider involved in the care or treatment of the patient. If the records are requested for purposes other than for emergency or acute medical care, the provider may charge the requesting provider a reasonable fee and retain the requested information until payment is received.

The client's signature is not required on the claim form for payment of a claim, but HHSC recommends the provider obtain written authorization from the client before releasing confidential medical information. A release may be obtained by having the client sign the indicated block on the claim form after the client has read the statement of release of information that is printed on the back of the form. The client's authorization for release of such information is not required when the release is requested by and made to DADS, HHSC, DSHS, TMHP, DFPS, DARS, HHSC OIG, the Texas Attorney General's MFCU or Antitrust and Civil Fraud Division, or HHS.

### 1.4.5 Compliance with Federal Legislation

HHSC complies with HHS regulations that protect against discrimination. All contractors must agree to comply with the following:

- Title VI of the *Civil Rights Act of 1964* (Public Law 88-352), Section 504 of the *Rehabilitation Act of 1973* (Public Law 93-112), *The Americans with Disabilities Act of 1990* (Public Law 101-336), Title 40, Chapter 73, of the TAC, all amendments to each, and all requirements imposed by the regulations issued pursuant to these acts. The laws provide in part that no persons in the

U.S. shall, on the grounds of race, color, national origin, age, sex, disability, political beliefs, or religion, be excluded from participation in or denied any aid, care, service, or other benefits provided by federal and/or state funding, or otherwise be subjected to any discrimination

• *Health and Safety Code 85.113* as described in "Model Workplace Guidelines for Businesses, State Agencies, and State Contractors" on page G-2 (relating to workplace and confidentiality guidelines on AIDS and HIV)

*Exception: In the case of minors receiving family planning services, only the client may consent to release of medical documentation and information. Providers must comply with the laws and regulations concerning discrimination. Payments for services and supplies are not authorized unless the services and supplies are provided without discrimination on the basis of race, color, sex, national origin, age, or disability. Send written complaints of noncompliance to the following address:*

HHSC Commissioner
1100 West 49th Street
Austin, TX 78756-3172

*Reminder: Each provider must furnish covered Medicaid services to eligible clients in the same manner, to the same extent, and of the same quality as services provided to other patients. Services made available to other patients must be made available to Texas Medicaid clients if the services are benefits of Texas Medicaid.*

## 1.4.6 Tamper-Resistant Prescription Pads

Providers are required by federal law (Public Law 110-28) to use a tamper-resistant prescription pad when writing a prescription for any drug for Medicaid clients.

Providers must take necessary steps to ensure that tamper-resistant pads are used for all written prescriptions provided to Medicaid clients. Providers may also use compliant, non-written alternatives for transmitting prescriptions such as by telephone, fax, or electronic submittal. Pharmacies are required to ensure that all written Medicaid prescriptions submitted for payment to the Vendor Drug Program are written on a compliant tamper-resistant pad.

If a prescription is not submitted on a tamper-resistant prescription form, a pharmacy may fill the prescription in full on an emergency basis.

The pharmacy must then obtain a verbal, faxed, electronic, or compliant, written prescription from the prescriber within 72 hours after the date on which the prescription was filled.

Providers may purchase tamper-resistant prescription pads from the vendor of their choice.

Special copy-resistant paper is not a requirement for prescriptions printed from electronic medical records (EMRs) or ePrescribing generated prescriptions. These prescriptions may be printed on plain paper and will be

fully compliant with all three categories of the tamper-resistant regulations, provided they contain at least one feature from each of the three following categories:

• Prevents unauthorized copying of completed or blank prescription forms.

• Prevents erasure or modification of information written on the prescription form.

• Prevents the use of counterfeit prescription forms.

## 1.4.7 Utilization Control — General Provisions

Title XIX of the *Social Security Act*, Sections 1902 and 1903, mandates utilization control of all Texas Medicaid services under regulations found at Title 42 CFR, Part 456. Utilization review activities required by Texas Medicaid are completed through a series of monitoring systems developed to ensure the quality of services provided, and that all services are both medically necessary and billed appropriately. Both clients and providers are subject to utilization review monitoring. Utilization control procedures safeguard against the delivery of unnecessary services, monitor quality, and ensure payments are appropriate and according to Texas Medicaid policies, rules, and regulations. All providers identified as a result of utilization control activities are presented to HHSC OIG to determine any and all subsequent actions.

The primary goal of utilization control activity is to identify providers with practice patterns inconsistent with the federal requirements and Texas Medicaid scope of benefits, policies, and procedures. The use of utilization control monitoring systems allows for identification of providers whose patterns of practice and use of services fall outside of the norm for their peer groups. Providers identified as exceptional are subject to an in-depth review of all Texas Medicaid billings. These review findings are presented to the HHSC OIG to determine any necessary action. Medical records may be requested from the provider to substantiate the medical necessity and appropriateness of services billed to Texas Medicaid. Inappropriate service utilization may result in recoupment of overpayments and/or sanctions, or other administrative actions deemed appropriate by the HHSC OIG. There are instances when a training specialist may be directed to communicate with the provider to offer assistance with the technical or administrative aspects of Texas Medicaid.

At the direction of the HHSC OIG, a provider's claims may be manually reviewed before payment. Parameters are developed for prepayment review based on the specific areas of concern identified in each case. As part of the prepayment review process, providers are required to submit paper claims, rather than electronic claims, along with supporting medical record documentation (e.g., clinical notes, progress notes, diagnostic testing results, other reports, superbills, X-rays, and any related medical record documentation) attached to each claim for all services billed. This documentation is used to ascertain that the services billed were medically necessary, billed

CPT only copyright 2008 American Medical Association. All rights reserved.

### 19.4.2 THSteps Dental Eligibility

The client must be Medicaid- and THSteps-eligible (birth through 20 years of age) at the time of the service request and service delivery. However, Medicaid-approved orthodontic services already in progress may be continued even after the client loses Medicaid eligibility if the orthodontic treatment is begun before the loss of Medicaid eligibility and before the day of the client's 21st birthday and is completed within 36 months. Medicaid-approved orthodontic services already in progress may be continued even after the client loses Medicaid eligibility if the orthodontic treatment is:

- Begun before the loss of Medicaid eligibility
- Begun before the day of the client's 21st birthday
- Completed within 36 months.

The client is not eligible for THSteps dental preventive or therapeutic benefits if the client's Medicaid Identification Form (Form H3087) or Medicaid Eligibility Verification Form (Forms H1027 and H1027-A-C) states any of the following:

- Emergency care only
- Presumptive eligibility (PE)
- Qualified Medicare beneficiary (QMB)
- Women's Health Program

A check mark will be present in the "Dental" column of the client's Medicaid Identification Form (Form H3087) to indicate that the client is eligible for dental services. A message (THSteps Dental checkup due) may appear below the client's name on the monthly client Medicaid Identification Form (Form H3087) stating the client is due for a dental checkup, which serves as a reminder to parents to contact their child's dentist and schedule an appointment for their periodic dental checkup. This message is printed on the H3087 when the client has not received any dental services (diagnostic, preventive, therapeutic, or orthodontic) for a period of six months.

Clients are not eligible for CCP services on or after their 21st birthday, but are eligible for non-CCP THSteps dental services (see fee schedule for CCP and non-CCP reimbursed services) through the end of the month of their 21st birthday.

**Note:** *If a client has a birthday on any day except the first day during the month, the new eligibility period is considered to begin on the first day of the following month.*

### 19.4.3 First Dental Home

First Dental Home is an initiative designed to establish a dental home, provide preventive care, identify oral health problems, and provide treatment and parental/guardian oral health instructions as early as possible.

A First Dental Home visit includes, but is not limited to:

- Comprehensive oral examination
- Oral hygiene instruction with primary caregiver

- Dental prophylaxis, if appropriate
- Topical fluoride application using fluoride varnish, if appropriate
- Caries risk assessment
- Dental anticipatory guidance

Procedure code D0145 bundles the above services for THSteps clients age 6 months of age through 35 months of age. THSteps dentists and Federally Qualified Healthcare Centers (FQHCs) that have completed training and been certified to participate in the First Dental Home initiative may be reimbursed for procedure code D0145. FQHC providers attending the training will be certified at the facility level.

Procedure code D0120, D0150, D1120, D1203, or D1206 are denied if procedure code D0145 is billed on the same date of service by any provider. A First Dental Home examination is limited to ten services per client lifetime with at least 60 days between visits. This service is limited to once per day.

## 19.5 ICF-MR Dental Services

ICF-MR dental services are mandated by Medicaid, and reimbursement is provided for treatment of dental problems for Medicaid-eligible residents of ICF-MR facilities who are 21 years of age or older. Residents of ICF-MR facilities who are 20 years of age or younger receive services through the regular THSteps Program. Eligibility for ICF-MR services is determined by DADS.

Procedure codes without a CCP designation in the *Limitations* column of the dental fee schedule may be billed in a routine manner for ICF-MR clients.

These procedures must be documented as medically necessary and appropriate. ICF-MR clients are not subject to periodicity for preventive care.

For procedure codes with a CCP designation, a provider may request authorization with documentation or provide documentation on the submitted claim.

**Refer to:** "Medicaid Dental Fee Schedule" on page 19-11.

## 19.6 THSteps and ICF-MR Provision of Services

All THSteps and ICF-MR dental services shall be performed by the Medicaid-enrolled dental provider except for permissible work delegated to a licensed dental hygienist, dental assistant, or dental technician in a dental laboratory on the premises where the dentist practices, or in a commercial laboratory registered with the Texas State Board of Dental Examiners (TSBDE). The *Texas Dental Practice Act* and the rules and regulations of the TSBDE (22 TAC, Part 5) define the scope of work that dental auxiliary personnel may perform. Any deviations from these practice limitations shall be reported to the TSBDE and HHSC, and could result in sanctions or other actions imposed against the provider.

## 19.18 Hospitalization and ASC/HASC

Dental services performed in an ASC, hospital ambulatory surgical center (HASC), or a hospital (either as an inpatient or an outpatient) may be benefits of THSteps based on the medical or behavioral justification provided, or if one of the following conditions exist:

- The procedures cannot be performed in the dental office.
- The client is severely disabled.

Contact the individual HMO for precertification requirements related to the hospital procedure. If services are precertified, the provider receives a precertification number effective for 90 days.

In those areas of the state with Medicaid managed care, the provider should contact the managed care plan for specific requirements or limitations. It is the dental provider's responsibility to obtain precertification from the client's HMO or managed care plan for facility and general anesthesia services if it is required.

To be reimbursed by the HMO, the provider must use the HMO's contracted facility and anesthesia provider. These services are included in the capitation rates paid to HMOs, and the facility/anesthesiologist risk nonpayment from the HMO without such approval. Coordination of all specialty care is the responsibility of the client's primary care provider. The primary care provider must be notified by the dentist and/or the HMO of the planned services.

Dentists providing sedation/anesthesia services must have the appropriate current permit from the TSBDE for the level of sedation/anesthesia provided.

The dental provider must be in compliance with the guidelines detailed in "Dental Therapy Under General Anesthesia" on page 19-35.

**Note:** *Post-treatment authorization will not be approved for codes that require mandatory prior authorization.*

## 19.19 Orthodontic Services (THSteps)

Orthodontic services for cosmetic purposes only are not a benefit of Texas Medicaid. Orthodontic services are limited to the treatment of children 12 years of age or older with severe handicapping malocclusion, children birth through 20 years of age with cleft palate, or other special medically necessary circumstances as outlined in Benefits and Limitations below.

### 19.19.1 Benefits and Limitations

Orthodontic services include the following:

- Correction of severe handicapping malocclusion as measured on the Handicapping Labiolingual Deviation (HLD) Index. Refer to page 19-45 for information on how to score the HLD. A minimum score of 26 points is required for full banding approval (only permanent dentition cases are considered).

**Exception:** *Retained deciduous teeth and cleft palates with gross malocclusion that will benefit from early treatment. Cleft palate cases do not have to meet the HLD 26-point scoring requirement. However, it is necessary to submit a sufficient narrative and/or outline of the proposed treatment plan when requesting authorization for orthodontic services on cleft palate cases.*

- Crossbite therapy.
- Head injury involving severe traumatic deviation.

The following limitations apply for orthodontic services:

- Orthodontic services for cosmetic purposes only are not a benefit of Texas Medicaid or THSteps.
- Orthognathic surgery, to include extractions, required or provided in conjunction with the application of braces must be completed while the client is Medicaid-eligible in order for reimbursement to be considered.
- Except for D8660, all orthodontic procedures require prior authorization for consideration of reimbursement.
- The THSteps client must be Medicaid/THSteps-eligible when authorization is requested and the orthodontic treatment plan is initiated. It is the provider's responsibility to see that the client has a current Medicaid Identification Form (Form H3087) or Medicaid Eligibility Verification Form (Forms H1027 and H1027-A-C) and that the date of birth on the form indicates the client is 20 years of age or younger and no limitations are indicated.
- Prior authorization is issued to the requesting provider only and is not transferable to another provider. If the client changes providers or if the provider stops practicing dentistry in Texas Medicaid for whatever reason, a new prior authorization must be requested.

**Refer to:** "Transfer of Orthodontic Services" on page 19-40.

The following procedure codes, policies, and limitations are applied to the processing and payment of orthodontic services under THSteps dental services:

- Procedure code D8660 is allowed when:
  - The client is referred to an orthodontist for a determination of whether orthodontic services are indicated and to determine the appropriate time to initiate such services.
  - The client is referred to an orthodontist and elects to receive services from another orthodontic provider because of justifiable reasons.
  - Repeat visits at different age levels are required to determine the appropriate time to initiate orthodontic treatment.
- Procedure code D8680 is payable for one retainer per arch, per lifetime, and each retainer may be replaced once because of loss or breakage (prior authorization is required).
- Procedure code D8670 should be billed only when an adjustment to the appliances is provided and may not be billed before the date the orthodontic adjustment was performed. The number of visits for monthly adjust-

CDT only copyright 2008 American Dental Association. All rights reserved.

ments to the appliances is restricted to the number that was authorized in the treatment plan. However, the number of monthly visits may be amended with appropriate documentation of medical necessity while the client is Medicaid eligible.

- Procedure code D8670 is paid only in conjunction with a history of braces (code D8080), unless special circumstances exist.
- All orthodontic codes and appliances are global fees.
- Separate fees for adjustments to retainers are not payable.
- The appropriate code should be billed for those appliances required as part of the treatment of cleft palate cases.

Special orthodontic appliances may also be used with full banding and crossbite therapy with approval by the TMHP Dental Director.

- Procedure codes D5951, D5952, D5953, D5954, D5955, D5958, D5959, and D5960 are to be used as applicable with documentation of medical necessity. Otherwise, use the appropriate special orthodontic appliance code.
- Full banding is allowed on permanent dentition only, and treatment should be accomplished in one stage and is allowed once per lifetime.

*Exception: Cases of mixed dentition when the treatment plan includes extractions of remaining primary teeth or cleft palate.*

- Crossbite therapy is allowed for primary, mixed, or permanent dentition.
- Providers must not request crossbite correction (limited orthodontics) for a mixed dentition client when there is a need for full banding in the adult teeth. Crossbite therapy is an inclusive charge for treating the crossbite to completion, and additional reimbursement is not provided for adjustments or maintenance.
- If a case is not approved, the dentist may file a claim for payment of the diagnostic workup necessary to obtain the authorization using procedure codes D0330, D0340, D0350, and D0470. The dentist may receive payment under these procedure codes for no more than two cases out of every ten cases denied. The dentist should determine if the client's condition meets orthodontic benefit criteria before performing a diagnostic workup.
- Procedure codes D8080, D8050, and D8060, are limited to one per lifetime.
- Comprehensive orthodontic services (procedure code D8080) are restricted to clients who are 12 years of age or older or clients who have exfoliated all primary dentition. Crossbite therapy includes diagnosic cast services.

## 19.19.2 Mandatory Prior Authorization

Prior authorization is required for all THSteps orthodontic services except for procedure code D8660. The prior authorization request must contain the DOS that the orthodontic diagnostic tools were produced. If the request is approved, the date that the records were produced is considered to be the date on which orthodontic treatment begins.

**Refer to:** "THSteps Dental Mandatory Prior Authorization Request Form" on page B-111.

If orthodontic treatment is medically indicated, providers are responsible for obtaining prior authorization for a complete orthodontic treatment plan while the client is eligible for Medicaid and THSteps and 20 years of age or younger.

Submission of diagnostic casts are not required when requesting prior authorization for procedure codes D8050, D8060, or D8080.

Prior authorization is a condition for reimbursement; it is not a guarantee of payment.

Upon receipt of prior authorization of complete treatment plans, providers are to advise clients that they will be able to receive the approved treatment services (e.g. orthodontic adjustments, bracket replacements and retainers), even if they lose Medicaid eligibility or reach 21 years of age. Approved orthodontic treatment must be initiated before the loss of Medicaid eligibility and completed within 36 months of the authorization date.

**Note:** *Providers must submit all orthodontic services for Medicaid managed care clients following these guidelines. STAR and STAR+PLUS are not responsible for orthodontic services.*

Requests for orthodontic services must be accompanied by all of the following documentation:

- An orthodontic treatment plan. The treatment plan must include all procedures required to complete full treatment (such as, extractions, orthognathic surgery, upper and lower appliance, monthly adjustments, anticipated bracket replacements, appliance removal if indicated, special orthodontic appliances, etc.). The treatment plan should incorporate only the minimal number of appliances required to properly treat the case. Requests for multiple appliances to treat an individual arch are reviewed for duplication of purpose.
- Cephalometric radiograph with tracing models.
- Completed and scored HLD sheet with diagnosis of Angle class (26 points required for approval of non-cleft palate cases).
- Facial photographs.
- Full series of radiographs or a panoramic radiograph; diagnostic-quality films are required (copies are accepted and radiographs will not be returned to the provider).

CDT only copyright 2008 American Dental Association. All rights reserved.

- Any additional pertinent information as determined by the dentist or requested by TMHP's Dental Director Requests for crossbite therapy require properly trimmed models to be retained in the office and must demonstrate the following criteria:
  - Posterior teeth. Not end to end, but buccal cusp of upper teeth should be lingual to buccal cusp of lower teeth.
  - Anterior teeth. The incisal edge of upper should be lingual to the incisal of the opposing arch.

The dentist should be certain that radiographs, photographs, and other information are properly packaged to avoid damage. TMHP is not responsible for lost or damaged materials.

**Refer to:** "THSteps Dental Mandatory Prior Authorization Request Form" on page B-111.

### 19.19.3  Completion of Treatment Plan

If a client reaches 21 years of age or loses Medicaid eligibility before the authorized orthodontic treatment is completed, reimbursement is provided to complete the orthodontic treatment that was authorized and initiated while the client was 20 years of age or younger, eligible for Medicaid and THSteps, and completed within 36 months. Any orthodontic-related service requested (e.g., extractions or surgeries) must be completed before the loss of client eligibility. Services cannot be added or approved after Medicaid/THSteps eligibility has expired.

### 19.19.4  Premature Removal of Appliances

The overall fee for orthodontic treatment (D8080) includes the removal of orthodontic brackets and/or treatment appliances. Procedure code D7997 may be used only when the appliances were placed by a different provider with an unaffiliated practice (not a partner or office-sharing arrangement) and one of the following conditions exist:

- There is documentation of a lack of cooperation from the client.
- The client requests premature removal and a release form has been signed by the parent, guardian, or client if he is at least 18 years of age.

Providers must keep a copy of the release form on file and are responsible for this documentation during a review process.

### 19.19.5  Transfer of Orthodontic Services

Prior authorization issued to a dental provider for orthodontic services is not transferable to another dental provider. The new provider must submit to TMHP a new prior authorization request in order to be approved to complete the orthodontic treatment initiated by the original provider.

The following supporting documentation must accompany the new request for orthodontia services and must include the DOS the orthodontic diagnostic tools were produced:

- All of the documentation as required for the original provider.
- The reason the client left the previous provider, if known.
- An explanation of the treatment status.
- A compete treatment plan addressing all procedures for which authorization is being requested (such as the number of monthly adjustments or retainers required to complete the case).
- A full diagnostic workup (D8080) with an HLD Index. The score of 26 points will be modified according to any progress achieved.

*Exception: The prior authorization requests for clients who initiate orthodontic services before becoming eligible for Medicaid do not require models or the HLD score sheet, nor does the client have to meet the HLD Index of 26 points. However, a complete plan of treatment is required.*

*Note: Medicaid clients who initiate orthodontic services privately (e.g. pay out of pocket for the orthodontic workup and/or initial banding, etc.) while Medicaid eligible due to not meeting the HLD index 26-points, are not eligible to have their orthodontic services transferred to and reimbursed by Medicaid.*

To request prior authorization for completion of the orthodontic treatment initiated by another provider, complete a THSteps Dental Mandatory Prior Authorization Request Form and send it with the complete plan of treatment and appropriate documentation for orthodontic services and/or crossbite therapy to the TMHP Dental Director at the following address:

Texas Medicaid & Healthcare Partnership
THSteps and ICF-MR Dental Authorization and Information
PO Box 202917
Austin, TX 78720-2917

### 19.19.6  Comprehensive Orthodontic Treatment

Comprehensive orthodontic services (procedure code D8080) are restricted to clients who are 12 years of age or older or clients who have exfoliated all primary dentition.

National procedure codes do not allow for any work-in-progress or partial billing by separating the three orthodontic components: diagnostic workup, orthodontic appliance (upper), or orthodontic appliance (lower).

When billing for comprehensive orthodontic treatment, D8080, three local codes must be submitted as remarks codes along with code D8080. Local codes (Z2009, Diagnostic workup approved, Z2011, Orthodontic

CDT only copyright 2008 American Dental Association. All rights reserved.

appliance, upper, or Z2012, Orthodontic appliance, lower) are placed in the Remarks Code field on electronic claims or Block 35 on paper claims.

**Note:** *If the remarks code and procedure code D8080 are not submitted, the claim will be denied.*

Each remarks code pays the correct reimbursement rate which, when combined, totals the maximum payment of $775. D8080 must be billed on three separate details, with the appropriate remarks code, even if billing for the workup and full banding. Billing only one detail for a total of $775 will not be accepted.

**Example 1:** A client is approved for full banding, but after the initial workup, the client discontinues treatment. This provider would bill the national code D8080 and place the local code Z2009, Diagnostic workup approved, in the Remarks/comment field. The claim would pay $175.

**Example 2:** A client is approved for full banding. The provider continues treatment and places the maxillary bands. The provider would bill the national procedure code D8080 and place the local code Z2009, Diagnostic workup approved, and Z2011, Maxillary bands, in the Remarks/comment field. The claim would pay $475.

All electronic claims for D8080 must have the appropriate remarks code associated with the procedure code.

Providers should adhere to the following guidelines for electronic claim submission so that TMHP can accurately apply the correct remarks code to the appropriate claim detail.

A Diagnostic Procedure Code (DPC) remarks code must be submitted, only once, in the first three bytes of the NTE02 at the 2400 loop.

**Example 1:** For a claim with one detail, submitted with procedure code D8080 and remarks code Z2009, enter the information as follows: DPCZ2009. The total billed would be $175.

**Example 2:** For a claim with two details, where details one and two are procedure code D8080 and the remarks codes are Z2009 and Z2011, enter the information as follows: DPCZ2009Z2011. The total billed would be $475.

**Example 3:** For a claim with three details, where all three details are submitted separately with procedure code D8080, enter the remarks code based on the order of the claim detail as follows: DPCZ2009Z2011Z2012. The total billed would be $775.

This method ensures accurate and appropriate payment for services rendered and addresses the need for partial billing.

### 19.19.7 Orthodontic Procedure Codes and Fee Schedule

When submitting claims for orthodontic procedures, use the following procedure codes:

| Procedure Code | Limitations | Maximum Fee |
|---|---|---|
| **Orthodontic Services** | | |
| D0330*, D0340*, D0350*, and D0470* | When requested orthodontic cases are submitted for authorization and denied, two out of ten denials will be paid. These four procedure codes, when billed together for denied cases, replace local procedure code Z2010. | $100.00 |
| D7280 | A 1-20 | $62.50 |
| D7997* | Replaces Z2016. Not payable to the dentist who placed the appliance. Includes removal of arch bar and premature removal of braces. A 1-20 | $50.00 |
| **Interceptive Orthodontic Treatment** | | |
| D8050* | Replaces Z2018 and 8110D. Limited to one per lifetime. | $340.00 |
| D8060* | Replaces Z2018 and 8120D. Limited to one per lifetime. | $340.00 |
| D8080* | Replaces Z2009, Z2011, and Z2012. Limited to one per lifetime. | $775.00 |
| **Minor Treatment to Control Harmful Habits** | | |
| D8210* | See separate table for associated remarks field code. | See separate table |
| *** = Services payable to an FQHC for a client encounter.** | | |

CDT only copyright 2008 American Dental Association. All rights reserved.

| Procedure Code | Limitations | Maximum Fee |
|---|---|---|
| D8220* | See separate table for associated remarks field code. | See separate table |
| **Other Orthodontic Services** | | |
| D8660* | Replaces Z2008. Denied when bill on the same DOS as D0145. | $15.00 |
| D8670* | Replaces Z2013. | $68.10 |
| D8680* | Replaces Z2014 and Z2015; one retainer per arch per lifetime; may be replaced once because of loss or breakage (prior authorization is required). | $100.00 |
| D8690* | Bracket replacement. | $20.00 |
| D8691 | Not considered medically necessary. | NC |
| D8693 | | $50.00 |
| D8999 | | Manually priced |

**\* = Services payable to an FQHC for a client encounter.**

## 19.20 Special Orthodontic Appliances

As with all orthodontic services, all removable or fixed special orthodontic applicances must be prior authorized. The prior authorization request must include both the national code and remarks code. However, prior authorization requests may omit the DPC prefix to the eight-digit remarks code.

All removable or fixed special orthodontic appliances must be billed with national procedure code D8210 or D8220. Dental models must be submitted when requesting prior authorization of a thumb-sucking or tongue thrust appliance. To ensure appropriate claims processing, the DPC remarks code (local procedure code) reflecting the specific service is also required. The appropriate remarks codes must be entered on the authorization request form. Failure to follow the following steps will cause the claims to deny. Failure to enter the DPC remarks code and the appropriate procedure code will not result in claim denial; however, manual intervention is required to process the claim, which may result in a delay of payment.

For paper claim submissions, providers must enter the local procedure code in Block 35 (Remarks) of the 2006 ADA claim form.

For electronic submissions, providers enter the DPC remarks code in the Comments field to ensure correct authorization, accurate records, and reimbursement.

For electronic submissions other than TexMedConnect submissions, providers must follow the steps below to ensure TMHP accurately applies the correct local procedure code to the appropriate claim detail:

1) The DPC prefix must be submitted, only once, in the first three bytes of the NTE02 at the 2400 loop.

2) In bytes 4-8, providers must submit the remark code (local procedure code) based on the order of the claim detail. Do not enter any spaces or punctuation between remark codes, unless to designate the detail is not billed with D8210 or D8220.

**Example:** *For a claim with three details, where details one and three are submitted with procedure code D8210 and detail two is not, enter the following information in the NTE02 at the 2400 loop: DPC1014D 1046D. (The space shows that detail two needs no local code.) If all details require a local code, enter DPC, no spaces, and the appropriate local codes.*

To submit using TexMedConnect, providers must enter the local code into the Remarks Code field, located under the details header. The Remarks Code field is the field directly after the Procedure Code field. TexMedConnect submitters are not required to manually enter the DPC prefix as it is placed in the appropriate field on the TexMedConnect electronic claim.

CDT only copyright 2008 American Dental Association. All rights reserved.

# 19.21 How to Score the Handicapping Labio-lingual Deviation (HLD) Index

The orthodontic provider must complete and sign the diagnosis (Angle class).

### Cleft Palate

Submit a cleft palate case in the mixed dentition only if it can be justified in a narrative why there should be treatment before the client is in the full dentition.

***Note:*** *Intermittent treatment requests may exceed the allowable 26 reimbursable treatment visits.*

### Severe Traumatic Deviations

Refers to facial accidents only. Points cannot be awarded for congenital deformity. Severe traumatic deviations do not include traumatic occlusions for crossbites.

### Overjet in Millimeters

Score the case exactly as measured, then subtract 2 mm (considered the norm), and enter the difference as the score.

### Overbite in Millimeters

Score the case exactly as measured, then subtract 3 mm (considered the norm), and enter the difference as the score. This would be double-counting.

### Mandibular Protrusion in Millimeters

Score the case by measurement in mm by the distance from the labial surface of the mandibular incisors to the labial surface of the maxillary incisor. Do not score both overbite and open bite.

### Open Bite in Millimeters

Score the case exactly as measured. Measurement should be recorded from the line of occlusion of the permanent teeth, not from ectopically erupted teeth in the anterior segment. Caution is advised in undertaking treatment of open bites in older teenagers, because of the frequency of relapse.

### Ectopic Eruption

An unusual pattern of eruption, such as high labial cuspids or teeth that are grossly out of the long axis of the alveolar ridge. Do not include (score) teeth from an arch if that arch is to be counted in the following category of Anterior Crowding. For each arch, either the ectopic eruption or anterior crowding may be scored, but not both.

### Anterior Crowding

Anterior teeth that require extractions as a prerequisite to gain adequate room to treat the case. If the arch expansion is to be implemented as an alternative to extraction, provide an estimated number of appointments required to attain adequate stabilization. Arch length insufficiency must exceed 3.5 mm to score for crowding on any arch. Mild rotations that may react favorably to stripping or moderate expansion procedures are not to be scored as crowded.

### Labio-lingual Spread in millimeters

The score for this category should be the total, in millimeters, of the anterior spaces.

Providers should be conservative in scoring. Liberal scoring will not be helpful in the evaluation and approval of the case. The case must be considered dysfunctional and have a minimum of 26 points on the HLD index to qualify for any orthodontic care other than crossbite correction. Half-mouth cases cannot be approved.

The intent of the program is to provide orthodontic care to clients with handicapping malocclusion to improve function. Although aesthetics is an important part of self-esteem, services that are primarily for aesthetics are not within the scope of benefits of this program.

The proposals for treatment services should incorporate only the minimal number of appliances required to properly treat the case. Requests for multiple appliances to treat an individual arch will be reviewed for duplication of purpose.

If attaining a qualifying score of 26 points is uncertain, providers should include a brief narrative when submitting the case. The narrative may reduce the time necessary to gain final approval and reduce shipping costs incurred to resubmit records.

Providers must properly label and protect all records (especially plaster diagnostic models) when shipping. If plaster diagnostic models are requested by and shipped to TMHP, the provider should assure that the models are adequately protected from breakage during shipping. TMHP will return intact models to the provider.

## 19.21.1 HLD Score Sheet

This sheet and a Boley Gauge are required to score.

Procedure:

- Occlude client or models in centric position.
- Record all measurements rounded-off to the nearest millimeter.
- Enter a score of 0 if the condition is absent.
- Overjet is measured from the most protrusive incisor.
- Overbite is measured from the labio-incisal edge of overlapped anterior tooth or teeth to point of maximum coverage.
- Ectopic eruption and anterior crowding: Do not double-score. Record the more serious condition.

**PLEASE PRINT CLEARLY:**

| Client Name: | | | Date of birth: | | Medicaid ID: | |
|---|---|---|---|---|---|---|
| Address: *(Street/City/County/State/Zip Code)* | | | | | | |
| CONDITIONS OBSERVED | | | | | | HLD SCORE |
| **Cleft Palate** | | | | Score 15 | | |
| **Severe Traumatic Deviations**<br>Trauma/Accident related only | | | | Score 15 | | |
| **Overjet** in mm. *Minus 2 mm.*<br>Example: 8 mm. – 2 mm. = 6 points | | | | | | = |
| **Overbite** in mm. *Minus 3 mm.*<br>Example: 5 mm. – 3 mm. = 2 points | | | | | | = |
| **Mandibular Protrusion** in mm.<br>See definitions/instructions to score (previous page) | | | | x5 | | = |
| **Open Bite in mm.**<br>See definitions/instructions to score (previous page) | | | | x4 | | = |
| **Ectopic Eruption** (Anteriors Only)<br>*Reminder: Points cannot be awarded on the same arch<br>for Ectopic Eruption and Crowding* | | | | Each tooth x3 | | = |
| **Anterior Crowding**<br>*10 point maximum total for both arches<br>combined* | Max. | Mand. | | = 5 pts. each<br>arch | | = |
| Labio-lingual Spread in mm. | | | | | | = |
| TOTAL | | | | | | = |
| Diagnosis | | | For TMHP use only<br>Authorization Number | | | |
| Examiner: | | | Recorder: | | | |
| Provider's Signature<br><br>Please submit this score sheet with records | | | | | | |

CDT only copyright 2008 American Dental Association. All rights reserved.

# Appendix G

# Dear Manual User:

Welcome to the 2008 *Texas Medicaid Provider Procedures Manual*. To enhance usability, this manual is available on a searchable CD-ROM and on the TMHP website at www.tmhp.com.

*Note: All users who access www.tmhp.com are required to accept the American Medical Association (AMA) End-user Agreement on the use of Current Procedural Terminology (CPT). For each computer that accesses the TMHP website, the agreement must be accepted every 30 days from the last date on which the agreement was accepted by the user. If the end-user agreement is not accepted on a particular computer every 30 days, no user will be able to enter the website from that computer. For additional information about the AMA and CPT, refer to www.ama-assn.org/ama/pub/category /3113.html.*

A *Claims Filing Resources* table is located at the end of each service section with page references to all claim instructions, appendices, Medicaid forms, and claim form examples associated with the service.

This manual contains both the Primary Care Case Management (PCCM) and Texas Health Steps (THSteps) manuals. PCCM information can be found primarily in Section 7, though relevant information can be found in other sections. THSteps information is contained in Section 43 and throughout the manual.

The Texas Medicaid Program policy published in this manual represents policy implemented as of October 31, 2007. Policy updates effective after October 31, 2007, are published bimonthly in the *Texas Medicaid Bulletin*.

The November/December 2007 *Texas Medicaid Bulletin* and all *Texas Medicaid Bulletins* through and including the September/October 2008 *Texas Medicaid Bulletin* supplement the 2008 *Texas Medicaid Provider Procedures Manual* and update the policy contained herein.

The *Texas Medicaid Provider Procedures Manual* serves as a comprehensive guide for Texas Medicaid providers, and contains information about Texas Medicaid benefits, policies, and procedures. The manual also includes an overview of the State of Texas Medicaid Managed Care programs to include the State of Texas Access Reform (STAR), STAR+PLUS, PCCM, and NorthSTAR. The information regarding the State of Texas Medicaid Managed Care programs, including Section 7, is not an exhaustive policies and procedures guide. For specific managed care information, contact the individual health plans participating in STAR, STAR+PLUS, and NorthSTAR. For PCCM, refer to the TMHP Telephone and Address Guide included in this manual.

## Provider Manual Overview

The 2008 *Texas Medicaid Provider Procedures Manual* is divided into three parts, including:

### Part I: Provider Information

The information in Part I is for all health-care providers who are enrolled in the Texas Medicaid Program and provide services to Texas Medicaid clients. In Part I, providers find instructions for providing allowable services and receiving appropriate reimbursement for services. The following sections are included in Part I:

- Introduction.
- TMHP Telephone and Address Guide.
- *Section 1*. Provider Enrollment and Responsibilities.
- *Section 2*. Texas Medicaid Reimbursement.
- *Section 3*. TMHP Electronic Data Interchange (EDI).
- *Section 4*. Client Eligibility.
- *Section 5*. Claims Filing.
- *Section 6*. Appeals.
- *Section 7*. Managed Care.

### Part II: Texas Medicaid Services

Part II contains a section for each Texas Medicaid service with information on health-care policy, procedures, and claims filing pertaining to each provider type.

CPT only copyright 2007 American Medical Association. All rights reserved.

*documents or other requested items may be altered or destroyed, the request must be completed by the provider at the time of the request or in less than 24 hours as provided by the requestor. If, in the opinion of the Inspector General or other requestor, the requested documents and other items requested cannot be completely provided on the day of the request, the Inspector General or requestor may set the deadline for production at 24 hours from the time of the original request.*

*Failure to supply the requested documents and other items, within the time frame specified, may result in payment hold to the provider's Medicaid payments, recoupment of payments for all claims related to the missing records, contract cancellation, and/or exclusion from the Texas Medicaid Program.*

As directed by the requestor, the provider or person will relinquish custody of the requested documents and other items and the requestor will take custody of the records and remove them from the premises. If the requestor should allow longer than "at the time of the request" to produce the records, the provider will be required to produce all records completed, at the time of the completion or at the end of each day of production, as directed by the requestor who will take custody of the requested items.

If the provider places the required information in another legal entity's records, such as a hospital, the provider is responsible for obtaining a copy of these requested records for use by the requesting state and federal agencies.

These documents and claims must be retained for a minimum period of five years from the date of service or until all audit questions, appeal hearings, investigations, or court cases are resolved. Freestanding RHCs must retain their records for a minimum of six years, and hospital-based RHCs must retain their records for a minimum of ten years. These records must be made available immediately at the time of the request to employees, agents, or contractors of HHSC Office of Inspector General (OIG), the Texas Attorney General's Medicaid Fraud Control Unit (MFCU) or Antitrust and Civil Medicaid Fraud Section, TMHP, DFPS, the Department of Aging and Disability Services (DADS), Department of State Health Services (DSHS), Department of Assistive and Rehabilitative Services (DARS), U.S. Department of Health and Human Services (HHS) representative, any state or federal agency authorized to conduct compliance, regulatory, or program integrity functions on the provider, person, or the services rendered by the provider or person, or any agent, contractor, or consultant of any agency or division delineated above. In addition, the provider must meet all requirements of 1 TAC, Part 15, §371.1643(f).

The records must be available as requested by each of these entities, during any investigation or study of the appropriateness of the Medicaid claims submitted by the provider.

## 1.2.4 Release of Confidential Information

Information about the diagnosis, evaluation, or treatment of a client with Texas Medicaid Program coverage by a person licensed or certified to perform the diagnosis, evaluation, or treatment of any medical, mental, or emotional disorder, or drug abuse, is confidential information that the provider may disclose only to authorized people. Family planning information is sensitive, and confidentiality must be ensured for all clients, especially minors.

Only the client may give written permission for release of any pertinent information before client information can be released, and confidentiality must be maintained in all other respects. If a client's medical records are requested by a licensed Texas health-care provider or a physician licensed by any state, territory, or insular possession of the United States or any State or province of Canada, for purposes of emergency or acute medical care, a provider must furnish such records at no cost to the requesting provider. This includes records received from another physician or health-care provider involved in the care or treatment of the patient. If the records are requested for purposes other than for emergency or acute medical care, the provider may charge the requesting provider a reasonable fee and retain the requested information until payment is received.

The client's signature is not required on the claim form for payment of a claim, but HHSC recommends the provider obtain written authorization from the client before releasing confidential medical information. A release may be obtained by having the client sign the indicated block on the claim form after the client has read the statement of release of information that is printed on the back of the form. The client's authorization for release of such information is not required when the release is requested by and made to DADS, HHSC, DSHS, TMHP, DFPS, DARS, HHSC OIG, the Texas Attorney General's MFCU or Antitrust and Civil Fraud Division, or HHS.

## 1.2.5 Compliance with Federal Legislation

HHSC complies with HHS regulations that protect against discrimination. All contractors must agree to comply with the following:

- Title VI of the *Civil Rights Act of 1964* (Public Law 88-352), Section 504 of the *Rehabilitation Act of 1973* (Public Law 93-112), *The Americans with Disabilities Act of 1990* (Public Law 101-336), Title 40, Chapter 73, of the TAC, all amendments to each, and all requirements imposed by the regulations issued pursuant to these acts. The laws provide in part that no persons in the U.S. shall, on the grounds of race, color, national origin, age, sex, disability, political beliefs, or religion, be excluded from participation in or denied any aid, care, service, or other benefits provided by federal and/or state funding, or otherwise be subjected to any discrimination.

CPT only copyright 2007 American Medical Association. All rights reserved.

- *Health and Safety Code 85.113* as described in "Model Workplace Guidelines for Businesses, State Agencies, and State Contractors" on page G-2 (relating to workplace and confidentiality guidelines on AIDS and HIV).

**Exception:** *In the case of minors receiving family planning services, only the client may consent to release of medical documentation and information. Providers must comply with the laws and regulations concerning discrimination. Payments for services and supplies are not authorized unless the services and supplies are provided without discrimination on the basis of race, color, sex, national origin, age, or disability. Send written complaints of noncompliance to the following address:*

HHSC Commissioner
1100 West 49th Street
Austin, TX 78756-3172

**Reminder:** *Each provider must furnish covered Medicaid services to eligible clients in the same manner, to the same extent, and of the same quality as services provided to other patients. Services made available to other patients must be made available to Texas Medicaid clients if the services are benefits of the Texas Medicaid Program.*

### 1.2.6 Utilization Control — General Provisions

Title XIX of the *Social Security Act*, Sections 1902 and 1903, mandates utilization control of all Texas Medicaid Program services under regulations found at Title 42 CFR, Part 456. Utilization review activities required by the Texas Medicaid Program are completed through a series of monitoring systems developed to ensure the quality of services provided, and that all services are both medically necessary and billed appropriately. Both clients and providers are subject to utilization review monitoring. Utilization control procedures safeguard against the delivery of unnecessary services, monitor quality, and ensure payments are appropriate and according to Texas Medicaid Program policies, rules, and regulations. All providers identified as a result of utilization control activities are presented to HHSC OIG to determine any and all subsequent actions.

The primary goal of utilization control activity is to identify providers with practice patterns inconsistent with the federal requirements and the Texas Medicaid Program scope of benefits, policies, and procedures. The use of utilization control monitoring systems allows for identification of providers whose patterns of practice and use of services fall outside of the norm for their peer groups. Providers identified as exceptional are subject to an in-depth review of all Texas Medicaid billings. These review findings are presented to the HHSC OIG to determine any necessary action. Medical records may be requested from the provider to substantiate the medical necessity and appropriateness of services billed to the Texas Medicaid Program. Inappropriate service utilization may result in recoupment of overpayments and/or sanctions, or other administrative actions deemed appropriate by the HHSC OIG. There are instances when a training specialist may

be directed to communicate with the provider to offer assistance with the technical or administrative aspects of the Texas Medicaid Program.

At the direction of the HHSC OIG, a provider's claims may be manually reviewed before payment. Parameters are developed for prepayment review based on the specific areas of concern identified in each case. As part of the prepayment review process, providers are required to submit paper claims, rather than electronic claims, along with supporting medical record documentation (e.g., clinical notes, progress notes, diagnostic testing results, other reports, superbills, X-rays, and any related medical record documentation) attached to each claim for all services billed. This documentation is used to ascertain that the services billed were medically necessary, billed appropriately, and according to Texas Medicaid Program requirements and policies. Services inconsistent with Texas Medicaid Program requirements and policies are adjudicated accordingly. Claims submitted initially without the supporting medical record documentation will be denied. Additional medical record documentation submitted by the provider for claims denied as a result of the prepayment review process is not considered at a later time. A provider is removed from prepayment review only when determined appropriate by the HHSC OIG. Once removed from prepayment review, a follow-up assessment of the provider's subsequent practice patterns is performed to monitor and ensure continued appropriate use of resources. Noncompliant providers are subject to administrative sanctions up to and including exclusion and contract cancellation, as deemed appropriate by the HHSC OIG as defined in the rules in 1 TAC §371.1643. Providers placed on prepayment review must submit all paper claims and supporting medical record documentation to the following address:

Texas Medicaid & Healthcare Partnership
Attention: Prepayment Review MC-A11 SURS
PO Box 203638
Austin, Texas 78720-3638

### 1.2.7 Provider Certification/Assignment

Texas Medicaid service providers are required to certify compliance with or agree to various provisions of state and federal laws and regulations. After submitting a signed claim to TMHP, the provider certifies the following:

- Services were personally rendered by the *billing provider* or under the personal supervision of the billing provider, if allowed for that provider type, or under the substitute physician arrangement.

- The information on the claim form is true, accurate, and complete.

- All services, supplies, or items billed were medically necessary for the client's diagnosis or treatment. Exception is allowed for special preventive and screening programs (for example, family planning and Texas Health Steps [THSteps]).

- Medical records document all services billed and the medical necessity of those services.

## 19.17  Hospitalization and ASC/HASC

Dental services performed in an ASC, hospital ambulatory surgical center (HASC), or a hospital (either as an inpatient or an outpatient) may be benefits of THSteps on the medical or behavioral justification provided, or if one of the following conditions exist:

- The procedures cannot be performed in the dental office.
- The client is severely disabled.

Contact the individual HMO for precertification requirements related to the hospital procedure. If services are precertified, the provider receives a precertification number effective for 90 days.

In those areas of the state with Medicaid Managed Care, precertification or approval is required from the client's HMO for anesthesia and facility charges. It is the dental provider's responsibility to obtain precertification from the client's HMO or managed care plan for facility and general anesthesia services.

To be reimbursed by the HMO, the provider must use the HMO's contracted facility and anesthesia provider. These services are included in the capitation rates paid to HMOs, and the facility/anesthesiologist risk nonpayment from the HMO without such approval. Coordination of all specialty care is the responsibility of the client's primary care provider. The primary care provider must be notified by the dentist and/or the HMO of the planned services.

Dentists providing sedation/anesthesia services must have the appropriate current permit from the TSBDE for the level of sedation/anesthesia provided.

The dental provider must be in compliance with the guidelines detailed in "Criteria for Dental Therapy Under General Anesthesia" on page 19-33.

**Note:** *Post-treatment authorization will not be approved for codes that require mandatory prior authorization.*

## 19.18  Orthodontic Services (THSteps)

Orthodontic services for cosmetic purposes only are not a benefit of the Texas Medicaid Program. Orthodontic services are limited to the treatment of severe handicapping malocclusion and other special medically necessary circumstances as outlined in Benefits and Limitations below.

### 19.18.1  Benefits and Limitations

Orthodontic services include the following:

- Correction of severe handicapping malocclusion as measured on the Handicapping Labiolingual Deviation (HLD) Index. Refer to page 19-42 for information on how to score the HLD. A minimum score of 26 points is required for full banding approval (only permanent dentition cases are considered).

*Exception: Retained deciduous teeth and cleft palates*

*with gross malocclusion that will benefit from early treatment. Cleft palate cases do not have to meet the HLD 26-point scoring requirement. However, it is necessary to submit a sufficient narrative and/or outline of the proposed treatment plan when requesting authorization for orthodontic services on cleft palate cases.*

- Crossbite therapy.
- Head injury involving severe traumatic deviation.

The following limitations apply for orthodontic services:

- Orthodontic services for cosmetic purposes only are not a benefit of the Texas Medicaid Program or THSteps.
- Orthognathic surgery, to include extractions, required or provided in conjunction with the application of braces must be completed while the client is Medicaid-eligible in order for reimbursement to be considered.
- Except for D8660, all orthodontic procedures require prior authorization for consideration of reimbursement.
- The THSteps client must be Medicaid/THSteps-eligible when authorization is requested and the orthodontic treatment plan is initiated. It is the provider's responsibility to see that the client has a current Medicaid Identification Form (Form H3087) or Medicaid Eligibility Verification Form (Forms H1027 and H1027-A-C) and that the date of birth on the form indicates the client is younger than 21 years of age and no limitations are indicated.
- Prior authorization is issued to the requesting provider only and is not transferable to another provider. If the client changes providers or if the provider stops practicing dentistry in the Texas Medicaid Program for whatever reason, a new prior authorization must be requested (see "Transfer of Orthodontic Services" on page 19-38).

The following procedure codes, policies, and limitations are applied to the processing and payment of orthodontic services under THSteps dental services:

- Procedure code D8660 is allowed when:
  - The client is referred to an orthodontist for a determination of whether orthodontic services are indicated and to determine the appropriate time to initiate such services.
  - The client is referred to an orthodontist and elects to receive services from another orthodontic provider because of justifiable reasons.
  - Repeat visits at different age levels are required to determine the appropriate time to initiate orthodontic treatment.
- Procedure code D8680 is payable for one retainer per arch, per lifetime, and may be replaced once because of loss or breakage (prior authorization is required).
- Procedure code D8670 should be billed only when an adjustment to the appliances is provided and may not be billed before the date the orthodontic adjustment was performed. The number of visits for monthly adjustments to the appliances is restricted to the number

CPT only copyright 2007 American Medical Association. All rights reserved.

that was authorized in the treatment plan. However, the number of monthly visits may be amended with appropriate documentation of medical necessity while the client is Medicaid eligible.

- Procedure code D8670 is paid only in conjunction with a history of braces (code D8080), unless special circumstances exist.
- All orthodontic codes and appliances are global fees.
- Separate fees for adjustments to retainers are not payable.
- The appropriate code should be billed for those appliances required as part of the treatment of cleft palate cases.

Special orthodontic appliances may also be used with full banding and crossbite therapy with approval by the TMHP Dental Director.

- Procedure codes D5951, D5952, D5953, D5954, D5955, D5958, D5959, and D5960 are to be used as applicable with documentation of medical necessity. Otherwise, use the appropriate special orthodontic appliance code.
- Full banding is allowed on permanent dentition only, and treatment should be accomplished in one stage and is allowed once per lifetime.

*Exception:* Cases of mixed dentition when the treatment plan includes extractions of remaining primary teeth or cleft palate.

- Crossbite therapy is allowed for primary, mixed, or permanent dentition.
- Providers must not request crossbite correction (limited orthodontics) for a mixed dentition client when there is a need for full banding in the adult teeth. Crossbite therapy is an inclusive charge for treating the crossbite to completion, and additional reimbursement is not provided for adjustments or maintenance.
- If a case is not approved, the dentist may file a claim for payment of the diagnostic work-up necessary to obtain the authorization using procedure codes D0330, D0340, D0350, and D0470. The dentist may receive payment under these procedure codes for no more than two cases out of every ten cases denied. The dentist should determine if the client's condition meets orthodontic benefit criteria before performing a diagnostic work-up.
- Procedure codes D8080, D8050, and D8060, are limited to one per lifetime.

## 19.18.2 Mandatory Prior Authorization

Prior authorization is required for all THSteps orthodontic services except for procedure code D8660. The prior authorization request must contain the date of service that the orthodontic records were produced. If the request is approved, the date that the records were produced is considered to be the date on which orthodontic treatment begins.

If orthodontic treatment is medically indicated, providers are responsible for obtaining prior authorization for a complete orthodontic treatment plan while the client is eligible for Medicaid and THSteps and younger than 21 years of age.

Prior authorization is a condition for reimbursement; it is not a guarantee of payment.

Upon receipt of prior authorization of complete treatment plans, providers are to advise clients that they will be able to receive the approved treatment services (e.g. orthodontic adjustments, bracket replacements and retainers), even if they lose Medicaid eligibility or reach 21 years of age. Approved orthodontic treatment must be initiated before the loss of Medicaid eligibility and completed within 36 months of the authorization date.

**Note:** *Providers must submit all orthodontic services for Medicaid Managed Care clients following these guidelines. STAR and STAR+PLUS are not responsible for orthodontic services.*

Requests for orthodontic services must be accompanied by all the following documentation:

- An orthodontic treatment plan. The treatment plan must include all procedures required to complete full treatment (such as, extractions, orthognathic surgery, upper and lower appliance, monthly adjustments, anticipated bracket replacements, appliance removal if indicated, special orthodontic appliances, etc.). The treatment plan should incorporate only the minimal number of appliances required to properly treat the case. Requests for multiple appliances to treat an individual arch are reviewed for duplication of purpose.
- Cephalometric radiograph with tracing models
- Completed and scored HLD sheet with diagnosis of Angle class (26 points required for approval of non-cleft palate cases).
- Facial photographs.
- Full series of radiographs or a panoramic radiograph; diagnostic-quality films are required (copies are accepted and radiographs will not be returned to the provider).
- Any additional pertinent information as determined by the dentist or requested by TMHP's Dental Director Requests for crossbite therapy require properly trimmed models to be retained in the office and must demonstrate the following criteria:
  - Posterior teeth. Not end to end, but buccal cusp of upper teeth should be lingual to buccal cusp of lower teeth.
  - Anterior teeth. The incisal edge of upper should be lingual to the incisal of the opposing arch.

The dentist should be certain that radiographs, photographs, and other information are properly packaged to avoid damage. TMHP is not responsible for lost or damaged materials.

### 19.18.3 Completion of Treatment Plan

If a client reaches 21 years of age or loses Medicaid eligibility before the authorized orthodontic treatment is completed, reimbursement is provided to complete the orthodontic treatment that was authorized and initiated while the client was younger than 21 years of age, eligible for Medicaid and THSteps, and completed within 36 months. Any orthodontic-related service requested (e.g., extractions or surgeries) must be completed before the loss of client eligibility. Services cannot be added or approved after Medicaid/THSteps eligibility has expired.

### 19.18.4 Premature Removal of Appliances

The overall fee for orthodontic treatment (D8080) includes the removal of orthodontic brackets and/or treatment appliances. Procedure code D7997 may be used only when the appliances were placed by a different provider with an unaffiliated practice (not a partner or office-sharing arrangement) and one of the following conditions exist:

- There is documentation of a lack of cooperation from the client.
- The client requests premature removal and a release form has been signed by the parent, guardian, or client if he is at least 18 years of age.

Providers must keep a copy of the release form on file and are responsible for this documentation during a review process.

### 19.18.5 Transfer of Orthodontic Services

Prior authorization issued to a dental provider for orthodontic services is not transferable to another dental provider. The new provider must submit to TMHP a new prior authorization request in order to be approved to complete the orthodontic treatment initiated by the original provider.

The following supporting documentation must accompany the new request for orthodontia services and must include the date of service the orthodontic records were produced:

- All of the documentation as required for the original provider.
- The reason the client left the previous provider, if known.
- An explanation of the treatment status.
- A compete treatment plan addressing all procedures for which authorization is being requested (such as the number of monthly adjustments or retainers required to complete the case).
- A full diagnostic work-up (D8080) with an HLD Index. The score of 26 points will be modified according to any progress achieved.

*Exception: The prior authorization requests for clients who initiate orthodontic services before becoming eligible for Medicaid do not require models or the HLD score*

*sheet, nor does the client have to meet the HLD Index of 26 points. However, a complete plan of treatment is required.*

*Note: Medicaid clients who initiate orthodontic services privately (e.g. pay out of pocket for the orthodontic workup and/or initial banding, etc.) while Medicaid eligible due to not meeting the HLD index 26-points, are not eligible to have their orthodontic services transferred to and reimbursed by Medicaid.*

To request prior authorization to complete the orthodontic treatment initiated by another provider, complete a THSteps Dental Mandatory Prior Authorization Request Form and send it with the complete plan of treatment and appropriate documentation for orthodontic services and/or crossbite therapy to the TMHP Dental Director at the following address:

Texas Medicaid & Healthcare Partnership
THSteps and ICF-MR Dental Authorization and Information
PO Box 202917
Austin, TX 78720-2917

### 19.18.6 Comprehensive Orthodontic Treatment

Comprehensive orthodontic services (procedure code D8080) are restricted to clients who are 12 years of age and older or clients who have exfoliated all primary dentition.

National procedure codes do not allow for any work-in-progress or partial billing by separating the three orthodontic components: diagnostic work-up, orthodontic appliance (upper), or orthodontic appliance (lower).

When billing for comprehensive orthodontic treatment, D8080, three local codes must be submitted as remarks codes along with code D8080. Local codes (Z2009, Diagnostic work-up approved, Z2011, Orthodontic appliance, upper, or Z2012, Orthodontic appliance, lower) are placed in the Remarks Code field on electronic claims or Block 35 on paper claims.

*Note: If the remarks code and procedure code D8080 are not submitted, the claim will be denied.*

Each remarks code pays the correct reimbursement rate which, when combined, totals the maximum payment of $775. D8080 must be billed on three separate details, with the appropriate remarks code, even if billing for the work-up and full banding. Billing only one detail for a total of $775 will not be accepted.

**Example 1:** A client is approved for full banding, but after the initial work-up, the client discontinues treatment. This provider would bill the national code D8080 and place the local code Z2009, Diagnostic work-up approved, in the Remarks/comment field. The claim would pay $175.

**Example 2:** A client is approved for full banding. The provider continues treatment and places the maxillary bands. The provider would bill the national procedure code D8080 and place the local code Z2009, Diagnostic work-up approved, and Z2011, Maxillary bands, in the Remarks/comment field. The claim would pay $475.

CPT only copyright 2007 American Medical Association. All rights reserved.

All electronic claims for D8080 must have the appropriate remarks code associated with the procedure code.

Providers should adhere to the following guidelines for electronic claim submission so that TMHP can accurately apply the correct remarks code to the appropriate claim detail.

A Diagnostic Procedure Code (DPC) remarks code must be submitted, only once, in the first three bytes of the NTE02 at the 2400 loop.

**Example 1:** For a claim with one detail, submitted with procedure code D8080 and remarks code Z2009, enter the information as follows: DPCZ2009. The total billed would be $175.

**Example 2:** For a claim with two details, where details one and two are procedure code D8080 and the remarks codes are Z2009 and Z2011, enter the information as follows: DPCZ2009Z2011. The total billed would be $475.

**Example 3:** For a claim with three details, where all three details are submitted separately with procedure code D8080, enter the remarks code based on the order of the claim detail as follows: DPCZ2009Z2011Z2012. The total billed would be $775.

This method ensures accurate and appropriate payment for services rendered and addresses the need for partial billing.

## 19.18.7 Orthodontic Procedure Codes and Fee Schedule

When submitting claims for orthodontic procedures, use the following procedure codes:

| Procedure Code | Limitations | Maximum Fee |
|---|---|---|
| **Orthodontic Services** | | |
| D0330*, D0340*, D0350*, and D0470* | When requested orthodontic cases are submitted for authorization and denied, two out of ten denials will be paid. These four procedure codes, when billed together for denied cases, replace local procedure code Z2010. | $100.00 |
| D7280 | A 1 - 20 | $62.50 |
| D7997* | Replaces Z2016. Not payable to the dentist who placed the appliance. Includes removal of arch bar and premature removal of braces. A 1 - 20 | $50.00 |
| **Interceptive Orthodontic Treatment** | | |
| D8050* | Replaces Z2018 and 8110D. Limited to one per lifetime. | $340.00 |
| D8060* | Replaces Z2018 and 8120D. Limited to one per lifetime. | $340.00 |
| D8080* | Replaces Z2009, Z2011, and Z2012. Limited to one per lifetime. | $775.00 |
| **Minor Treatment to Control Harmful Habits** | | |
| D8210* | See separate table for associated remarks field code. | See separate table |
| D8220* | See separate table for associated remarks field code. | See separate table |
| **Other Orthodontic Services** | | |
| D8660* | Replaces Z2008. | $15.00 |
| D8670* | Replaces Z2013. | $68.10 |
| D8680* | Replaces Z2014 and Z2015. | $100.00 |
| D8690* | Bracket replacement. | $20.00 |
| D8691 | Not considered medically necessary. | NC |
| D8692 | Limited to one service per arch per lifetime for each retainer. | NC |
| D8999 | | Manually priced |
| * = Services payable to an FQHC for a client encounter. | | |

## 19.19 Special Orthodontic Appliances

As with all orthodontic services, all removable or fixed special orthodontic appliances must be prior authorized. The prior authorization request must include both the national code and remarks code. However, prior authorization requests may omit the DPC prefix to the eight-digit remarks code.

All removable or fixed special orthodontic appliances must be billed with national procedure code D8210 or D8220. Dental models must be submitted when requesting prior authorization of a thumb-sucking or tongue thrust appliance. To ensure appropriate claims processing, the DPC remarks code (local procedure code) reflecting the specific service is also required. The appropriate remarks codes must be entered on the authorization request form. Failure to follow the following steps will cause the claims to deny. Failure to enter the DPC remarks code and the appropriate procedure code will not result in claim denial; however, manual intervention is required to process the claim, which may result in a delay of payment.

For paper claim submissions, providers must enter the local procedure code in Block 35 (Remarks) of the 2006 ADA claim form.

For electronic submissions, providers enter the DPC remarks code in the Comments field to ensure correct authorization, accurate records, and reimbursement.

For electronic submissions other than TexMedConnect or TDHconnect software submissions, providers must follow the steps below to ensure TMHP accurately applies the correct local procedure code to the appropriate claim detail:

1) The DPC prefix must be submitted, only once, in the first three bytes of the NTE02 at the 2400 loop.

2) In bytes 4-8, providers must submit the remark code (local procedure code) based on the order of the claim detail. Do not enter any spaces or punctuation between remark codes, unless to designate the detail is not billed with D8210 or D8220.

**Example:** *For a claim with three details, where details one and three are submitted with procedure code D8210 and detail two is not, enter the following information in the NTE02 at the 2400 loop: DPC1014D 1046D. (The space shows that detail two needs no local code.) If all details require a local code, enter DPC, no spaces, and the appropriate local codes.*

To submit using TexMedConnect or TDHconnect software, providers must enter the local code into the Remarks Code field, located under the details header. The Remarks Code field is the field directly after the Procedure Code field. TexMedConnect and TDHconnect software submitters are not required to manually enter the DPC prefix as it is placed in the appropriate field on the TexMedConnect or TDHconnect electronic claim.

The following table identifies the appropriate DPC remarks codes to use when requesting authorization or billing for procedure code D8210 or D8220:

| Procedure Code | Remarks Code | Remarks Code Description | Maximum Fee |
|---|---|---|---|
| | | **Special Orthodontic Appliances** | |
| D8220* | DPC1000D | Appliance with horizontal projections | $250 |
| D8220* | DPC1001D | Appliance with recurved springs | $250 |
| D8220* | DPC1002D | Arch wires for crossbite correction (for total treatment) | $595 |
| D8220* | DPC1003D | Banded maxillary expansion appliance | $375 |
| D8210* | DPC1004D | Bite plate/bite plane | $100 |
| D8210* | DPC1005D | Bionator | $100 |
| D8210* | DPC1006D | Bite block | $250 |
| D8210* | DPC1007D | Bite-plate with push springs | $250 |
| D8220* | DPC1008D | Bonded expansion device | $225 |
| D8210* | DPC1010D | Chateau appliance (face mask, palatal exp and hawley) | $300 |
| D8210* | DPC1011D | Coffin spring appliance | $275 |
| D8220* | DPC1012D | Crib | $100 |
| **\* = Services payable to an FQHC for a client encounter.** | | | |

CPT only copyright 2007 American Medical Association, All rights reserved.

| Procedure Code | Remarks Code | Remarks Code Description | Maximum Fee |
|---|---|---|---|
| D8210* | DPC1013D | Dental obturator, definitive (obturator) | $250 |
| D8210* | DPC1014D | Dental obturator, surgical (obturator, surgical stayplate, immediate temporary obturator) | $250 |
| D8220* | DPC1015D | Distalizing appliance with springs | $250 |
| D8220* | DPC1016D | Expansion device | $375 |
| D8210* | DPC1017D | Face mask (protraction mask) | $350 |
| D8220* | DPC1018D | Fixed expansion appliance | $375 |
| D8220* | DPC1019D | Fixed lingual arch | $225 |
| D8220* | DPC1020D | Fixed mandibular holding arch | $100 |
| D8220* | DPC1021D | Fixed rapid palatal expander | $375 |
| D8210* | DPC1022D | Frankel appliance | $100 |
| D8210* | DPC1023D | Functional appliance for reduction of anterior openbite and crossbite | $375 |
| D8210* | DPC1024D | Headgear (face bow) | $150 |
| D8220* | DPC1025D | Herbst appliance (fixed or removable) | $250 |
| D8220* | DPC1026D | Inter-occlusal cast cap surgical splints | $375 |
| D8210* | DPC1027D | Intrusion arch | $100 |
| D8220* | DPC1028D | Jasper jumpers | $100 |
| D8220* | DPC1029D | Lingual appliance with hooks | $100 |
| D8220* | DPC1030D | Mandibular anterior bridge | $175 |
| D8220* | DPC1031D | Mandibular bihelix (similar to a quad helix for mandibular expansion to attempt nonextraction treatment) | $100 |
| D8210* | DPC1032D | Mandibular lip bumper | $100 |
| D8220* | DPC1036D | Mandibular lingual 6x6 arch wire | $100 |
| D8210* | DPC1037D | Mandibular removable expander with bite plane (crozat) | $275 |
| D8210* | DPC1038D | Mandibular ricketts rest position splint | $375 |
| D8210* | DPC1039D | Mandibular splint | $225 |
| D8210* | DPC1040D | Maxillary anterior bridge | $175 |
| D8210* | DPC1041D | Maxillary bite-opening appliance with anterior springs | $100 |
| D8220* | DPC1042D | Maxillary lingual arch with spurs | $100 |
| D8220* | DPC1043D | Maxillary and mandibular distalizing appliance | $100 |
| D8220* | DPC1044D | Maxillary quad helix with finger springs | $325 |
| D8220* | DPC1045D | Maxillary and mandibular retainer with pontics | $175 |
| D8210* | DPC1046D | Maxillary Schwarz | $250 |
| D8210* | DPC1047D | Maxillary splint | $225 |
| D8210* | DPC1048D | Mobile intraoral Arch-Mia (similar to a Bihelix for nonextraction treatment) | $100 |
| D8220* | DPC1049D | Modified quad helix appliance | $275 |
| D8220* | DPC1050D | Modified quad helix appliance (with appliance) | $275 |
| D8220* | DPC1051D | Nance appliance | $100 |
| D8220* | DPC1052D | Nasal stent | $250 |
| D8210* | DPC1053D | Occlusal orthotic device | $175 |

* = Services payable to an FQHC for a client encounter.

CPT only copyright 2007 American Medical Association. All rights reserved.

| Procedure Code | Remarks Code | Remarks Code Description | Maximum Fee |
|---|---|---|---|
| D8210* | DPC1054D | Orthopedic appliance | $250 |
| D8210* | DPC1055D | Other mandibular utilities | $100 |
| D8210* | DPC1056D | Other maxillary utilities | $100 |
| D8220* | DPC1057D | Palatal bar | $225 |
| D8210* | DPC1058D | Post-surgical retainer | $125 |
| D8220* | DPC1059D | Quad helix appliance held with transpalatal arch horizontal projections | $275 |
| D8220* | DPC1060D | Quad helix maintainer | $275 |
| D8220* | DPC1061D | Rapid palatal expander (RPE), such as quad Helix, Haas, or Menne | $350 |
| D8210* | DPC1062D | Removable bite plate | $100 |
| D8210* | DPC1063D | Removable mandibular retainer | $100 |
| D8210* | DPC1064D | Removable maxillary retainer | $100 |
| D8210* | DPC1065D | Removable prosthesis | $175 |
| D8210* | DPC1066D | Sagittal appliance 2 way | $250 |
| D8210* | DPC1067D | Sagittal appliance 3 way | $350 |
| D8220* | DPC1068D | Stapled palatal expansion appliance | $375 |
| D8210* | DPC1069D | Surgical arch wires | $250 |
| D8210* | DPC1070D | Surgical splints (surgical stent/wafer) | $250 |
| D8210* | DPC1071D | Surgical stabilizing appliance | $250 |
| D8220* | DPC1072D | Thumbsucking appliance, requires submission of models | $175 |
| D8210* | DPC1073D | Tongue thrust appliance, requires submission of models | $100 |
| D8210* | DPC1074D | Tooth positioner (full maxillary and mandibular) | $325 |
| D8210* | DPC1075D | Tooth positioner with arch | $100 |
| D8220* | DPC1076D | Transpalatal arch | $100 |
| D8220* | DPC1077D | Two bands with transpalatal arch and horizontal projections forward | $175 |
| D8220* | DPC1078D | W-appliance | $275 |

\* = Services payable to an FQHC for a client encounter.

## 19.20 How to Score the Handicapping Labiolingual Deviation (HLD) Index

The orthodontic provider must complete and sign the diagnosis (Angle class).

### Cleft Palate

Submit a cleft palate case in the mixed dentition only if it can be justified in a narrative why there should be treatment before the client is in the full dentition.

*Note: Intermittent treatment requests may exceed the allowable 26 reimbursable treatment visits.*

### Severe Traumatic Deviations

Refers to facial accidents only. Points cannot be awarded for congenital deformity. Severe traumatic deviations do not include traumatic occlusions for crossbites.

### Overjet in Millimeters

Score the case exactly as measured, then subtract 2 mm (considered the norm), and enter the difference as the score.

CPT only copyright 2007 American Medical Association. All rights reserved.

# Appendix H

*European Journal of Orthodontics* 23 (2001) 153–167

© 2001 European Orthodontic Society

# Prevalence of malocclusion and orthodontic treatment need in children and adolescents in Bogota, Colombia. An epidemiological study related to different stages of dental development

Birgit Thilander*, Lucia Pena**, Clementina Infante**, Sara Stella Parada** and Clara de Mayorga**

*Göteborg University, Göteborg, Sweden and **Universidad Nacional de Colombia, Bogota, Colombia

SUMMARY The aim of the study was to assess the prevalence of malocclusion in a population of Bogotanian children and adolescents in terms of different degrees of severity in relation to sex and specific stages of dental development, in order to evaluate the need for orthodontic treatment in this part of Colombia. A sample of 4724 children (5–17 years of age) was randomly selected from a population that attended the Dental Health Service; none had been orthodontically treated. Based on their dental stages the subjects were grouped into deciduous, early mixed, late mixed and permanent dentition. The registrations were performed according to a method by Björk *et al.* (1964). The need for orthodontic treatment was evaluated according to an index used by the Swedish National Board of Health.

The results showed that 88 per cent of the subjects had some type of anomly, from mild to severe, half of them recorded as occlusal anomalies, one-third as space discrepancies, and one-fifth as dental anomalies. No clear sex differences were noted, except for maxillary overjet, spacing, tooth size (all more frequent in boys), and crowding (more frequent in girls). Occlusal anomalies and space discrepancies varied in the different dental developmental periods, as did tipped and rotated teeth.

Little need for orthodontic treatment was found in 35 per cent and moderate need in 30 per cent. A great need was estimated in 20 per cent, comprising children with prenormal occlusion, maxillary overjet, or overbite (>6 mm), posterior unilateral crossbite with midline deviation (>2 mm), severe crowding or spacing, congenitally missing maxillary incisors, impacted maxillary canines or anterior open bite (>3 mm in the permanent dentition). Urgent need for treatment was estimated to be 3 per cent, comprising subjects with extreme post- and pre-normal occlusion, impacted maxillary incisors or extensive aplasia.

## Introduction

The demand for orthodontic treatment is increasing in most countries. Therefore, rational planning of orthodontic measures on a population basis is essential in assessing the resources required for such a service. This stresses the importance of epidemiological studies in order to obtain knowledge about the prevalence of different types of malocclusions and the need for orthodontic treatment.

A large number of studies on the prevalence of malocclusion in different populations have been published (Table 1a). The reported incidences vary from 39 to 93 per cent, making it clear that the majority of children have irregular teeth and an occlusal relationship that differs from the ideal. This divergence in prevalence figures may

**Table 1a**  Prevalence (per cent) of malocclusion in children and adolescents in different ethnic groups.

| Authors | Population | Subjects | | Registration | % |
|---|---|---|---|---|---|
| | | No. | Age | | |
| Massler and Fränkel (1951) | Am. Caucasian | 2758 | 14–18 | Angle, modified | 78.9 |
| Altemus (1959) | Am. Negroes | 3289 | 12–16 | Angle, modified | 83.5 |
| Mills (1966) | Am. Caucasian | 1455 | 8–17 | Angle, modified | 82.5 |
| Grewe et al. (1968) | Am. Indians | 651 | 9–14 | Angle, modified | 65.4 |
| Helm (1968) | Danish | 1700 | 9–18 | Björk et al. | 78.5 |
| Helm (1970) | Danish | 3848 | 7–18 | Björk et al. DS | |
| Myllärniemi (1970) | Finnish | 1531 | 3–19 | Angle, subgroups | 38.9 |
| Wood (1971) | Eskimo | 100 | 11–20 | Angle, modified | 82.0 |
| Thilander and Myrberg (1973) | Swedish | 5459 | 7–13 | Björk et al. | 73.8 |
| Foster and Day (1974) | British | 1000 | 11–12 | Angle, modified | 59.9 |
| Ingervall and Hedegård (1975) | Skolt-Lapps | 200 | 8–16 | Angle, modified | 76.5 |
| Infante (1975) | Am. white/black Apache indian | 735 | 2–6 | Angle, modified | 31/21 48 |
| Magnússon (1976) | Icelandic | 1641 | 6–18 | Björk et al. DS | |
| Lavelle (1976) | British | 1000 | 15–20 | Björk et al., occl. space | |
| Garner and Butt (1985) | Am. Negroes | 445 | 13–15 | Angle, modified | 73.0 |
| | Kenyans | 505 | 13–14 | Angle, modified | 83.2 |
| Kerosuo et al. (1988) | Tanzanian | 642 | 11–18 | Björk et al. | 45.0 |
| Kerosuo et al. (1991) | Finnish | 458 | 12–18 | Björk et al. | 88.0 |
| Hensel (1991) | German | 408 | 3–10 | Angle, modified | 77 |
| Lew et al. (1993) | Chinese | 1050 | 12–14 | Foster and Day | 92.9 |
| Otuyemi and Abidoye (1993) | Nigerian | 574 | 12 | Björk et al. | |
| Harrison and Davis (1996) | Native Canadian | 1438 | 7–15 | Tooth relationship | 61.0 |
| Ng' ang' a et al. (1996) | Kenyan | 919 | 13–15 | Björk et al. | 72.0 |
| Trottman and Elsbach (1996) | Am. black, white | 238 | 3–5 | Angle, modified | 56/61 |
| Tschill et al. (1997) | French | 789 | 4–6 | FDI 1973 | 57.6 |
| Johannsdottir et al. (1997) | Icelandic | 396 | 6 | Björk et al. | 69 |

depend on differences for specific ethnic groups, but also on wide ranges in number, as well as in age among the subjects examined. However, differences in registration methods, i.e. the criteria for the recorded items, are probably the most important factor explaining these differences.

As will be seen from Table 1a, the methods used may be classified into the following categories:

1. Estimates of the *total frequency* of malocclusion. This is the simplest form of registration, based on a subjective judgement whether or not any specific malocclusion is present.

2. Methods based on *typological classification*, usually that by Angle (1907). Several investigators have emphasized that this classification is not sufficiently differentiated for epidemiological purposes and have

therefore supplemented Angle's classification by adding further classes (listed as Angle, modified in Table 1a).

3. Methods in which *single traits of malocclusion* are recorded on the basis of an evaluation of individual morphological variables, comprising *metric* and *qualitative* indices, e.g. the epidemiological registration of malocclusion developed by Björk et al. (1964).

4. Methods by which a *malocclusion index* is determined for each individual. Most such indices are intended for establishing the need of orthodontic treatment rather than affording information concerning the prevalence of given manifestations of malocclusion (Table 1b).

As will be seen from Table 1b, no fewer than eight different indices have been used to classify the need for orthodontic treatment. Furthermore, an

**Table 1b**   Orthodontic treatment need (per cent) in children and adolescents in different populations.

| Authors | Population | Subjects | | Registration | Need |
|---|---|---|---|---|---|
| | | No. | Age | | |
| Ingervall et al. (1972) | Swedish | 324 | 10 | Swe NBH | 75 |
| | | | | | 40 great |
| Myrberg and Thilander (1973) | Swedish | 5459 | 7–13 | Swe NBH | 73.8 |
| | | | | | 34 moderate |
| | | | | | 11 great |
| Hannuksela (1977) | Finnish | 1200 | 9 | Swe NBH | 60.2 |
| | | | | | 18 moderate |
| | | | | | 25.6 great |
| Hill (1992) | Scottish | 765 | 9–15 | MSI | 72 |
| Holmes (1992) | British | 955 | 12 | IOTN | 33 moderate |
| | | | | | 32 great |
| Steigman et al. (1983) | Israeli Arab | 803 | 13–15 | HMAR | 80 |
| | | | | | 30 moderate |
| | | | | | 12 great |
| Al-Emran et al. (1990) | Saudi Arab | 500 | 13–14 | Nor HS | 75.5 |
| Diagne et al. (1993) | Senegalese | 1708 | 11–19 | WHO | 32.6 |
| | | | | | 7.6 urgent |
| Burden and Holmes (1994) | British | 1920 | 11–12 | IOTN | 33 |
| Wheeler et al. (1994) | American | 3696 | 9–10 | Exam. | 47 white |
| | | | | | 35 black |
| | | | | | 40 others |
| Estioko et al. (1994) | Australian | 268 | 12–16 | DAI | 63.4 |
| | | | | | 18 severe |
| Shaw et al. (1995) | British | 333 | 11–12 | IOTN | 33 great |
| Bäßler-Zeltman et al. (1998) | German | 1020 | 9 | Swe NBH | 88 |
| | | | | | 32 moderate |
| | | | | | 32 great |

Swe NBH, Swedish National Board of Health (1967). MSI, Malocclusion Severity Index (Hill, 1992). IOTN, Index of Orthodontic Treatment Need (Brook and Shaw, 1989). HMAR, Handicapping Malocclusion Assessment Record (Salzmann, 1968). Nor HS, Norwegian Health Service (1986). WHO, World Health Organization (1989). Exam., based on orthodontic evaluation of need/no need. DAI, Dental Aesthetic Index (Cons et al., 1986).

index of treatment outcome, the PAR Index (Richmond et al., 1992), has been developed to evaluate treatment success.

An objective registration method is not sufficient to obtain reliable data on the prevalence of malocclusion. Orthodontic treatment, for instance, will have eliminated some types of malocclusions. It is therefore no longer possible to determine the prevalence of malocclusion in some populations, unaffected by orthodontic treatment.

Malocclusion studies have usually been based on grouping of the material by chronological age. Malocclusion, however, is a manifestation of morphological variations that are related to the development of the dentition, rather than to chronological age as such. As there are great individual variations in dental maturation, it seems logical to determine the prevalence of malocclusion for groups of different stages of dental development, rather than for different age groups.

In Colombia, South America, only one study of prevalence of oral health has been published (Moncada and Herazo, 1984). The whole country was divided into five areas for screening 10,968 subjects of both sexes and all ages. A few parameters regarding malocclussion (overjet, overbite, crossbite, diastema, and crowding) were included, but these data gave insufficient information for effective planning of orthodontic treatment.

The aim of the present study was therefore to assess the prevalence of malocclusion in a population of Bogotanian children and adolescents in terms of different degrees of severity in relation to sex, age, and different stages of dental development, in order to evaluate the need for orthodontic treatment in this part of Colombia.

## Subjects and methods

### Subjects

A sample of 4724 children (2353 girls and 2371 boys) (5–17 years of age) was randomly selected from a population that attended the Dental Health Service of the Paediatric Clinic of Colsubsidio in the centre of Bogota (Table 2). This Clinic is a new institution, organized for medical and dental health service for children (0–19 years of age) of different social background. Family origin, registered in order to determine the Colombian racial composition of the sample, was found representative of Bogotanians with an ancestry from the central part of the country (Figure 1).

The initial sample was designed to contain 5000 subjects with 384 children (192 girls and 192 boys) in each chronological age from 5 to 17 years of age. Difficulties arose, however, in



**Figure 1**  Map showing the area studied.

reaching all adolescents in the age groups 15–17 years, due to their schoolwork. Furthermore,

**Table 2**  Distribution of the 4724 subjects (N) related to chronological age. Number of children (n) and percentage (n/N × 100%).

| Age (years) | Girls | | Boys | | Total | |
|---|---|---|---|---|---|---|
| | n | % | n | % | n | % |
| 5 | 217 | 4.6 | 197 | 4.2 | 414 | 8.8 |
| 6 | 192 | 4.1 | 177 | 3.8 | 369 | 7.9 |
| 7 | 213 | 4.5 | 208 | 4.4 | 421 | 8.9 |
| 8 | 199 | 4.2 | 204 | 4.3 | 403 | 8.5 |
| 9 | 202 | 4.3 | 196 | 4.2 | 398 | 8.5 |
| 10 | 206 | 4.4 | 221 | 4.6 | 427 | 9.0 |
| 11 | 224 | 4.7 | 226 | 4.8 | 450 | 9.5 |
| 12 | 191 | 4.0 | 195 | 4.1 | 386 | 8.1 |
| 13 | 207 | 4.4 | 213 | 4.5 | 420 | 8.9 |
| 14 | 173 | 3.7 | 183 | 3.9 | 356 | 7.6 |
| 15 | 129 | 2.7 | 155 | 3.3 | 284 | 6.0 |
| 16 | 109 | 2.3 | 115 | 2.4 | 224 | 4.7 |
| 17 | 91 | 1.9 | 81 | 1.7 | 172 | 3.6 |
| Total | 2353 | 49.8 | 2371 | 50.2 | 4724 | 100 |

children who had previously had any kind of orthodontic treatment were excluded from the examination. Thus, the final sample was reduced to 4724 subjects. Children with clefts, syndromes, and systemic health disease were not included in this study, as those children are treated in special hospitals.

The subjects were also grouped by stage of dental development (DS), described by Björk et al. (1964), according to the variation in tooth eruption:

- deciduous teeth fully erupted (DS02);
- incisors erupting (DS1) and fully erupted (DS2);
- canines and premolars erupting (DS3) and fully erupted (DS4);
- first molars not fully erupted (DSM0) and fully erupted (DSM1);
- second molars fully erupted (DSM2).

Based on their dental stages the subjects were grouped into the following four developmental periods (Table 3):

(1) deciduous dentition (DS02);
(2) early mixed dentition (DS02M1, DS1M0, DS1M1, DS2M0, DS2M1);
(3) late mixed dentition (DS3M1, DS3M2, DS4M1);
(4) permanent dentition (DS4M2).

### Clinical examination

For each child, a registration chart related to malocclusions was designed, including all variables with their criteria, described in detail in a manual. Panoramic radiographs (not older than 1 month) were available for all children.

Before clinical registration, the examiners (four orthodontists) took part in a 3-day course on methods of clinical research and orthodontic diagnosis. They then had to pass an inter- and intra-observer calibration test on 15 plaster models with different types of malocclusion, in order to ensure accuracy and consistency of diagnosis. Finally, a pilot study on 50 children of different ages was performed before commencing the present investigation. The differences in the inter- and intra-observer tests were found not statistically significant ($P < 0.01$).

### Registration criteria

The registrations were performed according to a method evolved by Björk et al. (1964), i.e. a qualitative registration of occlusal, space and dental anomalies, which, by themselves or in combination, characterize malocclusions. The variables, with their criteria, were as follows:

### Occlusal anomalies
#### 1. Sagittal anomalies

1. Post-normal occlusion (distocclusion, Angle Class II).
2. Pre-normal occlusion (mesiocclusion, Angle Class III); >1/2 cusp width at the first molar. Migration due to extraction of deciduous molars was taken into account. In the case of extraction of first molars, the registration was

**Table 3** Grouping of the 4724 subjects according to specified stages of dental development. Number of children ($n$) and percentage ($n/N \times 100\%$).

| Dentition | Girls | | Boys | | Total | |
|---|---|---|---|---|---|---|
| | $n$ | % | $n$ | % | $n$ | % |
| Deciduous | 182 | 3.9 | 191 | 4.0 | 373 | 7.9 |
| Early mixed | 748 | 15.9 | 791 | 16.7 | 1539 | 32.6 |
| Late mixed | 667 | 14.1 | 704 | 14.9 | 1371 | 29.0 |
| Permanent | 756 | 16.0 | 685 | 14.5 | 1441 | 30.5 |

Deciduous: DS02; Early mixed: DS02M1, DS1M0, DS1M1, DS2M0, DS2M1; Late mixed: DS3M1, DS3M2, DS4M1; Permanent: DS4M2. DS according to Björk et al. (1964).

made on the second deciduous molars or canines.

3. Maxillary overjet (0 mm = edge-to-edge; 4–6 mm = moderate; >6 mm = severe).
4. Mandibular overjet (all four upper incisors in crossbite).
5. Bimaxillary protrusion (Angle Class I with lip strain over protruded teeth).

*2. Vertical anomalies*

1. Overbite (0 mm = edge-to-edge; 4–6 mm = moderate; >6 mm = severe).
2. Open bite, anterior (<3 mm = moderate; >3 mm = severe).
3. Open bite, lateral (lack of contact between at least two pairs of antagonists).

*3. Transversal anomalies*

1. Posterior crossbite (right, left, bilateral, occurrence of guidance was registered).
2. Scissors bite (right, left, bilateral).
3. Midline displacement (registered when >2 mm).

*Space discrepancies*

1. Crowding and spacing (anterior, posterior) recorded for the incisor segment and the canine-premolar segments of each jaw (1–3 mm = mild; 4–6 mm = moderate; >6 mm = severe).
2. Maxillary median diastema (recorded when >2 mm).

*Single tooth anomalies*

1. Ectopic eruption, impaction, supernumerary and congenitally missing teeth recorded from the panoramic radiographs.
2. Inverted incisors, canines.
3. Infra-occlusion (recorded for deciduous molars and first permanent molars).
4. Tipped teeth (>30 degrees) and rotated teeth (>45 degrees).
5. Variation in tooth size (microdontia, macrodontia).

*Orthodontic treatment need*

An effective organization and planning of orthodontic service within the dental health system at the Colsubsidio Paediatric Clinic requires not only prevalence figures of malocclusion, but, above all, data on the orthodontic treatment need. Therefore, a rough grouping of the treatment need was evaluated by one of the authors (BT) according to an index, used by the Swedish National Board of Health (1967) with some modifications as follows:

*Grade 1 (little need):* Minor deviations from normal occlusion of little cosmetic and/or functional significance, e.g. open bite with little anterior opening, mild crowding or spacing, mild rotations and tippings.

*Grade 2 (moderate need):* e.g. cosmetic and/or functionally disturbing proclined or retroclined incisors, deep bite without gingival irritation, moderate crowding or spacing, moderate anterior rotations or tippings.

*Grade 3 (great need):* e.g. anterior crossbite, deep bite with gingival irritation, extreme overjet or open bite, posterior crossbite and scissors bite with functional deviation, severe anterior crowding or spacing, impacted canines, cosmetically and/or functionally disturbing rotations or tippings.

*Grade 4 (urgent need):* cosmetic and/or functionally handicapping anomalies, e.g. extreme post- and pre-normal occlusion, extensive aplasia.

*Statistical analysis*

The ratio of the sample, as a maximum estimate of the proportion of occlusal, space, and single dental anomalies in the whole population, was calculated for the total sample and for girls and boys separately. For each of the different stages of dental development the number of children with the diagnosed anomaly ($n$) and its prevalence ($n/N \times 100$, where $N$ is the number of children examined) is given. Furthermore, the number of diagnoses per individual was calculated, and

some variables were defined in terms of mild, moderate, and severe so that assessment of their ratios in the sample could give rise to an estimate of the degree of severity and, hence, treatment need.

## Results

### Prevalence of malocclusion

#### Overall findings

As will be seen from Table 4, dentitions without any irregularity were found in 11.9 per cent. Thus, 88.1 per cent of the children had some type of anomaly, from mild to severe discrepancies. One or two anomalies were registered in 47 per cent, while 8.8 per cent of the children had five or more occlusal traits. In the children with some kind of anomaly, altogether 11,149 diagnoses were recorded (Table 5), half of them as occlusal anomalies, one-third as space discrepancies, and one-fifth as dental anomalies. No clear sex differences were noted, except for maxillary

**Table 4** Number and percentage of subjects according to number of anomalies.

| Number of malocclusions | Subjects | |
|---|---|---|
| | n | % |
| 0 | 560 | 11.9 |
| 1 | 1096 | 23.2 |
| 2 | 1125 | 23.8 |
| 3 | 932 | 19.7 |
| 4 | 594 | 12.6 |
| 5 | 265 | 5.6 |
| >5 | 152 | 3.2 |
| Total | 4724 | 100 |

**Table 5** Distribution and diagnoses, number (n) and percentage.

| Diagnoses | n | % |
|---|---|---|
| Occlusal anomalies | 5500 | 49.3 |
| Space discrepancies | 3686 | 33.1 |
| Dental anomalies | 1963 | 17.6 |
| Total | 11,149 | 100 |

overjet, overbite, spacing, tooth size (all more frequent in boys), and crowding (more frequent in girls) (Table 6). Furthermore, occlusal anomalies and space discrepancies varied in the different dental developmental periods (Table 7), as did tipped and rotated teeth.

### Occlusal anomalies

Post-normal occlusion (distocclusion), registered as Angle Class II, was recorded in 20.8 per cent (Class II division 1 in 14.9 per cent and Class II division 2 in 5.9 per cent). The prevalence increased with age until the late mixed dentition (up to 24.9 per cent) and then decreased in the permanent dentition (18.5 per cent). Class II division 1 was associated with maxillary overjet, which was the most common sagittal anomaly (25.8 per cent). A marked overjet (>6 mm), however, was recorded in only 3.4 per cent, most commonly in boys. Like post-normal occlusion, maxillary overjet increased in prevalence during the mixed dentition, but decreased in the permanent dentition.

Pre-normal occlusion (mesiocclusion), registered as Angle Class III, was recorded in 3.7 per cent, and, contrary to post-normal occlusion, showed increasing prevalence with age. It was associated with mandibular overjet (5.8 per cent), diagnosed as anterior crossbite and in approximately half of the subjects was caused by anterior guidance of the mandible by an acquired muscular reflex.

Bimaxillary protrusion also increased in prevalence with age, from 5.4 per cent in the early mixed dentition to 15.3 per cent in the permanent dentition.

Deep bite (21.6 per cent) was more common in boys, with the highest prevalence in the late mixed dentition. An extreme overbite (>6 mm) was recorded in only 1.8 per cent, also most frequently in boys. A deep bite was often associated with a Class II malocclusion.

An anterior open bite (9.0 per cent) was most frequent in the deciduous and early mixed dentitions (about 11 per cent), decreased in the late mixed dentition (6.2 per cent) and increased again in the permanent dentition (8.7 per cent). An open bite exceeding 3 mm in the adolescent period was registered in 4.2 per cent.

**Table 6** Prevalence of occlusal, space, and dental anomalies in the subjects (2353 girls and 2371 boys). Number of children with diagnosed anomaly (*n*) and prevalence given in per cent.

| Anomaly | Girls | | Boys | | Total | |
|---|---|---|---|---|---|---|
| | *n* | % | *n* | % | *n* | % |
| *Occlusal anomalies* | | | | | | |
| Sagittal | | | | | | |
| Post-normal (distocclusion) | 465 | 19.8 | 516 | 21.7 | 981 | 20.8 |
| Pre-normal (mesiocclusion) | 91 | 3.8 | 84 | 3.5 | 175 | 3.7 |
| Bimaxillary protrusion | 241 | 10.2 | 228 | 9.6 | 469 | 9.9 |
| Maxillary overjet >4 mm | 567 | 24.1 | 650 | 27.4 | 1217 | 25.8 |
| Mandibular overjet <0 mm | 135 | 5.7 | 137 | 5.8 | 272 | 5.8 |
| Vertical | | | | | | |
| Overbite >4 mm | 446 | 18.9 | 575 | 24.3 | 1021 | 21.6 |
| Anterior open bite | 220 | 9.3 | 205 | 8.6 | 425 | 9.0 |
| Transversal | | | | | | |
| Posterior crossbite | 117 | 5.0 | 99 | 4.2 | 216 | 4.6 |
| Scissors bite | 33 | 1.4 | 28 | 1.2 | 61 | 1.3 |
| Midline deviation >2 mm | 311 | 13.2 | 313 | 13.2 | 624 | 13.2 |
| *Space anomalies* | | | | | | |
| Crowding | 1296 | 55.1 | 1167 | 49.2 | 2463 | 52.1 |
| Spacing | 537 | 22.8 | 686 | 28.9 | 1223 | 25.9 |
| Median diastema >2 mm | 141 | 6.0 | 190 | 8.0 | 331 | 7.0 |
| *Dental anomalies* | | | | | | |
| Congenitally missing | 83 | 3.5 | 70 | 3.0 | 153 | 3.2 |
| Supernumerary | 35 | 1.5 | 52 | 2.2 | 87 | 1.8 |
| Inverted incisors, canines | 180 | 7.6 | 161 | 6.8 | 341 | 7.2 |
| Infra-occluded | 62 | 2.6 | 49 | 2.1 | 111 | 2.3 |
| Ectopic | 38 | 1.6 | 31 | 1.3 | 69 | 1.5 |
| Impacted | 82 | 3.5 | 64 | 2.7 | 146 | 3.1 |
| Tipped >30° | 176 | 7.5 | 153 | 6.5 | 329 | 7.0 |
| Rotated >45° | 218 | 9.3 | 202 | 8.5 | 420 | 8.9 |
| Tooth size (macro/microdontia) | 139 | 5.9 | 168 | 7.1 | 307 | 6.5 |

Of the *transverse anomalies*, a midline deviation (>2 mm) was registered in 13.2 per cent, increasing with age and being more frequent in the lower arch. It was often associated with space discrepancies and a posterior crossbite (unilateral in 3.5 per cent and bilateral in 1.1 per cent). Posterior crossbite was most frequent in the deciduous dentition (7.2 per cent).

*Space discrepancies*

As shown in Table 6, crowding in one or more segments was the most frequent of all anomalies recorded (52.1 per cent) and was more common in girls. As regards the different dental developmental stages, the crowding gradually increased from the early mixed to the young permanent dentition (Table 7). In most cases, it was bimaxillary, i.e. generalized crowding. In cases of

local crowding, it was observed in the anterior regions, more frequently in the lower arch, or in the posterior segments, associated with mesial migration of the first permanent molars. Migration of permanent molars (23.9 per cent) was due to carious defects or early extraction of deciduous molars. In most of the subjects the crowding was mild (1–3 mm, 35 per cent), while moderate and severe crowding (>4 mm in the anterior region or in the right or left posterior segments) was recorded in 17.1 per cent of the children (Table 8).

The prevalence of spacing was 25.9 per cent, i.e. it was half as common as crowding. Maxillary median diastema (2 mm or more; 7 per cent) is included in this figure. A median diastema was most common in the early mixed dentition (13.5 per cent), then decreased during dental development to 3.7 per cent in adolescents. Irrespective

**Table 7** Prevalence of different types of anomalies in the deciduous, early mixed, late mixed, and permanent dentitions, given in per cent of the different dentition samples (*N*).

| Anomaly | Deciduous (N = 373, %) | Early mixed (N = 1539, %) | Late mixed (N = 1371, %) | Permanent (N = 1441, %) |
|---|---|---|---|---|
| *Occlusal anomalies* | | | | |
| Sagittal | | | | |
| Post-normal (distocclusion) | 15.5 | 20.4 | 24.9 | 18.5 |
| Pre-normal (mesiocclusion) | 2.9 | 3.9 | 3.5 | 4.9 |
| Bimaxillary protrusion | 1.3 | 5.4 | 11.7 | 15.3 |
| Maxillary overjet >4 mm | 14.7 | 23.1 | 31.7 | 25.9 |
| Mandibular overjet <0 mm | 15.0 | 4.9 | 6.2 | 6.9 |
| Vertical | | | | |
| Overbite >4 mm | 18.0 | 17.4 | 29.7 | 19.2 |
| Anterior open bite | 10.7 | 11.4 | 6.2 | 8.7 |
| Transveral | | | | |
| Posterior crossbite | 7.2 | 4.0 | 3.7 | 3.9 |
| Midline deviation >2 mm | 6.7 | 8.8 | 16.4 | 16.6 |
| *Space discrepancies* | | | | |
| Crowding | 17.4 | 50.6 | 55.7 | 59.3 |
| Spacing | 19.5 | 15.1 | 18.5 | 23.0 |
| Median diastema >2 mm | 4.0 | 13.5 | 4.0 | 3.7 |
| *Dental anomalies* | | | | |
| Inverted incisors, canines | 5.9 | 6.1 | 8.8 | 7.3 |
| Tipped >30° | 3.0 | 3.2 | 6.5 | 12.4 |
| Rotated >45° | 2.4 | 4.2 | 9.2 | 15.3 |

Deciduous: DS02; Early mixed: DS02M1, DS1M0, DS1M1, DS2M0, DS2M1; Late mixed: DS3M1, DS3M2, DS4M1; Permanent: DS4M2. DS according to Björk *et al.* (1964).

**Table 8** Prevalence of crowding (mild, moderate, severe) in the different dental development stages. Number of children (*n*) and prevalence (*n/N* × 100%).

| Degree | Deciduous N = 373 | | Early mixed N = 1539 | | Late mixed N = 1371 | | Permanent N = 1441 | | Total N = 4724 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | n | % | n | % | n | % | n | % | n | % |
| Mild (1–3 mm) | 51 | 13.7 | 511 | 33.2 | 493 | 36.0 | 598 | 41.5 | 1653 | 35 |
| Moderate (4–6 mm) | 11 | 2.9 | 230 | 14.9 | 223 | 16.3 | 197 | 13.7 | 661 | 14 |
| Severe (>6 mm) | 3 | 0.8 | 38 | 2.5 | 47 | 3.4 | 61 | 4.2 | 149 | 3.1 |
| Total | 65 | 17.4 | 779 | 50.6 | 763 | 55.7 | 856 | 59.4 | 2463 | 52.1 |

of median diastema, local spacing was associated with congenitally missing teeth. Spacing in the posterior segments increased with age, due to extraction of permanent premolars and/or molars, as a result of caries.

*Dental anomalies*

The prevalences of the different dental anomalies demonstrated, as a whole, close

agreement between the sexes (Table 6). The children often showed more than one dental discrepancy.

Tipped (>30 degrees) and rotated teeth (>45 degrees) were the most common dental anomalies (7.0 and 8.9 per cent, respectively). The prevalences increased during occlusal development and reached their highest figures in the permanent dentition (Table 7). Tipped teeth were usually

observed in the posterior segments, associated with early extraction of deciduous molars, while rotated teeth were as frequent in the anterior as in the posterior regions, also associated with crowding.

Inversion of all four maxillary incisors was recorded as mandibular overjet (anterior crossbite) in 5.8 per cent, while single inverted incisors and canines were found in 7.2 per cent, with no difference between the dental stages. The lateral incisors were most often involved (5.8 per cent), followed by the central incisors and canines (0.7 per cent each).

Congenitally missing teeth (third molars excluded) were recorded in 3.2 per cent. The mandibular second premolar was the most affected tooth (0.9 per cent), followed by the lower incisor (0.7 per cent), the maxillary lateral incisor (0.6 per cent), the second maxillary premolar (0.5 per cent), and others (0.5 per cent). In 11 of the children (mainly boys), congenitally missing deciduous teeth were also recorded, all of them lateral incisors. In these subjects, the permanent successor was also congenitally missing.

Almost all supernumerary teeth were recorded as mesiodens (1.8 per cent), only a few as para- and disto-molars in the lower jaw.

Impacted teeth (third molars excluded) were recorded in 3.1 per cent. The maxillary canine was the most affected tooth (1.7 per cent), followed by premolars in both jaws (1.2 per cent), maxillary incisors and mandibular canines (0.1 per cent each). Of the ectopically erupted teeth (1.5 per cent), almost half were maxillary canines with a disturbed path of eruption, but not diagnosed as impaction.

Infra-occlusion of the first and second deciduous molars was recorded in 2 per cent in the early mixed dentition. Only 0.3 per cent of permanent molars were infra-occluded.

Deviation from normal dental morphology (6.5 per cent) was more frequent in boys. Microdontia was four times as common as macrodontia and consisted of peg-shaped teeth, in almost 90 per cent involving the maxillary lateral incisor. Macrodontia, on the other hand, usually affected the maxillary central incisors as shovel-shaped teeth.

## Orthodontic treatment need

It will be seen from Table 4 that no malocclusion traits were observed in 11.9 per cent of the subjects, and these children were registered as 'ideal' or 'normal' cases, i.e. children showing dentitions without any irregularity. Thus, 88.1 per cent of the subjects were considered to be in need of orthodontic treatment, from little to urgent need.

A rough grouping of the children in the four different grades of treatment need, used by the Swedish National Board of Health (Swe NBH) (Figure 2) showed that little need (Grade 1) was found among 35 per cent of the children. This category comprised subjects with minimal deviations from 'normality', i.e. children with overjet/overbite (<3 mm), mild crowding/spacing, infra-occlusion, supernumerary, or ectopic teeth.

The prevalence of moderate need (Grade 2) was estimated at 30 per cent and this was recorded for subjects with moderate crowding or spacing, maxillary overjet or overbite (4–6 mm), aesthetically disturbing bimaxillary protrusion, rotated and tipped maxillary incisors, or single inverted incisors/canines.

A great need (Grade 3) was estimated to be present in 20 per cent. This group consisted of subjects with mesiocclusion, inversion (two or three incisors), maxillary overjet or overbite (>6 mm), posterior unilateral crossbite with a



Figure 2   Orthodontic treatment need in the Bogotanian children and adolescents.

midline deviation (>2 mm), severe crowding or spacing, congenitally missing maxillary incisors, impacted maxillary canines, or anterior open bite (>3 mm in the permanent dentition).

The prevalence of urgent need (Grade 4) was estimated to be 3 per cent, comprising subjects with extreme distocclusion and mesiocclusion, impacted maxillary incisors, or extensive aplasia.

## Discussion

In this study, specific criteria for random subject selection were used and the racial composition of the sample was representative of Bogotanians with an ancestry from the central part of the country. The sample consisted of children and adolescents of different ages; none had been orthodontically treated, either by interceptive or by corrective measures. In studies of prevalences of malocclusion, the material should be obtained from a well-defined population, be large enough, and cover non-orthodontically treated children and adolescents of different ages. Thus, the present sample satisfies these requirements well.

The clinical registrations were based on the method evolved by Björk *et al.* (1964), a method that has been used in many studies during recent years (Table 1a) and, hence, allows objective comparisons of the presence of malocclusion in different populations. The examiners had to pass an inter- and intra-observer calibration test before the start of the study, which resulted in satisfactory conformity, and the risk of methodological misjudgements is consequently considered to be small.

The results showed that 88 per cent of the subjects had some type of anomaly, from mild to severe. Such a high prevalence is in agreement with most previous published studies using the same classification system (Table 1a). Many papers have used Angle's classificaton (1907) or various modifications of his system, which will jeopardize comparison of the total prevalence of malocclusion traits. However, as Table 1a clearly shows, racial differences do exist. It can also be seen that differences exist between chronological ages.

A few studies on prevalence of malocclusions in preschool children have been published (Table 1a), based on various classification systems. The numbers of children examined in the different studies are of about the same magnitude as for children in the deciduous group in the present investigation, so comparisons of some malocclusion traits may be made. Generally, the present study shows a lower prevalence of anterior open bite (10.7 per cent) and especially posterior crossbite (7.2 per cent), but a higher prevalence of crowding (17.4 per cent) than in Europeans and white Americans. The prevalences in Bogotanian preschool children are, however, closer to those of Indians and black Americans.

Sex differences in some malocclusion prevalences were demonstrated in the different dental stages. It is well known that there are developmental differences in tooth eruption time between boys and girls, as well as between individual children; some are 'early' and some 'late' throughout their occlusal development. This is also valid for the present sample, as the various dental stage groups comprised children of different ages. Due to these great individual variations, grouping by dental stage, rather than by chronological age would seem to increase the probability of detecting sex differences in malocclusion prevalence during the development of the dentition.

When comparing the prevalences of malocclusion in the three developmental stages (early mixed, late mixed, and permanent dentition), it must be taken into account that the present study is cross-sectional. Although the sample was sufficiently large to demonstrate changes in the prevalence of the anomalies from one dental stage to another, individual changes in the morphological variables could not be assessed. This would have required longitudinal collection of the material. Longitudinal follow-up of the present sample seems, however, to be impossible to perform due to social conditions in this region. However, the classification according to dental stage resulted in three groups of rather equal size, i.e. those of special interest from developmental aspects (early mixed, late mixed and young permanent dentition). It was clearly shown that changes in prevalences in the different dental periods occurred. Despite being cross-sectional in nature, the present study may thus

justify recommending the orthodontist to use this knowledge in orthodontic treatment planning.

Crowding was the most common anomaly and was recorded in 52.1 per cent, which is a higher figure than reported in other publications. In one-third of these subjects, the crowding was mild, but moderate or severe in 17 per cent. The prevalence increased from the early mixed to the permanent dentition. Plaque, caries lesions and extracted deciduous molars were of frequent occurrence. The occlusal development became negatively influenced due to mesial migration of the first permanent molars (25 per cent), which in turn caused deviation of the midline, tipped (>30 degrees) and rotated (>45 degrees) teeth. Thus, it cannot be excluded that poor dental health partly explains the high prevalence of crowding. A prophylactic oral hygiene programme is of greatest importance for this population and such a programme was commenced during this study. It would be of interest to find out if this decreases the prevalence of malocclusion, especially crowding.

The prevalences of occlusal anomalies agree on the whole with figures given in the literature for Europeans and white Americans. No marked sex difference was observed in the prevalence of Angle Classes II and III. However, differences between the developmental periods were observed, e.g. decreasing prevalences of Class II, but increasing prevalences of Class III, especially from the late mixed to the permanent dentition, a period of average mandibular growth spurt. Knowledge of the relationship between the growth patterns of the jaws and the development of the occlusion is essential for an understanding of the occurrence of sagittal malocclusions in different ages. It is well known from longitudinal cephalometric studies that mandibular prognathism increases in relation to the maxilla with age (Björk and Skieller, 1983). This explains why the prevalence of maxillary overjet decreased, but the prevalence of mandibular overjet increased during these periods.

Differences in the prevalences between Class III and mandibular overjet (3.7 and 5.8 per cent, respectively) indicate a functional anterior crossbite in 2.1 per cent, i.e. an anterior guidance of the mandible due to a muscular reflex. A

functional anterior crossbite generally shows a Class III molar relationship in the centric position, but a Class I relationship in the retruded position and should therefore be diagnosed as a Class I malocclusion according to Angle. Negligence of such a differential diagnostic principle may explain variations in Class III prevalences given in the literature. However, a high incidence of anterior crossbite in Class I, as well as in Class III malocclusions has been reported in Chinese and Indian schoolchildren, in the Chinese sample combined with crowding in the upper anterior region (50 per cent), as a result of retrognathic maxillary growth.

Of the vertical anomalies, deep bite (overbite >4 mm) was more than twice as frequent as anterior open bite. The prevalence of deep bite increased up to the late mixed dentition, which may be explained by the common use of extraction of deciduous molars, a procedure that will usually result in a collapsed dentition. Full eruption of the premolars and second molars aims to stabilize the occlusion, which may explain the decrease in the prevalence of deep bite in the permanent dentition. Another explanation is that during craniofacial growth the mandible will rotate in a backward direction (posterior according to Björk and Skieller, 1983), while the overjet will decrease. This hypothesis on mandibular backward rotation was confirmed by the fact that the anterior open bite increased from the late mixed to the permanent dentition. This is in agreement with cephalometric data from Inuit adolescents (showing open bite in 14 per cent), demonstrating a long lower face and high mandibular plane, characteristics that are associated with an open bite configuration. Anterior open bite is also frequent in black American adolescents; an overall prevalence of 10 per cent has been reported, compared with about 1 per cent in white American adolescents.

Bimaxillary protrusion is a characteristic finding in black populations, but prevalences from those and other populations are missing. Clinical experience, however, tells us that a subjective need and demand for orthodontic treatment exists in some populations, which also is true for the Bogotanian children. Bimaxillary protrusion, therefore, had to be one of the

malocclusion traits included in the present study. It was, however, difficult to distinguish between mild, moderate, and pronounced cases without cephalometric analysis. Therefore, only clinically observable traits of protrusion were noted, which, according to the Bogotanian orthodontic examiners, were not difficult to classify.

Posterior crossbite was registered in only 4.6 per cent, which is close to findings in rural Nigerian, Indian, and Chinese children, but much lower than in other populations, for which prevalences varying between 8 and 16 per cent have been reported. The great majority are unilateral, and often associated with forced guidance and mandibular midline deviation, which was also observed in the present study. It is generally considered that the influence of finger- and dummy-sucking is one aetiological factor of unilateral crossbite in the early dentition. One explanation for the low prevalence in the present sample might be that oral habits are rather rare among small Bogotanian children, who are usually breast-fed for at least the first year of life.

For the dental anomalies, no differences in frequencies were observed between boys and girls. Irrespective of congenitally missing teeth, the figures were of about the same magnitude as those given in previous publications. The congenital absence of 3.2 per cent of teeth in the present material is very low compared with the 6.0–8.5 per cent given in the literature. In the present study, only panoramic radiographs from subjects in the late mixed and permanent groups were used, to ensure that the lateral incisors and the premolars had reached such a maturation that they could be observed on the radiographs. A reduction in tooth form is a common sign in patients with congenitally missing teeth, and in the present sample conical or peg-shaped upper lateral incisors were seen in 4.8 per cent. Heredity is one of the most important aetiological factors in congenitally missing teeth as in reduction of tooth material. No extraction of permanent upper laterals or premolars had been carried out according to the dental examination charts of each child. Thus, heredity must explain the low prevalence of hypodontia in the Bogotanian population.

Some other occlusal traits also vary in frequency between the Bogotanian children and other populations. A mixture of races live in Colombia; Indians in the south, black people in the west and Caribbeans in the northern part of the country (Figure 1). Thus, it would be of great interest to repeat the present study in those areas, which might reveal racial differences.

The need for orthodontic treatment has been presented in the literature by means of different indices (Table 1b). In the present study, the classification by SweNBH was used as one of the authors is familiar with this index. This classification is a method of defining the severity or degree of traits, which are divided into four grades intended to define the urgency of treatment need. However, the dividing lines between the grades are somewhat vague, which may result in loss of reproducibility, especially among untrained examiners. Due to that fact, only a rough estimate by one of the authors was made from the registration charts at the end of the examination. Despite this, the overall objective need for orthodontic treatment in the Bogotanian sample seems to be of the same magnitude as has been described for other populations. However, differences exist between great, severe and urgent need in various populations, which cannot be attributed solely to the populations studied, but are also due to differences in the interpretation of the criteria when grading treatment need.

The number and severity of malocclusal traits may reflect the need and demand for orthodontic treatment in the individual case. However, an evaluation of the subjective need is not included in the SweNBH classification. Such information would require the use of other methods, e.g. the aesthetic component of IOTN according to a 10-point scale. The demand for treatment could be assessed by interviewing the children and their parents. The use of special methods to obtain information on subjective need for treatment and demand for such orthodontic care was, however, not realistic in the present study.

As for the need of treatment in different populations and cultures, there are usually several levels of treatment need based on socio-economic

and/or ethnic differences. Thus, orthodontic treatment need should be understood as a relative concept and, when expressed as a single figure, is not easily comparable between different cultures. However, as regards facial appearance, cultural factors have a strong effect, i.e. an anomaly judged as aesthetically unacceptable in one population may be acceptable and even a sign of beauty in another.

The need for orthodontic treatment seems to be great in the Bogotanian sample. Most of the major occlusal trends characterizing the young permanent dentition were detectable at early developmental stages, which suggests that development of the occlusion is a continuum. Consequently, the question will arise: When to start treatment? Prevention and early treatment in orthodontics are still controversial with respect to cost effectiveness analysis, and functional and psychological benefit. Although the present study has demonstrated a great and urgent need for orthodontic treatment (close to 25 per cent), oral hygiene aspects must be taken into consideration. Preventive programmes and early treatment of caries are still the best means of reducing the high prevalences of malocclusion traits, especially crowding. The question of the orthodontic treatment need therefore remains irrelevant as long as dental health care is neglected.

**Address for correspondence**

Professor Birgit Thilander
Department of Orthodontics
Faculty of Odontology
Box 450
SE 405 30 Göteborg
Sweden

**Acknowledgements**

The authors wish to thank Dr Luis Gabriel Duenas, chairman of the Dental Health Service of the Pediatric Clinic of Colsubsidio in Bogota, for placing his local facilities and staff at our disposal during the registration period. His support during the project is highly appreciated.

**References**

Al-Emran S, Wisth P J, Böe O E 1990 Prevalence of malocclusion and need for orthodontic treatment in Saudi Arabia. Community Dentistry and Oral Epidemiology 18: 253–255

Altemus L A 1959 Frequency of the incidence of malocclusion in American Negro children aged twelve to sixteen. Angle Orthodontist 29: 189–200

Angle E H 1907 Treatment of malocclusion of the teeth. Angle's system. S S White Dental Manufacturing Company, Philadelphia

Bäßler-Zeltmann S, Kretschmer I, Göz G 1998 Malocclusion and the need for orthodontic treatment in 9-year-old children. Survey based on the Swedish National Board of Health and Welfare Scale. Journal of Orofacial Orthopedics 59: 193–201

Björk A, Skieller V 1983 Normal and abnormal growth of the mandible. A synthesis of longitudinal cephalometric implant studies over a period of 25 years. European Journal of Orthodontics 5: 1–46

Björk A, Krebs A, Solow B 1964 A method for epidemiological registration of malocclusion. Acta Odontologica Scandinavica 22: 27–41

Brook P H, Shaw W C 1989 The development of an index of orthodontic treatment priority. European Journal of Orthodontics 11: 309–320

Burden D J, Holmes A 1994 The need for orthodontic treatment in a child population of the United Kingdom. European Journal of Orthodontics 16: 395–399

Cons N C, Jenny J, Kohaut F J 1986 DAI: Dental Aesthetic Index. College of Dentistry, University of Iowa, Iowa City

Diagne F, Ba I, Ba-Diop K, Yam A A, Ba-Tamba A 1993 Prevalence of malocclusion in Senegal. Community Dentistry and Oral Epidemiology 21: 325–326

Estioko L J, Wright F A C, Morgan M V 1994 Orthodontic treatment need of secondary schoolchildren in Heidelberg, Victoria: an epidemiologic study using the Dental Aesthetic Index. Community Dental Health 11: 147–151

Foster T D, Day A J W 1974 A survey of malocclusion and the need for orthodontic treatment in a Shropshire school population. British Journal of Orthodontics 3: 73–78

Garner L D, Butt M H 1985 Malocclusion in black Americans and Nyeri Kenyans. An epidemiologic study. Angle Orthodontist 55: 139–146

Grewe J M, Cervenka J, Shapiro B L, Witkop C J 1968 Prevalence of malocclusion in Chippewa Indian children. Journal of Dental Research 47: 302–305

Hannuksela A 1977 The prevalence of malocclusion and the need for orthodontic treatment in 9-year-old Finnish schoolchildren. Proceedings of the Finnish Dental Society 73: 21–26

Harrison R L, Davis D W 1996 Dental malocclusion in native children of British Columbia, Canada. Community Dentistry and Oral Epidemiology 24: 217–221

Helm S 1968 Malocclusion in Danish children with adolescent dentition: an epidemiologic study. American Journal of Orthodontics 54: 352–366

Helm S 1970 Prevalence of malocclusion in relation to development of the dentition. An epidemiological study of Danish school children. Acta Odontologica Scandinavica 28: Supplementum 58

Hensel E 1991 Untersuchungen zur Dysgnathieentwicklung von der ersten Dentition zum Wechselgebiß. Fortschritte der Kieferorthopädie 52: 353–358

Hill P A 1992 The prevalence and severity of malocclusion and the need for orthodontic treatment in 9-, 12-, and 15-year-old Glasgow schoolchildren. British Journal of Orthodontics 19: 87–96

Holmes A 1992 The prevalence of orthodontic treatment need. British Journal of Orthodontics 19: 177–182

Infante P F 1975 Malocclusion in the deciduous dentition in white, black, and Apache Indian children. Angle Orthodontics 45: 213–218

Ingervall B, Hedegård B 1975 Prevalence of malocclusion in young Finnish Skolt-Lapps. Community Dentistry and Oral Epidemiology 3: 294–301

Ingervall B, Seeman L, Thilander B 1972 Frequency of malocclusion and need of orthodontic treatment in 10-year old children in Gothenburg. Swedish Dental Journal 65: 7–21

Johannsdottir B, Wisth P J, Magnusson T E 1997 Prevalence of malocclusion in 6-year-old Icelandic children. A study using plaster models and orthopantomograms. Acta Odontologica Scandinavica 55: 398–402

Kerosuo H, Laine T, Kerosuo E, Ngassapa D, Honkala E 1988 Occlusion among a group of Tanzanian urban school-children. Community Dentistry and Oral Epidemiology 16: 306–309

Kerosuo H, Laine T, Nyyssonen V, Honkala E 1991 Occlusal characteristics in groups of Tanzanian and Finnish urban schoolchildren. Angle Orthodontist 61: 49–56

Lavelle C L B 1976 A study of multiracial malocclusion. Community Dentistry and Oral Epidemiology 4: 38–41

Lew K K, Foong W C, Loh E 1993 Malocclusion prevalence in an ethnic Chinese population. Australian Dental Journal 38: 442–449

Magnússon T E 1976 An epidemiologic study of occlusal anomalies in relation to development of the dentition in Icelandic children. Community Dentistry and Oral Epidemiology 4: 121–128

Massler M, Frankel J M 1951 Prevalence of malocclusion in children aged fourteen to eighteen years. American Journal of Orthodontics 37: 751–768

Mills L F 1966 Epidemiologic studies of occlusion IV. The prevalence of malocclusion in a population of 1455 school children. Journal Dental Research 45: 332–336

Moncada O, Herazo B 1984 Estudio nacional de salud de morbilidad oral. Anomalias dento-maxilo-faciales. Ministerio de Salud–Republica de Colombia. Chapter 7: 69–70

Myllärniemi S 1970 Malocclusion in Finnish rural children. An epidemiological study of different stages of dental development. Suomen Hammaslääkäriseuran Toimituksia Supplementum 5

Myrberg N, Thilander B 1973 Orthodontic need of treatment of Swedish schoolchildren from objective and subjective aspects. Scandinavian Journal Dental Research 81: 81–84

Ng'ang'a P M, Ohito F, Ögaard B, Valderhaug J 1996 The prevalence of malocclusion in 13- to 15-year-old children in Nairobi, Kenya. Acta Odontologica Scandinavica 54: 126–130

Norwegian Health Service 1986 Folketrygdens finansiering av tannhelsearbeid. Universitetsforlaget, Oslo NOU, 25

Otuyemi O D, Abidoye R O 1993 Malocclusion in 12-year-old suburban and rural Nigerian children. Community Dental Health 10: 375–380

Richmond S, Shaw W C, Roberts C T, Andrews M 1992 The PAR Index (Peer Assessment Rating): methods to determine outcome of orthodontic treatment in terms of improvement and standards. European Journal of Orthodontics 14: 180–187

Salzmann J A 1968 Handicapping malocclusion assessment to establish treatment priority. American Journal of Orthodontics 54: 749–765

Shaw W C, Richmond S, O'Brien K D 1995 The use of occlusal indices: a European perspective. American Journal of Orthodontics and Dentofacial Orthopedics 107: 1–10

Steigman S, Kawar M, Zilberman Y 1983 Prevalence and severity of malocclusion in Israeli Arab urban children 13 to 15 years of age. American Journal of Orthodontics 84: 337–343

Swedish National Board of Health 1967 Kungliga medicin-alstyrelsens cirkulär, Stockholm, MF No. 71

Thilander B, Myrberg N 1973 The prevalence of malocclusion in Swedish schoolchildren. Scandinavian Journal Dental Research 81: 12–20

Trottman A, Elsbach H G 1996 Comparison of malocclusion in preschool black and white children. American Journal of Orthodontics and Dentofacial Orthopedics 110: 69–72

Tschill P, Bacon W, Sonko A 1997 Malocclusion in the deciduous dentition of Caucasian children. European Journal of Orthodontics 19: 361–367

Wheeler T T, McGorray S P, Yurkiewicz L, Keeling S D, King G J 1994 Orthodontic treatment demand and need in third and fourth grade schoolchildren. American Journal of Orthodontics and Dentofacial Orthopedics 106: 22–33

Wood B F 1971 Malocclusion in modern Alaskan Eskimo. American Journal of Orthodontics 60: 344–354

World Health Organization 1989 International collaborative study of oral health outcomes (ICS II), document 2-oral data collection instrument and examination criteria. WHO, Geneva

# Appendix I

# R49 – tadlock spreadsheet

# ANTOINE SCORES - BY TOOTH

| # | Upper 3 | Upper 2 | Upper 1 | Upper 1 | Upper 2 | Upper 3 | Lower 3 | Lower 2 | Lower 1 | Lower 1 | Lower 2 | Lower 3 | Antoine HLD | Ectopic score | Tadlock HLD | Ectopic score |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 |  | 1 | 1 | 1 | 1 |  |  | 1 | 1 | 1 | 1 |  | 26 | 24 | 0 | 0 |
| 2 |  | 1 | 1 | 1 | 1 |  |  | 1 | 1 | 1 | 1 |  | 32 | 24 | 4 | 0 |
| 3 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |  |  |  |  | 1 | 26 | 24 | 2 | 0 |
| 4 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 38 | 36 | 11 | 6 |
| 5 |  | 1 | 1 | 1 | 1 |  |  | 1 | 1 | 1 | 1 |  | 27 | 24 | 9 | 0 |
| 6 |  | 1 | 1 | 1 | 1 |  |  | 1 | 1 | 1 | 1 |  | 27 | 24 | 1 | 0 |
| 7 |  | 1 | 1 | 1 | 1 |  |  | 1 | 1 | 1 | 1 |  | 32 | 24 | 19 | 0 |
| 8 |  | 1 | 1 | 1 | 1 |  |  | 1 | 1 | 1 | 1 |  | 35 | 24 | 5 | 0 |
| 9 |  | 1 | 1 | 1 | 1 |  |  | 1 | 1 | 1 | 1 |  | 27 | 24 | 10 | 0 |
| 10 |  |  |  |  |  |  |  |  |  |  |  |  | 0 | 0 | 6 | 0 |
| 11 |  | 1 | 1 | 1 | 1 |  |  | 1 | 1 | 1 | 1 |  | 27 | 24 | 5 | 0 |
| 12 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 36 | 36 | 7 | 3 |
| 13 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 36 | 36 | 0 | 0 |
| 14 |  | 1 | 1 | 1 | 1 |  | 1 | 1 | 1 | 1 | 1 | 1 | 33 | 30 | 2 | 0 |
| 15 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 55 | 36 | 28 | 0 |
| 16 |  | 1 | 1 | 1 | 1 |  | 1 | 1 | 1 | 1 | 1 | 1 | 36 | 30 | 13 | 0 |
| 17 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 39 | 36 | 3 | 0 |
| 18 |  | 1 | 1 | 1 | 1 |  |  | 1 | 1 | 1 | 1 |  | 28 | 24 | 10 | 0 |
| 19 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 40 | 36 | 16 | 0 |
| 20 | 1 | 1 | 1 | 1 | 1 |  |  | 1 | 1 | 1 | 1 |  | 29 | 27 | 7 | 0 |
| 21 |  | 1 | 1 | 1 | 1 |  |  | 1 | 1 | 1 | 1 |  | 30 | 24 | 9 | 0 |
| 22 | 1 | 1 | 1 | 1 | 1 | 1 |  |  | 1 | 1 |  |  | 28 | 24 | 3 | 0 |
| 23 |  | 1 | 1 | 1 | 1 |  |  | 1 | 1 | 1 | 1 |  | 28 | 24 | 9 | 0 |
| 24 |  | 1 | 1 | 1 | 1 |  |  | 1 | 1 | 1 | 1 |  | 29 | 24 | 1 | 0 |
| 25 |  | 1 | 1 | 1 | 1 |  |  |  | 1 | 1 | 1 |  | 27 | 24 | 1 | 0 |
| 26 | 1 | 1 | 1 |  | 1 |  |  |  | 1 | 1 | 1 |  | 31 | 21 | 12 | 0 |
| 27 |  | 1 | 1 | 1 |  |  |  | 1 | 1 | 1 | 1 |  | 29 | 24 | 3 | 0 |
| 28 |  | 1 | 1 | 1 |  |  |  | 1 | 1 | 1 | 1 |  | 28 | 24 | 0 | 0 |
| 29 |  | 1 | 1 | 1 | 1 |  |  | 1 | 1 | 1 | 1 |  | 29 | 24 | 5 | 0 |
| 30 |  | 1 | 1 | 1 | 1 |  |  | 1 | 1 | 1 | 1 |  | 28 | 24 | 3 | 0 |
| 31 |  | 1 | 1 | 1 | 1 |  |  | 1 | 1 | 1 | 1 |  | 26 | 24 | 5 | 0 |
| 32 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 44 | 36 | 15 | 0 |
| 33 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 48 | 36 | 12 | 0 |
| 34 | 1 | 1 | 1 | 1 | 1 |  |  | 1 | 1 | 1 | 1 |  | 30 | 27 | 7 | 0 |
| 35 |  | 1 | 1 | 1 | 1 |  |  | 1 | 1 | 1 | 1 |  | 31 | 24 | 6 | 0 |
| 36 |  | 1 | 1 | 1 | 1 |  |  | 1 | 1 | 1 | 1 |  | 29 | 24 | 10 | 0 |
| 37 |  |  | 1 | 1 |  | 1 |  | 1 | 1 | 1 | 1 |  | 29 | 21 | 15 | 6 |
| 38 | 1 | 1 | 1 | 1 | 1 | 1 |  |  |  |  |  |  | 26 | 18 | 4 | 0 |
| 39 |  | 1 | 1 | 1 | 1 |  |  | 1 | 1 | 1 | 1 |  | 27 | 24 | 7 | 0 |
| 40 |  | 1 | 1 | 1 | 1 |  | 1 | 1 | 1 | 1 | 1 | 1 | 33 | 30 | 4 | 0 |
| 41 |  | 1 | 1 | 1 | 1 |  |  | 1 | 1 | 1 | 1 |  | 30 | 24 | 7 | 0 |
| 42 |  | 1 | 1 | 1 | 1 |  |  | 1 | 1 | 1 | 1 |  | 28 | 24 | 12 | 6 |
| 43 |  | 1 | 1 | 1 | 1 |  |  | 1 | 1 | 1 | 1 |  | 27 | 24 | 1 | 3 |
| 44 |  |  |  |  |  |  |  |  |  |  |  |  |  |  | 11 | 0 |
| 45 | 1 | 1 | 1 | 1 | 1 |  |  | 1 | 1 | 1 | 1 |  | 31 | 27 | 0 | 0 |
| 46 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 36 | 36 | 4 | 3 |
| 47 |  | 1 | 1 | 1 | 1 |  |  | 1 | 1 | 1 | 1 |  | 35 | 24 | 8 | 0 |
| 48 |  | 1 | 1 | 1 | 1 |  |  | 1 | 1 | 1 | 1 |  | 32 | 24 | 7 | 0 |
| 49 |  | 1 | 1 | 1 | 1 |  | 1 | 1 | 1 | 1 | 1 | 1 | 34 | 30 | 7 | 0 |
| 50 |  | 1 | 1 | 1 | 1 |  |  | 1 | 1 | 1 | 1 |  | 27 | 24 | 12 | 0 |
| 51 |  |  |  |  |  |  |  |  |  |  |  |  |  |  | 4 | 0 |
| 52 | 1 | 1 | 1 | 1 | 1 | 1 |  |  |  |  |  |  | 29 | 18 | 3 | 0 |
| 53 |  |  |  |  |  |  |  |  |  |  |  |  |  |  | 1 | 0 |
| 54 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 36 | 36 | 1 | 0 |
| 55 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 39 | 36 | 7 | 3 |
| 56 |  | 1 | 1 | 1 | 1 |  |  | 1 | 1 | 1 | 1 |  | 30 | 24 | 6 | 0 |
| 57 |  | 1 | 1 | 1 | 1 |  |  | 1 | 1 | 1 | 1 |  | 35 | 24 | 4 | 0 |
| 58 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 36 | 36 | 11 | 0 |
| 59 |  | 1 | 1 | 1 | 1 |  | 1 | 1 | 1 | 1 | 1 | 1 | 30 | 30 | 0 | 0 |
| 60 |  | 1 | 1 | 1 | 1 |  |  | 1 | 1 | 1 | 1 |  | 30 | 24 | 6 | 0 |
| 61 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 36 | 36 | 11 | 6 |
| 62 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 36 | 36 | 14 | 0 |
| 63 | 1 | 1 | 1 | 1 | 1 | 1 |  |  |  |  |  |  | 26 | 18 | 10 | 0 |

# Appendix J

SOAH DOCKET NO. 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
HHSC-OIG CASE NO.: P2011131652384891

| | | |
|---|---|---|
| ANTOINE DENTAL CENTER, | § | BEFORE THE STATE OFFICE |
| *Petitioner* | § | |
| | § | |
| v. | § | OF |
| | § | |
| | § | |
| TEXAS HEALTH & HUMAN | § | ADMINISTRATIVE HEARINGS |
| SERVICES COMMISSION, OFFICE | § | |
| OF INSPECTOR GENERAL, | § | |
| *Respondent* | § | |
| | § | |

## HHSC-OIG's PROFFER OF REBUTTAL
## TESTIMONY FROM DR. LINDA ALTENHOFF

**TO THE HONORABLE ADMINISTRATIVE LAW JUDGES:**

COMES NOW the Texas Health and Human Services Commission, Office of Inspector General ("HHSC-OIG"), and requests the ability to recall Dr. Linda Altenhoff to offer rebuttal testimony. HHSC-OIG offers the following proffer of expected testimony from Dr. Altenhoff:

### PROFFER

Q:    Dr. Altenhoff, you are the same Linda Altenhoff who testified on day one of this hearing, correct?

A:    I am.

Q:    Have you been in attendance during all of the testimony given by the various witnesses?

A:    I have been.

Q:    Specifically, did you hear the testimony of Dr. Orr and Dr. Kanaan?

A:    I did.

1

000695

Q: Did you hear their testimony regarding the meaning of ectopic eruption as used by Texas Medicaid?

A: I did.

Q: Dr. Altenhoff, did Medicaid intend, at any time, for the term "ectopic eruption" to have a different meaning when used in the evaluation of Medicaid patients than is generally understood in the practice of dentistry?

A: No.

Q: Were dentists expected to employ the training and education they received as dentists in applying the terms used in the Provider Manual?

A: Yes.


## PRAYER

For these reasons, HHSC-OIG prays to be allowed to recall Dr. Linda Altenhoff for limited rebuttal testimony in keeping with the above proffer.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

JOHN B. SCOTT
Deputy First Assistant Attorney General

*Margaret Moore*

RAYMOND C. WINTER
State Bar No. 21791950
Chief, Civil Medicaid Fraud Division
(512) 936-1709
MARGARET MOORE
State Bar No. 14360050

2

Deputy Chief, Civil Medicaid Fraud Division
(512) 936-1319 direct dial

Assistant Attorneys General
P.O. Box 12548
Austin, Texas 78711-2548
(512) 499-0712 fax

*Dan Hargrove*

_____  _____

Dan Hargrove

State Bar No. 00790822

WATERS & KRAUS, LLP

3219 McKinney Avenue

Dallas, Texas 75204

(214) 357-6244   Telephone

(214) 357-7252   Facsimile

*Jim Moriarty*

_____

James Moriarty

State Bar No. 14459000

MORIARTY LEYENDECKER, PC

4203 Montrose Blvd, Suite 150

Houston, TX 77006

(713) 528-0700  Telephone

3

000697